Michael J. Garcia
United States Attorney for the
Southern District of New York
By:    Rua Kelly (MA 643351)
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2471



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>BANK OF CYPRUS PUBLIC COMPANY<br>LIMITED,<br><br><br>                    Defendant. | <u>COMPLAINT</u><br><br>07-CV-<br><br>07 CIV 9234 |

Plaintiff, the United States of America, by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, for its complaint alleges as follows:

1.    Defendant Bank of Cyprus Public Company Limited ("Bank of Cyprus" or the "Bank"), an international financial institution, violated United States money laundering provisions by knowingly concealing and disguising the nature, the location, the source, the ownership, and the control of proceeds of specified unlawful activity in furtherance of a fraud perpetrated against AremisSoft Corporation ("AremisSoft" or the "Company") by Lycourgos Kyprianou ("Kyprianou") and his co-conspirators. Kyprianou, the founder and former Chairman of the Board of Directors of AremisSoft, a company traded on the NASDAQ national exchange, engaged in a scheme in which he artificially inflated the price

1

of AremisSoft's publicly traded stock, used nominee companies to hold and sell the stock, misled the American investing public into thinking that the sales were genuine arms length transactions while concealing his illegal conduct, and laundered the funds obtained from defrauding American investors by means of inter-account transfers through accounts he controlled at Bank of Cyprus. From May 1999 through at least July 2005, Kyprianou, with the assistance and participation of Bank of Cyprus, controlled approximately 40 accounts at Bank of Cyprus' locations in Cyprus and in the United Kingdom and engaged in money laundering transactions, through those accounts, having an aggregate value of at least approximately $162 million.[1] As discussed in greater detail at paragraph 14, Kyprianou was indicted in the Southern District of New York in 2002 for the AremisSoft securities fraud, and is currently a fugitive believed to be living in Cyprus.

## NATURE OF THE ACTION

2.      This action is brought by the United States pursuant to 18 U.S.C. § 1956(b) to obtain monetary civil penalties for Defendant's violation of sections (a)(1), (a)(2) and (h) of 18 U.S.C. § 1956.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      Venue is proper in this District pursuant to 18 U.S.C. § 1956(i) because acts and omissions giving rise to the money laundering occurred within the Southern District of

---

[1] Due to the extensive and pervasive nature of Kyprianou's money laundering scheme, intended to conceal, mislead and frustrate the tracing of assets, Plaintiff is currently unaware of the full extent of the value of the money laundered through Bank of Cyprus and reserves the right, as additional evidence is uncovered, to amend the Complaint to increase the civil money judgment sought from Bank of Cyprus.

New York. These acts include the inside trading of stock by Kyprianou and his co-conspirators through New York-based brokerage accounts, the transfers of funds used for fraudulent purposes initiated by an AremisSoft director and officer based in New York, the participation by Kyprianou at board of directors meetings held in New York in which were discussed financial reports that Kyprianou and Poyiadjis knew to be false, and the wire transfers of tens of millions of United States dollars in fraudulently obtained proceeds through correspondent bank accounts located in New York. Among other things, the U.S. dollars laundered through Bank of Cyprus included proceeds from illegal insider trading sales of stock of AremisSoft, a U.S. public company traded on the U.S. NASDAQ exchange.

5.    This Court has personal jurisdiction over the Defendant, which maintains a representative office in this district, pursuant to 18 U.S.C. § 1956(b)(2); the New York Banking Law, §§ 200-b(2)(e) and 221-c; the Federal Reserve Act of 1913, 12 U.S.C. § 632; and the New York "long arm" statute, N.Y.C.P.L.R. § 302(a)(1).

## OVERVIEW OF THE AREMISSOFT FRAUD

6.    From in or about 1998 through July of 2001, Kyprianou and/or his co-conspirator and former AremisSoft co-CEO Roys Poyiadjis ("Poyiadjis"), and in conspiracy with others, caused AremisSoft, purportedly a leading international software company, to issue false and fraudulent public statements and regulatory filings representing to the investing public and regulators that AremisSoft's business, revenues and profits were experiencing rapid growth with annual revenues exceeding $100 million.

7.    In particular, and as part of their fraudulent conduct, Kyprianou and Poyiadjis, assisted by others, caused AremisSoft to announce publicly that it had acquired software companies with substantial revenues for prices totaling tens of millions of dollars when, in

reality, the acquired companies were small, with minimal revenues, and the prices paid were only a small fraction of the claimed amount. Similarly, Kyprianou and Poyiadjis, assisted by others, caused AremisSoft to publicly announce that it had entered into a contract worth $37.5 million with the Bulgarian Health Ministry, when the contract's value was no more than $3.9 million, and AremisSoft was paid only $1.7 million. In furtherance of the fraud, Kyprianou and Poyiadjis, assisted by others, fabricated books and records to give the false appearance that AremisSoft was generating the reported revenues. Kyprianou and Poyiadjis, for example, caused AremisSoft to report approximately $90 million in revenue that was almost entirely fictitious.

8.     The effect of these fraudulent misrepresentations was that the perceived value and profitability of AremisSoft was far higher than its actual value and profitability. As a result, the value of AremisSoft shares traded on the NASDAQ National Market were artificially inflated. Privy to this knowledge, Kyprianou, Poyiadjis and others secretly and illegally sold their AremisSoft shares at these inflated prices to investors who were not privy to such knowledge and believed the price paid to be fair and reasonable.

9.     Additionally, Kyprianou, as part of the scheme to acquire international software companies at publicly reported inflated values, siphoned the funds AremisSoft had set aside for the acquisition of these entities by directing at least $18 million to be wired to accounts under his control at Bank of Cyprus in Cyprus ("Bank of Cyprus (Cyprus)"). Kyprianou also routed approximately $21 million from AremisSoft into other accounts he controlled at Bank of Cyprus (Cyprus).

10.     In order to conceal his illegal conduct, Kyprianou and his co-conspirators engaged in a sophisticated money laundering scheme, employing numerous entities to hold

and sell their AremisSoft stock, and numerous bank accounts to hold and transfer the proceeds of their scheme. Kyprianou could not have succeeded without the knowing and substantial assistance provided by other individuals, entities, and financial institutions, and in this particular case, Kyprianou utilized Bank of Cyprus (Cyprus) and branches of Bank of Cyprus in England ("Bank of Cyprus UK") as a network to launder his ill-gotten proceeds in banking transactions with an aggregate value of at least approximately $162 million.

11.    By May 2001, worldwide attention began to focus on AremisSoft for reporting fraudulently inflated income. Specifically, on May 17, 2001, the *New York Times* reported that the true value of the AremisSoft contract with the Bulgarian government was less than $4 million, instead of the $37.5 million claimed by the Company. Moreover, at least one class action lawsuit had been filed against AremisSoft and its directors by May 24, 2001. At the same time, other international news organizations began reporting that Kyprianou and Poyiadjis fraudulently misrepresented the value and profitability of AremisSoft.

12.    When the truth about AremisSoft's financial condition and business was revealed, the price of AremisSoft's publicly held shares plummeted. By the time the fraud was uncovered in 2001, the investing public had sustained losses of approximately $500 million, plus interest.

13.    Trading in AremisSoft was halted by NASDAQ on July 30, 2001. On July 31, 2001, AremisSoft announced that it was delaying the release of its results indefinitely and that Kyprianou had resigned from the Company. NASDAQ delisted the Company's securities on August 29, 2001 due to, *inter alia*, the failure of the Company to file its Form 10-Q for the second quarter ending on June 30, 2001. During this period, the press coverage

of events with respect to the fraud accusations, class action lawsuits and AremisSoft's delisting were widespread and notorious throughout the world.

14.    On December 19, 2001, a federal grand jury in the Southern District of New York indicted Poyiadjis for securities fraud in connection with the AremisSoft fraud. On February 11, 2002, the Government obtained a restraining order as to certain of Poyiadjis's assets, including four bank accounts held in the Isle of Man in the names of Olympus Capital Investment, Inc. and Oracle Capital, Inc. On June 24, 2002, the grand jury returned a superseding indictment that charged Poyiadjis, Kyprianou, and M.C. Mathews ("Mathews"), the top AremisSoft executive in India, with securities fraud (both on the market and insider trading), money laundering, and conspiracy to commit securities fraud, money laundering, mail fraud and wire fraud.

15.    On March 15, 2002, AremisSoft filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq.

16.    Throughout the period of the AremisSoft fraud, Bank of Cyprus (Cyprus):

- maintained at least 40 accounts beneficially owned or controlled by Kyprianou and actively aided and abetted Kyprianou's fraudulent activities by enabling Kyprianou to use Bank of Cyprus accounts to launder the proceeds of his criminal conduct, knowing that Kyprianou was engaged in money laundering activities and theft of assets from AremisSoft;

- permitted the laundering of proceeds of the fraud through these approximately 40 accounts via transactions between intra-bank accounts that Kyprianou controlled or for which he was the beneficial owner;

- permitted Kyprianou, acting alone, to transfer tens of millions of dollars out of AremisSoft's corporate bank accounts from in or about 1999 in or about 2002, despite an AremisSoft corporate resolution requiring the signature of two authorized signatories for all transfers exceeding $200,000, and the Bank's knowledge of the resolution.

17.    From at least in or about 2001 until at least 2005, Bank of Cyprus UK:

- maintained at least more than 30 personal bank accounts of Kyprianou and his wife, Hermione Kyprianou, through which millions of dollars moved in and out in rapid succession;

- despite Kyprianou's indictment in 2002, continued to process transactions until at least in or about 2005 for the benefit of Kyprianou involving, in part, the proceeds of his fraudulent conduct;

- knowingly and continuously assisted Kyprianou's fraud and in the dissipation of the proceeds of the fraud.

## THE RELEVANT PARTIES

18.    Bank of Cyprus Public Company Limited, the operations of which include but are not limited to Bank of Cyprus (Cyprus) and Bank of Cyprus UK, maintains its headquarters at 51 Stassinos Street, Ayia Pareskevi, Strovolos, Nicosia, Cyprus. Through its branches and subsidiaries throughout the world, including in New York, Bank of Cyprus offers retail and commercial banking, finance, factoring, investment banking, brokerage, fund management, custody, and life and general insurance.

19.    Bank of Cyprus operates more than 260 branches throughout Cyprus, Greece and the United Kingdom. It also maintains a correspondent relationship with more than

2,300 banks, including most of the major international banking institutions. Bank of Cyprus also operates representative offices in New York, Canada, South Africa, Moscow and Romania.

20.     Bank of Cyprus operates in the United States through its New York representative office located at 80 Broad Street, 27th Floor, New York, New York, 10004 (the "New York Office"), which is licensed under the New York Banking Law, §§ 221A-221K. The New York Office is regulated, supervised and examined by the New York State Banking Department and the Board of Governors of the Federal Reserve System. New York-based correspondent banks through which Bank of Cyprus routes U.S. dollar transactions, including at all relevant times transactions in furtherance of Kyprianou's fraud and money laundering, include Bankers Trust (now Deutsche Bank Trust Company America), J.P. Morgan Chase Bank, Citibank N.A., and Bank of New York.

21.     AremisSoft was reincorporated in 1998 in the State of Delaware in the United States and had its principal place of business in the State of New Jersey. Beginning on April 22, 1999, AremisSoft's shares were publicly traded on the NASDAQ. The Company's main business was the development and sale of computer software technology. Kyprianou was the founder of AremisSoft and served from its inception as the Chairman of the Board of Directors and Chief Executive Officer ("CEO") until May 2000 and, together with Poyiadjis, as co-CEO from February 2001 to July 31, 2001, when Kyprianou resigned.

## RELATED ACTIONS

22.     On October 4, 2001, the SEC filed a civil enforcement action in this district in connection with the AremisSoft fraud. That action, 01 Civ. 8903 (CSH), alleges that the Company overstated the value of its contracts, revenue, and acquisitions while, at the same

time, Poyiadjis and Kyprianou engaged in massive insider trading. On October 22, 2001, the Honorable Charles S. Haight, Jr. issued an order, with the consent of AremisSoft, enjoining the Company and its officers from, among other things, making further false statements regarding its financial condition. The Court also granted an injunction freezing all assets of Poyiadjis and Kyprianou and ordering them to repatriate to the United States all proceeds of their sales of AremisSoft stock.

23.    On December 19, 2001, the United States Attorney for the Southern District of New York obtained an indictment against Poyiadjis in No. 01 Cr. 1177 (LTS), on one count of securities fraud.

24.    On March 22, 2002, the United States commenced a civil forfeiture action in this district, 02 Civ. 2319 (TPG), seeking to forfeit approximately $175 million in funds in bank accounts in the Isle of Man that had been restrained by the Attorney General of the Isle of Man at the request of the United States, and alleging that there was probable cause to believe the accounts contained proceeds of securities fraud and constituted property of money laundering (the "Civil Forfeiture Action"). On or about July 31, 2002, the Court entered judgment in favor of the United States ordering the funds to be forfeited.

25.    In or about January 2005, Poyiadjis, among other parties, entered a guilty plea to the Indictment, and reached a settlement of the Civil Forfeiture Action, whereby Poyiadjis agreed to forfeit to the United States and pay the AremisSoft Liquidating Trust a total of € 151,768,098.35 (which equaled approximately $200 million U.S. dollars at the exchange rate in effect on January 7, 2005), representing all of the proceeds from Poyiadjis's individual sales of AremisSoft stock, plus interest. The AremisSoft Liquidating Trust was formed in 2002 pursuant to orders by the Honorable Joel A. Pisano, United States District Judge for the

District of New Jersey, and represents the claims of AremisSoft as well as those of the Company's former shareholders.

26.    On September 15, 2005, the AremisSoft Liquidating Trust filed a civil complaint against Bordier et Cie and Dominick Company AG, 05 Civ. 4520 (JAP), in the District of New Jersey alleging aiding and abetting breach of fiduciary duty and violations of Swiss money laundering statutes. The Honorable Joel A. Pisano determined that the action was preempted under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb. On December 11, 2006, the AremisSoft Liquidating Trust appealed the matter to the United States Court of Appeals for the Third Circuit. Oral argument is tentatively scheduled for November 2007.

27.    On March 3, 2006, the AremisSoft Liquidating Trust filed a civil complaint in this district against UBS AG, 06 Civ. 1736 (CSH), alleging aiding and abetting breach of fiduciary duty and violations of Swiss money laundering statutes.

28.    On March 21, 2006, the SEC filed a civil complaint in this district against AremisSoft's former Cypriot-based outside auditor and an accountant for violations of the anti-fraud provisions of the federal securities laws, 06 Civ. 2223 (CSH). This action is pending before the Honorable Charles S. Haight, Jr.

29.    On April 12, 2006, the SEC filed a second civil complaint concerning AremisSoft's former auditors, this one against AremisSoft's former UK-based outside auditor and that firm's principal auditor for AremisSoft, No. 06 Civ. 2853 (CSH). On April 18, 2007, the Court entered final judgment requiring payment of approximately $2.4 million in penalties and disgorgement.

30.     On June 8, 2006, the AremisSoft Liquidating Trust filed a civil complaint in this district against Lloyds TSB Bank plc, 06 Civ. 4335 (CSH), alleging aiding and abetting breach of fiduciary duty, aiding and abetting fraud, fraud, negligent misrepresentation, and violations of Swiss money laundering statutes. On August 15, 2007, the Honorable Charles S. Haight, Jr. granted the defendant's motion to dismiss on the ground of *forum non conveniens*. The AremisSoft Liquidating Trust has filed a motion to reconsider the Court's decision.

31.     On September 1, 2006, the AremisSoft Liquidating Trust filed a civil complaint in this district against Bank of Cyprus Public Company Ltd., 06 Civ. 6673 (CSH), alleging aiding and abetting breach of fiduciary duty, constructive trust, breach of contract, breach of implied covenant of good faith and fair dealing, and negligence. On August 15, 2007, the Honorable Charles S. Haight, Jr. granted the defendant's motion to dismiss on the ground of *forum non conveniens*. The AremisSoft Liquidating Trust has filed a motion to reconsider the Court's decision.

## BANK OF CYPRUS' KNOWLEDGE AND PARTICIPATION IN THE MONEY LAUNDERING SCHEME

32.     Bank of Cyprus and Kyprianou[2] had a long-standing relationship dating back to 1988. From that time through at least 2005, Kyprianou owned or controlled at least 70 accounts at branches in Cyprus and England. Beginning in 1999, Kyprianou opened

---

[2] Kyprianou is part of a wealthy and influential family of Cypriots. He is the nephew of Spyros Kyprianou, the founder of the Democratic Part of Cyprus and the republic's former president. Kyprianou's cousin was the Minister of Finance in Cyprus and currently serves as the European Commissioner for Health and Consumer Protection. In addition, Kyprianou's wife is the daughter of Solon Zevlaris, one of Cyprus' leading business figures and the owner of a major Cypriot insurance company. Both Kyprianou and Zevlaris are reputed to be among the wealthiest Cypriots residing in Cyprus, and Kyprianou and his wife own the largest private residence in the country.

accounts at Bank of Cyprus (Cyprus) for AremisSoft, and he controlled yet other accounts in the names of off-shore entities which received large deposits from AremisSoft.

33.    Throughout this period, Bank of Cyprus (Cyprus) allowed Kyprianou to conduct approximately 100 large transactions in rapid succession, transferring monies from AremisSoft accounts to accounts of third-parties controlled by Kyprianou, and then back to Kyprianou's personal accounts, all of which were maintained at the same branch of Bank of Cyprus. In other instances, Bank of Cyprus permitted Kyprianou to siphon millions from AremisSoft through accounts at the Bank and then to Kyprianou's personal accounts at other financial institutions. Likewise, Bank of Cyprus (Cyprus) disregarded AremisSoft corporate resolutions prohibiting transfers exceeding $200,000 without the signature of either Mathews or Noel Voice ("Voice"), AremisSoft's Chief Operating Officer, Secretary and director at the time, and routinely allowed Kyprianou to make multi-million dollar transfers in and out of AremisSoft's Bank of Cyprus (Cyprus) accounts on his sole authorization. At least $38 million of the funds laundered were derived from sources in the United States. In addition, all of the United States dollar transactions involving AremisSoft and all of Kyprianou's alter ego accounts at the Bank of Cyprus from 1999 through 2003 were facilitated through correspondent banks located in the United States.

34.    Instead of exercising caution and due diligence as to these suspicious transactions, which bore all the classic hallmarks of money laundering, Bank of Cyprus disregarded its obligations under, at least, Cyprus' Prevention and Suppression of Money Laundering Activities Law (1996) (the "Cyprus Money Laundering and Activities Law") and knowingly assisted Kyprianou in the indiscriminate laundering of the AremisSoft fraud proceeds through the dozens of accounts he controlled at the Bank.

35.    The Cyprus Money Laundering and Activities Law criminalizes money laundering and requires all banks operating in Cyprus to implement strict procedures for preventing the use of their services for money laundering. Cypriot banks, including the Bank of Cyprus (Cyprus), are required to implement procedures for customer identification, record keeping and internal reporting, as well as to ensure that their employees are aware of their obligations under the law and receive adequate training to assist them in recognizing money laundering transactions. Further, the Cyprus Money Laundering and Activities Law is in conformity with the European Union's Directives on the prevention of the use of the financial system for the purpose of money laundering (Directive 91/308/EEC as amended by Directive 2001/97/EC), and the Council of Europe's 1990 Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime.

36.    Similarly, the United Kingdom's Money Laundering Regulations 1993 (revised in 2003) (the "UK Money Laundering Regulations") require banks located in the UK, including Bank of Cyprus (UK), to comply with strict identification, record-keeping, and internal reporting procedures with respect to suspicious financial transactions. Moreover, if a money laundering offense under these regulations committed by a bank is shown to have been committed with the consent or the connivance of an officer, or to be attributable to any neglect on his or her part, the officer, as well as the bank, would be guilty of an offense.

37.    These money laundering laws apply to all financial intermediaries and impose obligations on banks to properly identify their customers and to exercise due diligence if faced with circumstances suggesting money laundering. Among the core principles of both the Cyprus and UK laws is to "know your customer." It is not sufficient for banks and other

financial institutions to merely request an individual's passport or driver's license or a corporation's records in order to verify the identity of the customer opening the account. Rather, due diligence must be conducted to ascertain whether the assets deposited in the account belong to the contracting party or some third party. In circumstances where it appears that the contracting party is not the beneficial owner of the assets, the bank must take steps to clarify the identity of the beneficial owner or refrain from opening an account.

38.    These respective money laundering regulations also impose certain obligations on banks that are triggered when a customer's transactions bear certain characteristics that suggest that he or she is engaging in money laundering. Among other things, banks must conduct further investigation where the economic justification for a particular transaction is not discernible or which may not make any economic sense where assets are withdrawn shortly after being deposited and there is no plausible reason for such an immediate withdrawal, or where the transactions are incompatible with the knowledge and experience of the bank concerning the customer and the stated purpose of the relationship.

39.    In such circumstances, the bank is required to investigate and exercise diligence to determine whether any economic justification exists for the suspicious transactions. In certain situations, the bank may be required to freeze the account without notifying the customer and further, at times, report the activity to government officials.

40.    In contravention of these laws and regulations, the Bank of Cyprus -- both in Cyprus and the UK -- unlawfully and knowingly conspired with Kyprianou to engage in at least 100 money laundering transactions with an aggregate value of more than $162 million. By no later than 2000, Bank of Cyprus was aware of Kyprianou's money laundering activities as a result of his multi-million dollar transfers of AremisSoft funds into other

accounts at Bank of Cyprus, as well as the rapid transfers of millions of dollars between several accounts that knew Kyprianou controlled. Notably, Kyprianou's financial transactions at Bank of Cyprus, all of which related to the proceeds of his underlying unlawful activities, continued after news of the fraud broke in the worldwide press in May 2001. Still other transactions occurred at Bank of Cyprus after Kyprianou was indicted by the U.S. Government. These financial transactions were a critical part of the overall unified scheme to defraud U.S. investors of over $500 million and represent the continuing offense over many years.

41.    The specified unlawful activities that Kyprianou engaged in, for which he was ultimately indicted, included securities fraud, wire fraud, mail fraud and money laundering. Bank of Cyprus enabled and permitted Kyprianou to transfer the proceeds of his crimes through his accounts, in transactions with an aggregate value of more than $162 million. Bank of Cyprus also facilitated Kyprianou's money laundering activities at other financial institutions. These transactions included large wire transfers with a multitude of banks worldwide, including, but not limited to, the following:

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 1 | 3-May-99 | 800,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Semark Consultancy Services Ltd., Bank of Cyprus (Diagorou), account ████02-06 |
| 2 | 13-Jul-99 | 1,040,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████84-06 |
| 3 | 27-Dec-99 | 3,616,960.00 | Semark Consultancy Services, Bank of Cyprus, account ████47-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████50-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 4 | 27-Dec-99 | 1,735,335.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd., Bank of Cyprus (Strovolos), account ███47-06 |
| 5 | 27-Dec-99 | 952,874.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd., Bank of Cyprus (Strovolos), account ███47-06 |
| 6 | 28-Dec-99 | 188,789.00 | Semark Consultancy Services Ltd., Bank of Cyprus (Strovolos), account ███████47-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███50-06 |
| 7 | 19-Jan-00 | 190,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd., Bank of Cyprus (Strovolos), account ███47-06 |
| 8 | 10-Feb-00 | 10,945,458.00 | Bartel Eng, Wells Fargo Bank | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███84-06 |
| 9 | 18-Feb-00 | 2,000,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███████84-06 | Lion Enterprises Limited, Barclays Bank Plc (London), account ███3877 |
| 10 | 18-Feb-00 | 2,551,390.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███████84-06 | Cronos Capital, Cyprus Popular Bank, account ███0274 |
| 11 | 21-Feb-00 | 1,262,767.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ███████60-06 |
| 12 | 23-Feb-00 | 2,499,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███████84-06 | HSBC UK account ███5151 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 13 | 14-Apr-00 | 2,000,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 14 | 14-Apr-00 | 2,000,000.00 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ████60-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 15 | 14-Apr-00 | 3,999,975.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 | Quantum Group Mgmt Ltd., Bordier & Cie, account ████0.840 |
| 16 | 19-Apr-00 | 1,200,000.00 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ████60-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 17 | 20-Apr-00 | 999,970.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 | Quantum Group Mgmt Ltd., Bordier & Cie, account ████0.840 |
| 18 | 5-May-00 | 1,500,000.00 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ████60-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████50-06 |
| 19 | 10-May-00 | 1,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 20 | 10-May-00 | 1,499,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 | HSBC UK account ██5151 |
| 21 | 31-May-00 | 30,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | HSBC UK account ██5151 |
| 22 | 2-Jun-00 | 40,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Easton Services Ltd, European Popular Bank (Athens) |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 23 | 29-Jun-00 | 30,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 24 | 7-Jul-00 | 250,000.00 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ██████23-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████50-06 |
| 25 | 12-Jul-00 | 23,688.05 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 26 | 26-Jul-00 | 30,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 27 | 3-Aug-00 | 799,500.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████████84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████50-06 |
| 28 | 8-Aug-00 | 1,553,000.00 | Quantum Group Mgmt Ltd., Bordier & Cie, account █████████0.840 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████84-06 |
| 29 | 16-Aug-00 | 1,499,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████████84-06 | HSBC UK account ████5151 |
| 30 | 17-Oct-00 | 2,533,175.00 | Emerging Markets Capital Ltd., Dominick Co., account █████████03.33 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████84-06 |
| 31 | 20-Oct-00 | 1,999,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████████84-06 | HSBC UK account ████5151 |
| 32 | 6-Nov-00 | 365,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████02-01 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████84-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 33 | 15-Nov-00 | 4,012,488.00 | Emerging Markets Capital Ltd., Dominick Co., account ▮03.33 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ▮84-06 |
| 34 | 20-Nov-00 | 399,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ▮84-06 | HSBC UK account ▮5151 |
| 35 | 14-Dec-00 | 500,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ▮84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 |
| 36 | 14-Dec-00 | 154,500.00 | L. & E. Kyprianou HSBC Joint Account ▮5151 | S. & H. Zevlaris & M. Miltiadou & E. Kyprianou account at Bank of Cyprus UK ▮0-751 |
| 37 | 21-Dec-00 | 6,000,043.00 | Lloyds TSB Lady Moura ▮0-110 | Bank of Cyprus UK Aremis Holdings ▮9110 |
| 38 | 27-Dec-00 | 2,493,766.80 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ▮84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 |
| 39 | 27-Dec-00 | 2,500,000.00 | Semark Consultancy Services, Bank of Cyprus, account ▮08-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 |
| 40 | 27-Dec-00 | 1,444,498.00 | Semark Consultancy Services, Bank of Cyprus, account ▮08-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 |
| 41 | 27-Dec-00 | 2,413,464.42 | Semark Consultancy Services, Bank of Cyprus, account ▮08-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 |
| 42 | 27-Dec-00 | 2,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ▮50-06 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ▮76-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 43 | 27-Dec-00 | 2,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████████50-06 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ███████76-06 |
| 44 | 27-Dec-00 | 2,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████████50-06 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ███████76-06 |
| 45 | 27-Dec-00 | 2,400,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████████50-06 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ███████76-06 |
| 46 | 27-Dec-00 | 1,000,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████████50-06 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ███████76-06 |
| 47 | 27-Dec-00 | 2,500,000.00 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ██████76-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ████████08-06 |
| 48 | 27-Dec-00 | 2,500,000.00 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ██████76-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ████████08-06 |
| 49 | 27-Dec-00 | 2,500,000.00 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ██████76-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ████████08-06 |
| 50 | 27-Dec-00 | 2,400,000.00 | Still and Life GMBH, Bank of Cyprus (Cyprus), account ██████76-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ████████08-06 |
| 51 | 28-Dec-00 | 2,000,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████50-06 |
| 52 | 28-Dec-00 | 250,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account █████84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account █████50-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 53 | 28-Dec-00 | 1,220,579.84 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 |
| 54 | 28-Dec-00 | 1,250,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 |
| 55 | 28-Dec-00 | 2,500,000.00 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 |
| 56 | 28-Dec-00 | 2,000,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 |
| 57 | 28-Dec-00 | 2,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 |
| 58 | 28-Dec-00 | 2,500,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ████ 50-06 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 |
| 59 | 28-Dec-00 | 2,500,000.00 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 |
| 60 | 28-Dec-00 | 2,500,000.00 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 |
| 61 | 28-Dec-00 | 2,000,000.00 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 |
| 62 | 28-Dec-00 | 240,000.00 | Denon International, Bank of Cyprus (Cyprus), account ████ 18-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ████ 84-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 63 | 29-Dec-00 | 340,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Denon International, Bank of Cyprus (Cyprus), account ██████18-06 |
| 64 | 19-Jan-01 | 1,100,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ██████08-06 |
| 65 | 22-Jan-01 | 100,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 66 | 26-Jan-01 | € 6,881,004.79 | Lloyds TSB Lady Moura ██████0-110 | Bank of Cyprus UK Aremis Holdings ██████9110 |
| 67 | 1-Feb-01 | 2,100,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 68 | 1-Feb-01 | 200,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 69 | 22-Feb-01 | 200,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████18-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 70 | 9-Mar-01 | 863,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 71 | 9-Mar-01 | 535,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 72 | 9-Mar-01 | 300,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |
| 73 | 9-Mar-01 | 1,005,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ██████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ██████84-06 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 74 | 9-Mar-01 | 1,367,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███84-06 |
| 75 | 9-Mar-01 | 365,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ███08-06 |
| 76 | 9-Mar-01 | 860,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ███08-06 |
| 77 | 9-Mar-01 | 1,415,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ███08-06 |
| 78 | 9-Mar-01 | 1,355,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ███08-06 |
| 79 | 9-Mar-01 | 1,235,000.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Semark Consultancy Services Ltd, Bank of Cyprus (Cyprus), account ███08-06 |
| 80 | 14-Mar-01 | 1,539,967.50 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███84-06 | HSBC UK account ███5151 |
| 81 | 14-Mar-01 | 2,459,967.50 | Semark Consultancy Services Ltd., Bank of Cyprus (Cyprus), account ███08-06 | HSBC UK account ███5151 |
| 82 | 2-Apr-01 | 286,963.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | Southwood Management Ltd., Bank of Cyprus (Nicosia), account ███84-06 |
| 83 | 11-Apr-01 | 100,003.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███████50-06 | HSBC UK account ███5151 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 84 | 5-Jun-01 | 66,666.00 | AremisSoft Corporation, Bank of Cyprus (Cyprus) account ███50-06 | HSBC UK account ███5151 |
| 85 | 13-Jun-01 | 10,963,910.00 | Oracle Capital, UBS Account ███6707 | LK Globalsoft.com Ltd, Bank of Cyprus (Strovolos), account ███0060 |
| 86 | 12-Jul-01 | 10,012,957.06 | AremisSoft EEMEA account at Lloyds TSB, account ███1-110 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 |
| 87 | 12-Jul-01 | 180,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Michalis Nicolouzos, Alpha Bank |
| 88 | 12-Jul-01 | 360,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Michalis Nicolouzos, Alpha Bank |
| 89 | 12-Jul-01 | 400,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Sysco Enterprises, unidentified bank account |
| 90 | 13-Jul-01 | 42,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Vision Group LLC, Emirates Bank |
| 91 | 13-Jul-01 | 80,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | fixed deposit account at direction of MC Mathews for the purported benefit of AremisSoft EEMEA |
| 92 | 27-Jul-01 | 390,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Morgan Developments LLC, Anglo Irish Bank Austria |
| 93 | 27-Jul-01 | 615,000.00 | AremisSoft EEMEA, Bank of Cyprus Nicosia, account ███55-06 | Stratton Commercial Holdings LLC, Anglo Irish Bank Austria |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|---|---|---|---|---|
| 94 | 8-Aug-01 | £207,244.31 | Transfer by check from HSBC | Hermione Kyprianou, Bank of Cyprus (London), account ███2-750 |
| 95 | 30-Aug-01 | £70,195.26 | Transfer by check from HSBC | Lycourgos Kyprianou, Bank of Cyprus (London), account ███4-750 |
| 96 | 20-Sep-01 | 41,168.95 | Unidentified account controlled by Kyprianou at Lloyds TSB | Hermione Kyprianou, Bank of Cyprus (London), account ███2-060 |
| 97 | 10-Oct-01 | £25,000.00 | Lycourgos Kyprianou, Bank of Cyprus London, account ███4-750 | Cassiere Enterprises, Inc., Lloyds TSB Bank (Geneva), account ███0047 |
| 98 | 22-Apr-02 | 50,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | UG Business Account, Lloyds TSB Bank (Geneva), account ███3212 |
| 99 | 28-May-02 | 16,200.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | UG Business Account, Lloyds TSB Bank (Geneva), account ███3212 |
| 100 | 23-Jan-03 | £25,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | E-Cash Direct, Natwest Bank London, account ███4317 |
| 101 | 31-Jan-03 | £25,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | E-Cash Direct, Natwest Bank London, account ███4317 |
| 102 | 5-Feb-03 | £25,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | E-Cash Direct, Natwest Bank London, account ███4317 |
| 103 | 7-Feb-03 | £75,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ███0706 | E-Cash Direct, Natwest Bank London, account ███4317 |

| Ex. | Date of Transfer | Amount of Transfer | By Whom | To Whom |
|-----|------------------|--------------------|---------|---------|
| 104 | 17-Feb-03 | £50,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ██0706 | E-Cash Direct, Natwest Bank London, account ██4317 |
| 105 | 24-Feb-03 | £175,000.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ██0706 | E-Cash Direct, Natwest Bank London, account ██4317 |
| 106 | 11-Mar-03 | £73,500.00 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ██0706 | E-Cash Direct, Natwest Bank London, account ██4317 |
| 107 | 14-Apr-03 | 176,216.41 | Lycourgos Kyprianou Property Account, Bank of Cyprus London, account ██0706 | Highland West Consultancy, Kredietbank, account ██1571 |

42.     The financial transactions set forth above were orchestrated by Kyprianou as a result of the full cooperation he was afforded by the Bank, and, as such, with the knowledge and assistance of Bank of Cyprus, Kyprianou was allowed to indiscriminately transfer funds and launder the proceeds of his fraud.

**The Multitude of Accounts Controlled by Kyprianou at Bank of Cyprus (Cyprus)**

43.     On April 26, 1999, the AremisSoft Board of Directors unanimously voted a resolution to authorize Kyprianou to open accounts at Bank of Cyprus (Cyprus). This resolution, which was known to Bank of Cyprus, specifically restricted Kyprianou to obtain the additional signatures of either Mathews or Voice before transacting in any amount exceeding $200,000. From 1999 through 2002, throughout Kyprianou's tenure at AremisSoft, Bank of Cyprus disregarded the resolution and repeatedly allowed massive

transfers from AremisSoft accounts to Kyprianou-controlled accounts pursuant to the wire instructions of Kyprianou alone.

44.     The initial AremisSoft account at Bank of Cyprus (Cyprus) was funded regularly with money transferred from AremisSoft accounts at Commerce Bank in New Jersey, including most of the approximately $12.9 million raised in AremisSoft's initial public offering in April 1999.

45.     From 1999 through 2002, Kyprianou opened numerous other accounts at Bank of Cyprus (Cyprus) in AremisSoft's name and in the names of several of its subsidiaries and divisions, including AremisSoft (Cyprus) Ltd. and AremisSoft Eastern Europe, Middle East and Africa ("EEMEA") Inc., its subsidiary operating in Cyprus and India.

46.     Further, as early as 1999, Bank of Cyprus (Cyprus) knew that Kyprianou, apart from the AremisSoft accounts and his personal accounts and those of his family members, had numerous other bank accounts at Bank of Cyprus (Cyprus) over which either he had signatory authority or for entities which he owned and controlled.  These accounts included that of Southwood Management Limited ("Southwood") (███████8784), a Kyprianou alter-ego entity which he controlled and for which Voice was the owner of record. The Bank of Cyprus knew that Voice simultaneously also served as Secretary and as a Director of AremisSoft and, further, was a signatory to the AremisSoft accounts at the Bank. Southwood was established in 1997 in the British Virgin Islands ("BVI"), and its sole director was Athos Gavriel, an associate of Kyprianou and a resident of Cyprus.

47.     Other Kyprianou-controlled accounts at Bank of Cyprus (Cyprus) were in the name of Semark Consultancy Services Limited ("Semark") (███████7102, ██████

████08-06 and ████████47-06), a Kyprianou alter-ego entity for which the Bank of Cyprus knew he and his wife served as sole directors and shareholders at least through October 17, 2001.  Semark was established as a Cypriot entity, and its purported beneficial owner was Kurt Sedlmayer ("Sedlmayer"), an associate of Kyprianou.

48.    Bank of Cyprus (Cyprus) also knew that certain other entities maintained accounts at the Bank had received large transfers from AremisSoft from in or about 2000 through in or about 2001.  These account holders included Still & Life GmbH ("Still & Life"), an Austrian entity (████████76-06); and Denon International Limited ("Denon"), a BVI entity (██████2418) which was incorporated by Sedlmayer on Kyprianou's behalf.  None of these entities maintained an office or conducted any business in Cyprus, yet they all maintained accounts at Bank of Cyprus (Cyprus) into which AremisSoft transferred millions of dollars.  All of these accounts were controlled by Kyprianou.

49.    Moreover, Bank of Cyprus (Cyprus) knew that, for no bonafide business purpose, numerous large deposits from AremisSoft into these accounts immediately were transferred to Semark and Southwood accounts controlled by Kyprianou.  All of these transactions from one Bank of Cyprus (Cyprus) account to another were made in U.S. dollars and facilitated through correspondent banks in New York.

50.    As set forth below, Kyprianou, as part of his money laundering scheme, used these accounts to convert AremisSoft assets and launder the fraud proceeds of his illegal insider trading.  Based on Kyprianou's historical pattern of suspicious activity at Bank of Cyprus (Cyprus), including the control of approximately 40 accounts through which he transferred millions of dollars in rapid succession, Bank of Cyprus either had knowledge of

or consciously avoided and was willfully blind to financial transactions involving proceeds of Kyprianou's fraud.

51.    To this date, Kyprianou's close relationship with Bank of Cyprus (Cyprus) appears to continue unabated. Even though Bank of Cyprus has knowledge of the 2002 indictment of Kyprianou in the United States and the 2005 Mareva in Cyprus freezing his assets up to US$500 million, Bank of Cyprus has continued to provide banking services to Kyprianou.

*The Fraudulent Acquisitions of E-ChaRM and Denon*

*E-ChaRM*

52.    On December 27, 2000, Kyprianou caused $10.9 million to be transferred, in five different tranches, from an AremisSoft Bank of Cyprus (Cyprus) account to an account in the name of Still & Life, maintained at the same branch of Bank of Cyprus (Cyprus) (████████76-06) with the notation "partial payment for e-ChaRM contract." This amount purportedly was to pay for the acquisition of a company in India known as E-ChaRM (India) Pvt. Ltd.

53.    Almost immediately thereafter, Kyprianou caused the transfer of approximately $9.9 million in four different tranches from the Still & Life account to an account in the name of Semark at the same Bank of Cyprus (Cyprus) branch. This is demonstrated by Semark account statements which show the receipt of such funds. The sole directors and officers of Semark were Kyprianou and his wife, and this was known to Bank of Cyprus (Cyprus).

54.    Immediately after the transfers of the $9.9 million to Semark, Kyprianou directed the transfer of approximately $6.4 million from the Semark account back to the originating AremisSoft account at Bank of Cyprus (Cyprus) (███████50-06).

55.    These transfers bore the classic hallmarks of money laundering and churning. For example, one tranche of $2.5 million first was transferred from an AremisSoft account to a Still & Life account, then to a Semark account, and then from the Semark account back to an AremisSoft account, all of the transfers occurring on the same day -- December 27, 2000.

56.    As a consequence, Bank of Cyprus (Cyprus) knowingly allowed Kyprianou to siphon $3.5 million from AremisSoft into one of his accounts at Bank of Cyprus (Cyprus).

*Denon*

57.    On December 28, 2000, Kyprianou, in a series of transactions, directed the transfer of approximately $7.34 million from AremisSoft's Bank of Cyprus (Cyprus) account (███████50-06) to an account in the name of Denon at the same branch of Bank of Cyprus (Cyprus) (███████2418).  This Denon account was controlled by Kyprianou.

58.    On that very day, Bank of Cyprus (Cyprus) allowed Kyprianou to direct in a series of transactions the transfer of almost all those funds - approximately $7.24 million - from the Denon account to Kyprianou's Southwood account at the same branch of Bank of Cyprus (Cyprus).3  This burst of activity in a single day involving transfers of millions of dollars - all of which originated from three different accounts at the same Bank of Cyprus (Cyprus) branch - should have raised significant red-flags that Kyprianou was siphoning AremisSoft funds for his personal purposes.  Rather than alert AremisSoft to these suspicious

---

[3] The transactions were effected through four separate wire transfers occurring on the same date and to the same destination account in the amounts of $2.5 million, $2.5 million, $2 million, and $0.24 million.

transactions or refuse to allow the transactions to clear, Bank of Cyprus knowingly permitted Kyprianou to manipulate these accounts for his personal benefit.

59.    On or about January 16, 2001, Poyiadjis, in furtherance of the conspiracy to defraud AremisSoft, gave directions from New York, New York, for AremisSoft to transfer $7.1 million in United States dollars from an AremisSoft account at Commerce Bank in New Jersey to an AremisSoft account at Bank of Cyprus (Cyprus), in connection with the purported Denon purchase.    To create the illusion of cash flow, this $7.1 million was transferred to AremisSoft account number ██████████50-06 at Bank of Cyprus (Cyprus), then to another AremisSoft account at Bank of Cyprus (Cyprus) (██████████8156), and then transferred back to the original destination account (██████████50-06) in four separate tranches on staggered days.  The wire transfer of these United States dollars from Commerce Bank to Bank of Cyprus was facilitated through correspondent bank accounts located in New York.  The funds themselves originated from the covert payments on behalf of Poyiadjis and Kyprianou of stock option exercise prices from Swiss accounts managed by Roger Meyer and from Brown Brothers Harriman, a New York brokerage firm used by Meyer.

60.    Further, in March 2001, $1,539,967.50 – a portion of the money received by Southwood from Denon and amounts siphoned from AremisSoft's corporate account – was transferred from Southwood's Bank of Cyprus (Cyprus) account to the Kyprianous' joint bank account at HSBC Bank in London.

61.    Having maintained accounts under Kyprianou's control for AremisSoft, Still & Life, Denon, Semark and Southwood, Bank of Cyprus (Cyprus) knowingly and in rapid succession allowed Kyprianou to launder at least $18 million in fraud proceeds.

*Laundering of Funds Through Southwood and Semark Accounts at Bank of Cyprus (Cyprus).*

62.    As a result of Kyprianou's fraudulent activity at AremisSoft from 1999 through 2001, the stock price of AremisSoft was artificially inflated. Kyprianou, knowing that the information disclosed was false, took advantage of the inflated stock price and used alter ego companies to sell a substantial number of AremisSoft shares and options at artificially inflated prices to unsuspecting and innocent public investors and then retained control of the profits. Many of the proceeds of these stock sales were laundered through accounts at Bank of Cyprus (Cyprus) owned and/or controlled by Kyprianou.

### *Southwood Management Ltd.*

63.    Southwood is a company incorporated in the BVI in 1997. There are no operations or business purpose for Southwood, which simply acted as an alter ego for Kyprianou. Kyprianou held over one million shares of AremisSoft stock through Southwood, much of which was sold and the millions of dollars of proceeds transferred to Kyprianou through Southwood's Bank of Cyprus (Cyprus) account.

64.    In light of its obligations to know its customer, and the heightened due diligence obligations occasioned by transactions in large U.S. dollar-denominated amounts, Bank of Cyprus (Cyprus) knew that Voice, the Secretary of AremisSoft, was the record owner of Southwood and that its accounts at Bank of Cyprus (Cyprus) were controlled by Kyprianou.

65.    In early 1999, Kyprianou assigned 403,425 shares of AremisSoft stock to Southwood. In February 2000, Southwood sold 201,473 shares of AremisSoft to a company known as Info-Quest. Approximately $10,945,458 of the proceeds were transferred to

Southwood's account at Bank of Cyprus (Cyprus). A majority of the proceeds was wired in 2000 from Southwood's Bank of Cyprus (Cyprus) account to the Kyprianous' joint account at HSBC Bank in London (■5151) (the "Joint HSBC Account").

66.    Additionally, in an effort to prop up AremisSoft's share price in anticipation by Kyprianou and Poyiadjis of a second public offering, in April 2000 approximately $5 million was transferred by Southwood through Bank of Cyprus (Cyprus) to the account of Quantum Group Management ("Quantum") at Bordier et Cie, a Swiss bank, to purchase additional AremisSoft stock. The transfers of these funds, as well as the transfer to AremisSoft of other funds from Kyprianou through accounts he controlled at Bank of Cyprus, were transacted through correspondent bank accounts located in New York, New York.

67.    Moreover, in furtherance of his fraud and illegal insider trading, Kyprianou and Poyiadjis' AremisSoft stock holdings were traded through a brokerage account in New York at Brown Brothers Harriman & Co. ("Brown Brothers"). The proceeds of these trades were transferred to accounts at various banks for the benefit of Kyprianou and Poyiadjis, including a transfer of $6 million on March 16, 2001 from Brown Brothers to an AremisSoft account controlled by Kyprianou at Bank of Cyprus (Cyprus) (■2750).

68.    On August 8, 2000, $1,553,000 in insider trading proceeds were transferred by Quantum into a Southwood account controlled by Kyprianou at Bank of Cyprus (Cyprus). These proceeds were only a small part of a sell-off through Quantum over several months from 2000-2001 of more than 5.1 million shares of AremisSoft common stock belonging to both Poyiadjis and Kyprianou.

69.    Similarly, a nominee entity account held in the name of Emerging Markets Capital at Dominick Company AG, a Swiss bank, received and sold on behalf of Kyprianou and Poyiadjis 712,600 AremisSoft shares for net proceeds of $26,879,407.    After the majority of these shares were sold, a total of $2,533,175 was transferred on October 17, 2000 to a Southwood account at Bank of Cyprus (Cyprus) (████████8784).    An additional $4,012,488 was transferred to this same Southwood account on November 15, 2000.

70.    These $19 million in proceeds resulting from the insider trading of AremisSoft shares were the source of approximately $9.5 million laundered from Southwood's account to the Joint HSBC Account, through U.S. correspondent banks, as follows:

- 23 February 2000:        $2,499,967.50
- 10 May 2000:             $1,499,967.50
- 16 August 2000:          $1,499,967.50
- 20 October 2000:         $1,999,967.50
- 20 November 2000:        $  399,967.50
- 14 March 2001:           $1,539,967.50

71.    Kyprianou also used accounts at Bank of Cyprus in the name of his Cyprus company, LK GlobalSoft.com ("GlobalSoft"), to transfer proceeds into his Southwood accounts.  In April 2000 alone, Kyprianou caused the transfer of $3.2 million in U.S. dollars from GlobalSoft to Southwood, the transfers of which were facilitated through correspondent banks in New York.  Less than a month later, in May 2000, Kyprianou, along with Poyiadjis, attended an AremisSoft board of directors meeting at the Four Seasons hotel in New York at which he was re-elected as chairman of AremisSoft, where a report was given on the falsely inflated financial results contained in the Company's Form 10-Q filing for the quarter ended

March 31, 2000, and where Kyprianou was permitted to continue to act as chairman for GlobalSoft.

72.     In addition to the above transactions, and for no legitimate business purpose, between December 1999 and March 2001, Bank of Cyprus (Cyprus) allowed more than $30 million to pass between the AremisSoft Bank of Cyprus (Cyprus) account and Southwood's Bank of Cyprus (Cyprus) accounts.   From July 1999 to April 2001, approximately $19,185,651 was transferred to Southwood's Bank of Cyprus (Cyprus) account from AremisSoft's Bank of Cyprus (Cyprus) account.   From July 1999 to December 2000, approximately $11,013,847 was transferred from Southwood's Bank of Cyprus (Cyprus) account to AremisSoft's Bank of Cyprus (Cyprus) account.

73.     AremisSoft had no record of services rendered for these payments. Southwood was neither a vendor nor a customer of AremisSoft.   Nevertheless, Bank of Cyprus (Cyprus)'s conduct enabled Kyprianou to improperly transfer these funds from the Bank's customer, AremisSoft, to an entity controlled by Kyprianou.

**Semark Consultancy Services, Ltd.**

74.     Semark, a Cyprus company whose purported beneficial owner, Kurt Sedlmayer, was one of Kyprianou's co-conspirators, also was used by Kyprianou to launder proceeds of his fraud.   According to an affidavit filed by Sedlmayer in response to an action initiated in Cyprus by the AremisSoft Liquidating Trust against Kyprianou, Semark and other persons, the purported business purpose of Semark was simply the purchase and ownership of real property in Limassol, Cyprus.   Sedlmayer also states in the affidavit that he was not aware that Kyprianou opened accounts at Bank of Cyprus (Cyprus) in the name of Semark.

75.    Bank of Cyprus (Cyprus) knew that as late as October 17, 2001, Kyprianou and Mrs. Kyprianou were the directors and sole shareholders of Semark, which had several accounts at Bank of Cyprus, including: ███████7102; ███████08-06; and ███████ ███47-06.

76.    Resembling the AremisSoft-Southwood transactions, for no bonafide business purpose and for no apparent services rendered, approximately $20 million passed between AremisSoft's Bank of Cyprus (Cyprus) account and Semark's Bank of Cyprus (Cyprus) accounts from May 1999 through March 2001.   On March 14, 2001, Bank of Cyprus (Cyprus) facilitated the transfer of, at least, $2,459,967.50 from Semark's account into the Kyprianous' Joint HSBC Account.

77.    Bank of Cyprus (Cyprus) knew that millions of dollars were being transferred from its depositor, AremisSoft, to an entity it knew was controlled by Kyprianou, and then further transferred to a Kyprianou personal account in London.  Such transfers in the names of different shell entities in such a short period of time bear the classic hallmarks of money laundering.   Rather than stop the unlawful activity, Bank of Cyprus (Cyprus) helped Kyprianou to conceal the origins of the transfers and to personally profit from them.

*Money Laundering Through Bank of Cyprus UK*

78.    From August 2001 through July 2005, Bank of Cyprus UK permitted Kyprianou, and those acting on his behalf, to use its accounts to launder an aggregate of at least $1.4 million in furtherance of his fraudulent scheme.

79.    In or about August 2001, well after the May 2001 *New York Times* article disclosing that AremisSoft grossly inflated its revenues and the value of the Bulgarian contract, the filing of at least one class action lawsuit arising out of Kyprianou's fraud, and

the delisting of AremisSoft stock, Bank of Cyprus UK permitted Kyprianou and Mrs. Kyprianou to open several bank accounts, thus further facilitating Kyprianou's laundering of the fraud proceeds.

80.     Specifically, Kyprianou maintained the following accounts in his name alone at Bank of Cyprus UK:     ████4-060,     ████4-750 and     ████7-060.   Mrs. Kyprianou maintained the following accounts in her name alone at Bank of Cyprus UK:     ████2-060, ████2-791,     ████2-690 and     ████2-750.   Mrs. Kyprianou also maintained several joint accounts at Bank with her parents and her sister as follows:     ████0-792,     ████0-793, ████0-795,     ████0-794,     ████0-751,     ████0-750 and     ████0-060.

81.     A £207,244.31 balance from the accounts at HSBC (US$300,000) was used to fund the newly opened Bank of Cyprus UK accounts on August 8, 2001.   A further £70,195.26 from the HSBC accounts was transferred to one of Kyprianou's personal accounts at Bank of Cyprus UK in late August 2001.   These opening balances, aggregating at the time approximately US$401,818.22, were derived from the proceeds of Kyprianou's frauds.

82.     On October 5, 2001, the Operations Department at Bank of Cyprus UK became aware of a Bloomberg news release that reported on allegations of fraud against Kyprianou and that a New York federal judge had frozen Kyprianou's assets.   The news release was highlighted to emphasize that the judge "directed them to return the proceeds of their illegal stock sales."   Despite this affirmative knowledge and understanding of Kyprianou's involvement in the AremisSoft fraud, Bank of Cyprus allowed the Kyprianous to make several large and rapid transfers.

83.     On October 10, 2001, Kyprianou instructed Bank of Cyprus UK to cancel the

automatic transfer from his personal account to his property account, and instead instructed that transfers would be made from his wife's account. Kyprianou also instructed Bank of Cyprus UK to send £25,000 from his account (████4-060) to an account in the name of CEI that he controlled at Lloyds TSB Bank plc, a Swiss bank. The instruction directed the Bank of Cyprus UK to process the transfer *without showing the remitter's name*. Bank of Cyprus UK complied with this instruction and acted to conceal Kyprianou's fraud.

84.    Acknowledging the irregularity of such instructions, a Bank of Cyprus UK employee, Maro Georgiou ("Georgiou"), memorialized her concerns in an October 10, 2001 memorandum to Soteris Antoniades ("Antoniades"), the Bank's Assistant General Manager and Head of Operations. Georgiou requested that, "in view of the latest developments please give me your instructions."

85.    Another Bank of Cyprus UK employee, Christopher Davies, in an internal e-mail dated October 10, 2001, states: "(re) ... lycourgos - I have discussed with [Bank of Cyprus Legal Advisor] Stephen Byrne, and have reported to NCIS [National Criminal Intelligence Services] today. Clearly, the Bloomberg report is a suspicion. We have no basis not to pay according to instructions as yet, but we must make sure that instruction were absolute complete according to SWIFT rules. On the cheque paid into a single rather than a joint name, we wonder whether there is a basis for reversing this to a new account to protect the wife."

86.    Further, on October 17, 2001, Georgiou informed Kyprianou that, "in view of recent press reports concerning your business affairs," Bank of Cyprus UK decided to withdraw Kyprianou's access to the Bank's overdraft and credit card facilities. Thus, while

seeking to assure that Bank of Cyprus UK itself was not at risk, the Bank's management allowed all of Kyprianou's other financial transactions to proceed.

87.    By October 10, 2001, Bank of Cyprus UK knew that Kyprianou and Mrs. Kyprianou were requesting irregular activity in their accounts but still serviced those accounts and facilitated their transfers for approximately three more years.

88.    On or about June 27, 2002, Georgiou distributed an internal memorandum attaching a news release from Cyprus stating that Kyprianou had been charged in New York with money laundering, accounting irregularities and insider trading of AremisSoft stock. This memorandum, which was addressed to Antoniades, states: "Further to previous correspondence and in view of fresh information from Cyprus press, as per attached copy, please advise me whether any action should be taken regarding the operation of the accounts in the name of the above."

89.    In spite of Bank of Cyprus UK's actual knowledge of Kyprianou's involvement in the AremisSoft fraud and that he possessed millions of dollars in insider trading proceeds, Bank of Cyprus UK continued to allow Kyprianou to make unrestricted transfers into and out of accounts at the Bank. On April 22, 2002, Kyprianou transferred $50,000 to an account he controlled at Lloyds TSB Bank in Geneva, in the name of UG Business.  On May 28, 2002, Kyprianou transferred an additional $16,200 to this same UG Business account.

90.    As there was no discernible legitimate purpose served by these, as well as other, transactions, several Bank of Cyprus UK employees continued to voice their concerns to Bank management.  Bank management, however, placated the employee's concerns and

allowed Kyprianou to continue his churning activities.   For example, in an e-mail dated July 2, 2002, Davies assures Georgiou that:

> "We spoke about the transfer of £125,000 to Switzerland.  We agreed that the source of these funds was the known sale of a property in the name of the wife.  The proceeds pass via her account to the Kyprianou property account. There are no grounds to believe that these funds belong to a third party, and no reason to link this to proceedings in US against the customer.  The transaction may therefore proceed.   You should be aware that we have reported Mr. Kyprianou to NCIS under normal money laundering procedures last October.  They have not indicated that we should not deal with him.  I will also report this transaction."

91.    In another instance of a Bank of Cyprus UK employee voicing concerns about Kyprianou, Antoniades wrote an email to Davies and Stephen Byrne dated July 1, 2002 stating that "Maro Georgiou has just seen me to alert me to the fact that she has been told to expect a fax transmission in relation to [L. Kyprianou] for the sum of £180K [£180,000], in relation to an investment.  The monies will be covered by a transfer from his wife's account. Given the case in New York can we re-examine the issue of whether there is a constructive trust and/or an issue for an NCIS report.  This will need to be looked at quickly so that we can take a view as to whether to act on the customers instructions or not."

92.    The return e-mail from Davies shows that an NCIS report had been made on October 10, 2001.  Yet Davies states: "Having reported, we are not necessarily assumed to know that the funds are not Mr K's, so we are not necessarily vulnerable to constructive trust. We have however demonstrated publicly that we are 'suspicious.'  We are able to approach NCIS for further guidance should another transfer request comes [sic] in. . . That would be my advice here-report to NCIS again before paying away."

93.    Under the guise of showing concern for established money laundering protocol, Bank of Cyprus UK nevertheless facilitated Kyprianou's transactions and allowed him to continue his transfers of funds, some of which were fraudulently derived proceeds.

94.    On October 17, 2002, news organizations worldwide reported that Kyprianou had been arrested in Cyprus for violations relating to a former AremisSoft subsidiary. In an internal Bank of Cyprus UK memorandum, Georgiou inquired whether the third party mandate on Kyprianou's property account was still valid. Nevertheless, Bank of Cyprus UK facilitated the transfers by Kyprianou of the following funds over the subsequent weeks: On December 17, 2002, Kyprianou transferred £70,000 to Highland West, an account he used to mask payments in support of his yacht, which itself was procured from the proceeds of Kyprianou's illegal insider trading. Further, from January 23 through February 5, 2003, Kyprianou in three separate tranches transferred a total of £75,000 to E-Cash Direct, an online gaming entity.

95.    On February 4, 2003, a series of e-mails circulated throughout Bank of Cyprus UK concerning a request to open a special tracker account for Mrs. Kyprianou to accommodate incoming funds in the amount of £750,000. Christian Kreps of Bank of Cyprus UK voiced his concern by writing: "I am not at all happy about this, and I do not believe we should be accepting funds on this basis unless we have an explanation of why money can't be applied directly to destination account. Please consider and revert."

96.    Nevertheless, once again, management of Bank of Cyprus UK continued to allow transfers out of the Kyprianou accounts. On February 7, 2003, Kyprianou transferred £75,000 to E-Cash Direct. On February 17, 2003, he transferred £50,000 to E-Cash Direct.

On February 24, 2003, Kyprianou transferred an additional £175,000 to E-Cash Direct, and on March 11, 2003, he transferred a final £73,500 to E-Cash Direct.

97.    Kyprianou also transferred funds through at least April 2003 from his Bank of Cyprus UK accounts to a Highland West account he controlled at Kredietbank in Geneva (a/c 301571). On April 4, 2003, he sent approximately £15,000 to Highland West. And on April 14, 2003, Kyprianou transferred $176,216.41 in U.S. dollars to this same Highland West account. The Highland West and UG Business accounts that Kyprianou controlled at the Swiss banks Kredietbank and Lloyds TSB, respectively, were sub-accounts used to shelter payments from Bank of Cyprus UK and other sources to maintain his yacht.

98.    Additionally, Kyprianou transferred through his accounts at Bank of Cyprus UK monthly payments of approximately £4,000 to a UK-based assistant and accomplice, Mike Miragliotta, for his services in assisting Kyprianou to churn his assets through various bank accounts located in the UK and Switzerland. These transfers, to accounts again at both Kredietbank and Lloyds TSB, were sent to Miragliotta in the names of Star Management and Velvet Underground. The £4,000 monthly transfers to Star Management continued through at least March 2004.

99.    The Kyprianous' banking activities through Bank of Cyprus UK continued well into 2005 and included transactions involving millions of dollars, a substantial portion of which can be traced to the insider trading and other frauds by Kyprianou.

## COUNT I

### FOR CIVIL PENALTIES FOR MONEY
### LAUNDERING IN VIOLATION OF 18 U.S.C. §§1956(a)(1)(A) and (b)

100.    Plaintiff repeats and realleges and incorporates by reference herein the entirety

of the allegations contained in the foregoing paragraphs.

101.    Bank of Cyprus is a financial institution which is engaged in interstate and

foreign commerce.    The financial transactions, which represented the proceeds of

Kyprianou's specified unlawful activity, involved the use of Bank of Cyprus and other

financial institutions.  In addition, the financial transactions which represented the proceeds

of Kyprianou's specified unlawful activity affected interstate and foreign commerce and

involved the movement of funds by wire and other means, and involved the use of

investment securities, specifically securities issued by AremisSoft.

102.    The financial transactions alleged herein involved the proceeds of

Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities

under 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in

violation of 18 U.S.C. §1341, embezzlement and conversion of corporate assets by wire

fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C.

§§1956(a)(2)(B)(i) and 1957.

103.    Bank of Cyprus knew that the funds transferred into and out of accounts

maintained by it for Kyprianou represented the proceeds of unlawful activity.

104.    For several years through and including at least April 2003, Bank of Cyprus

continuously acted with the intent to promote Kyprianou's underlying acts securities fraud,

mail fraud, wire fraud, money laundering, and to aid him in promoting and concealing his money laundering.

105.    Bank of Cyprus is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

## COUNT II

### FOR CIVIL PENALTIES FOR MONEY LAUNDERING UNDER 18 U.S.C. §§1956(a)(1)(B) and (b)

106.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

107.    Bank of Cyprus is a financial institution which is engaged in interstate and/or foreign commerce.    The financial transactions, which represented the proceeds of Kyprianou's specified unlawful activity, involved the use of Bank of Cyprus and other financial institutions.    In addition, the financial transactions which represented the proceeds of Kyprianou's specified unlawful activity affected interstate and foreign commerce and involved the movement of funds by wire and other means, and involved the use of investment securities, specifically securities issued by AremisSoft.

108.    The financial transactions alleged herein involved the proceeds of Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities under 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C. §§1956(a)(2)(B)(i) and 1957.

109.    Bank of Cyprus knew that the funds transferred to and out of accounts maintained by it for Kyprianou represented the proceeds of unlawful activity.

110.    For several years Bank of Cyprus continuously knew that the financial transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

111.    Bank of Cyprus is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

### COUNT III

**FOR CIVIL PENALTIES FOR MONEY LAUNDERING
UNDER 18 U.S.C. §§1956(a)(2)(A) and (B) and (b)**

112.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

113.    Bank of Cyprus is a financial institution which is engaged in interstate and/or foreign commerce.    The financial transactions, which represented the proceeds of Kyprianou's specified unlawful activity, involved the use of Bank of Cyprus and other financial institutions.    In addition, the financial transactions which represented the proceeds of Kyprianou's specified unlawful activity affected interstate and foreign commerce and involved the movement of funds by wire and other means, and involved the use of investment securities, specifically securities issued by AremisSoft.

114.    The financial transactions alleged herein involved the proceeds of Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities under 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C. §§1956(a)(2)(B)(i) and 1957.

115.    Bank of Cyprus knew that the funds transferred to and out of accounts maintained by it for Kyprianou represented the proceeds of unlawful activity.

116.    For several years, Bank of Cyprus and Kyprianou would and did transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

117.    For several years, Bank of Cyprus and Kyprianou, with knowledge that the funds involved represented the proceeds of some form of unlawful activity, would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

## COUNT IV

### FOR CIVIL PENALTIES FOR MONEY LAUNDERING UNDER 18 U.S.C. §§1957 AND 1956(b)

118.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

119.    Bank of Cyprus knowingly engaged in financial transactions of greater than $10,000 involving the proceeds of Kyprianou's unlawful embezzlement and insider trading, which were denominated in United States Dollars, and were transferred to and from the accounts maintained by Bank of Cyprus for Kyprianou in United States Dollars.

**COUNT V**

**FOR CIVIL PENALTIES FOR CONSPIRACY TO
COMMIT MONEY LAUNDERING UNDER 18 U.S.C. §§1956(h) and (b)**

120.    Plaintiff repeats and realleges and incorporates by reference herein the entirety
of the allegations contained in the foregoing paragraphs.

121.    From in or about May 1999 through in or about April 2003, Bank of Cyprus
and Kyprianou unlawfully, willfully and knowingly did combine, conspire, confederate and
agree together and with each other to violate 18 U.S.C. §§ 1956(a)(1), (A), (a)(1)(B), (2)(A)
and (2)(B)(i).

122.    It was a part and an object of the conspiracy that Bank of Cyprus and
Kyprianou engaged in financial transactions involving the proceeds of Kyprianou's unlawful
activity in order to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire
fraud and money laundering.

123.    It was a further part and an object of the conspiracy that Bank of Cyprus and
Kyprianou engaged in financial transactions in whole or in part to conceal or disguise the
nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts
of embezzlement and conversion of corporate assets, securities fraud, mail fraud, wire fraud
and money laundering.

124.    It was a further part and an object of the conspiracy that Bank of Cyprus and
Kyprianou would transport, transmit, and transfer monetary instruments and funds from a
place in the United States to or through a place outside of the United States, or to a place in
the United States from or through a place outside the United States, with the intent to

47

promote Kyprianou's underlying acts of embezzlement and conversion of corporate assets, securities fraud, mail fraud, wire fraud and money laundering.

125.    It was a further part and an object of the conspiracy that Bank of Cyprus and Kyprianou, with knowledge that the funds involved represented the proceeds of some form of unlawful activity, would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of embezzlement and conversion of corporate assets, securities fraud, mail fraud, wire fraud and money laundering.

126.    Bank of Cyprus is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

## RELIEF REQUESTED

**WHEREFORE**, the United States requests that this Court, as authorized by Section 1956 (b) of Title 18:

A.    Enter judgment against Defendant Bank of Cyprus and in favor of Plaintiff for each violation alleged in the Complaint;

B.    Award Plaintiff monetary civil penalties from Defendant Bank of Cyprus for the value of the funds involved in the financial transactions in violation of Sections (a)(1), and (h) of 18 U.S.C. § 1956 and 18 U.S.C. § 1957, which total at least $162 million;

C.    Order Defendant Bank of Cyprus to pay costs of this action; and

D.    Award Plaintiff such other and additional relief as the Court may determine to be just and proper.

48

Plaintiff demands a trial by jury.

Dated:      New York, New York
            October 15, 2007

                         MICHAEL J. GARCIA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States of America

                    By: _____
                         RUA M. KELLY (MA-643351)
                         Assistant United States Attorney
                         One Saint Andrew's Plaza
                         New York, New York 10007
                         Telephone:  (212) 637-2471
                         Facsimile:  (212) 637-0421