UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-against-                                     Index No.:  07 CIV 9234 (CSH)

BANK OF CYPRUS
PUBLIC COMPANY LIMITED,

Defendant.

# EXHIBIT 5

DECLARATION OF JOHN FELLAS IN SUPPORT OF BANK OF CYPRUS
PUBLIC COMPANY LIMITED'S MOTION TO DISMISS THE COMPLAINT

**COURTESY COPY**

**GREENBERG TRAURIG, LLP**
Hal M. Hirsch (HH 0417)
Ronald D. Lefton (RL 2666)
200 Park Avenue
New York, New York 10166
Phone: (212) 801-9200

*Attorneys for Joseph P. LaSala and Fred S. Zeidman,*
*as Co-Trustees of the AremisSoft Liquidating Trust, Plaintiffs*

### UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH P. LASALA and FRED S. ZEIDMAN, as CO-TRUSTEES of the AREMISSOFT CORPORATION LIQUIDATING TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF CYPRUS PUBLIC COMPANY LIMITED, <br><br> Defendant. | Civil Action No. 06-CV-6673 (CSH) <br><br><br> Plaintiffs Demand <br> <u>A Jury Trial</u> |

### AMENDED COMPLAINT

## I.    INTRODUCTION

1.    Joseph P. LaSala and Fred S. Zeidman, as Co-Trustees (the "Co-Trustees" or "Plaintiffs") of the AremisSoft Liquidating Trust (the "AremisSoft Trust"), bring this action against Bank of Cyprus Public Company Limited, doing business in the United States, Cyprus and England, among other places, as Bank of

Cyprus (the "Bank of Cyprus" or "Defendant"), to recover damages caused by the Defendant's wrongful conduct.

2.      Defendant, knowingly and in breach of its duties and obligations to AremisSoft Corporation ("AremisSoft" or the "Company") as its depositor, allowed AremisSoft's former Chairman and CEO Lycourgos Kyprianou ("Kyprianou") to loot Company assets for Kyprianou's personal gain and benefit and to launder through bank accounts at Bank of Cyprus millions of dollars in proceeds of the massive, international fraud Kyprianou and his co-conspirators perpetrated on AremisSoft.

3.      Bank of Cyprus held accounts for both AremisSoft and certain of its affiliates, including AremisSoft Cyprus and AremisSoft EEMEA, and for Kyprianou and for shell companies Kyprianou owned or controlled, including Southwood Management Limited ("Southwood") and Semark Consultancy Services Limited ("Semark"). Bank of Cyprus also was a lender to another of Kyprianou's alter-ego companies, Aremis Holdings Ltd., which loan was secured by the common stock of AremisSoft.

4.      In disregard of its duties of diligence and care, as well as its contract obligations to AremisSoft as depositor, Bank of Cyprus allowed Kyprianou to engage in transactions whereby he converted tens of millions of United States dollars from AremisSoft to his own accounts, and thereafter allowed Kyprianou to launder proceeds obtained by him in further breach of his fiduciary duties to AremisSoft. By reason thereof, AremisSoft and its investors sustained damages in an amount to be proven at trial but not less than $40 million dollars.

## II.    THE PLAINTIFFS

5.    The AremisSoft Trust is a Delaware trust formed pursuant to three Orders entered by the Honorable Joel A. Pisano of the United States District Court for the District of New Jersey (the "New Jersey Federal Court") as follows: (i) July 1, 2002 Order (the "Confirmation Order") confirming the First Amended Joint Plan of Reorganization (the "Plan") of AremisSoft; (ii) August 1, 2002 Order approving a Class Action Settlement with AremisSoft; and (iii) August 16, 2002 Order entered nunc pro tunc to August 1, 2002, correcting the Order and Final Judgment previously entered August 1, 2002, filed in a Chapter 11 case captioned In re AremisSoft Corp., Bankruptcy Case No. 02-32621 (D.N.J.) (the "Chapter 11 Case"). The Chapter 11 Case and the Confirmation Order resulted from the Chapter 11 bankruptcy filing by AremisSoft on or about March 15, 2002.

6.    Under the terms of the Plan as approved by the New Jersey Federal Court in the Confirmation Order, any and all claims of AremisSoft's former shareholders arising out of the purchase of AremisSoft securities on the open market or otherwise from April 22, 1999 through and including July 27, 2001, and any and all of the claims of the Company itself which arose pre-bankruptcy, were assigned to, and for the benefit of, the AremisSoft Trust. The AremisSoft Trust acts as the representative of the Company and its shareholders who are beneficiaries of the AremisSoft Trust ("Trust Beneficiaries").

7.    Joseph P. LaSala, with an address in care of McElroy, Deutsch, Mulvaney & Carpenter, LLP, 1300 Mount Kemble Road, Morristown, New Jersey, 07962, is an individual who has been appointed by the New Jersey Federal Court as Co-Trustee of the AremisSoft Trust, responsible to act for the Trust.

3

8.     Fred S. Zeidman, with an address in care of Corporate Strategies, Inc., 109 North Post Oak Lane, Suite 422, Houston, Texas 77024, is an individual who has been appointed by the New Jersey Federal Court as Co-Trustee of the AremisSoft Trust, responsible to act for the Trust.

## III.    AREMISSOFT

9.     AremisSoft was incorporated in the State of Delaware in the United States and at various times during the relevant period maintained offices in New York and New Jersey.  The Company's main business was the development and sale of computer software technology, particularly for the healthcare, hospitality, construction and manufacturing industries.  Kyprianou was the founder of AremisSoft and served as the Chairman of the Board of Directors since 1997, Chief Executive Officer from October 1997 to May 2000, and co-CEO with Roys Poyiadjis from February 2001 until July 31, 2001, when Kyprianou resigned.  As a result of the massive, international fraud perpetrated by Kyprianou, Poyiadjis and their co-conspirators as set forth herein, on March 15, 2002 AremisSoft filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.  AremisSoft maintained accounts at Bank of Cyprus from 1999 through 2002.

10.     Many of the innocent officers and directors of AremisSoft who were not involved in the fraud perpetrated by Kyprianou and Poyiadjis went on to become officers and directors of SoftBrands, Inc., the reconstituted debtor, formed as a result of AremisSoft's bankruptcy proceeding.

## IV.    THE DEFENDANT

11.     Bank of Cyprus, the operations of which include but are not limited to branches in Cyprus and England and a representative office in New York City,

4

maintains a headquarters at 51 Stassinos Street, Ayia Pareskevi, Strovolos, Nicosia, Cyprus. Through its offices throughout the world, the Bank of Cyprus offers customers the services of retail and commercial banking, finance, factoring, investment banking, brokerage, fund management, custody, and providing life and general insurance.

12.     According to its website, Bank of Cyprus operates more than 260 branches throughout the world. It also maintains a correspondent relationship with more than 2,300 banks, including most of the major international banking institutions, and operates representative offices in New York, Canada, South Africa, Moscow and Romania.

13.     In New York, Bank of Cyprus operates through its Representative Office licensed under the New York Banking Law, §§ 221A-221K, which is located at 80 Broad Street, 27th Floor, New York, New York, 10004 (the "New York Office"). According to the website of Bank of Cyprus, the New York Office provides information on retail and corporate banking for the Greek and Cypriot communities of New York, and it also works to develop relationships with international banks, institutional investors and other financial entities. Further, it provides account opening documents for non-Cyprus residents seeking to open bank accounts at branches operated worldwide by Bank of Cyprus. The New York Office is regulated, supervised and examined by the New York State Banking Department and the Board of Governors of the Federal Reserve System.

14.     Bank of Cyprus maintains correspondent banking relationships with banks in New York including, but not limited to, Deutsche Bank (formerly Bankers

Trust Company), Barclays Bank PLC New York, HSBC Bank New York, and Citibank, N.A., to allow, inter alia, Bank of Cyprus to engage in transactions in United States currency.

## V.    JURISDICTION

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the defendant is not a citizen of the same state as any plaintiff and the amount in controversy, exclusive of interest, exceeds $75,000.

16.    This Court has personal jurisdiction over Defendant pursuant to the New York Banking Law, §§200-b(2)(e) and 221-c, the Federal Reserve Act of 1913, 12 U.S.C. §632, and N.Y.C.P.L.R. § 301 on the ground that Bank of Cyprus maintains an office in New York City and is thus domiciled in New York. Alternatively, jurisdiction is predicated on N.Y.C.P.L.R. § 302(a)(1).

## VI.    RELEVANT PROCEDURAL HISTORY

17.    As a result of an action filed against Kyprianou and others on October 27, 2005 in the Commercial Court of the Queen's Bench Division of the High Court of Justice of England & Wales (the "UK Action"), that Court issued a freezing order ("Freezing Order") with respect to Kyprianou's assets. The purpose of the Freezing Order is to preserve assets identified as being owned and/or controlled by Kyprianou and others which are proceeds of the AremisSoft fraud, and to require disclosure of information concerning such assets and proceeds so that they may be traced and frozen. As a result of the Freezing Order and the ancillary orders in the UK Action, Plaintiffs have received numerous bank account statements from Bank of Cyprus UK.

18.    In addition, only within the past months, Plaintiffs have received additional account statements from Bank of Cyprus' office in Nicosia, Cyprus.

19. Based on Plaintiffs' investigation conducted to date, including information learned in connection with a lawsuit brought by the AremisSoft Trust against Kyprianou and others in Cyprus in July 2005, the recently obtained documents from the UK Action, and other relevant information regarding Defendant, Plaintiffs have recently uncovered Bank of Cyprus' involvement in the fraud perpetrated on AremisSoft which the Bank sought to conceal. Upon discovery of the Bank of Cyprus' involvement, the Plaintiffs have acted with all reasonable speed to commence this action on behalf of the AremisSoft Trust.

## VII.    OVERVIEW OF THE FRAUD PERPETRATED ON AREMISSOFT

20. From in or about 1998 through July of 2001, Kyprianou and/or Poyiadjis, alone or in conspiracy with others, but without the knowledge or approval of AremisSoft's Board of Directors, caused AremisSoft to issue false and fraudulent public statements and regulatory filings representing to the investing public and regulators that AremisSoft's business, revenues and profits were experiencing rapid growth with substantial annual revenues. To further the fraud, Kyprianou and/or Poyiadjis, and assisted by others, fabricated bogus books and records to give the false appearance that the Company was generating the reported revenues.

21. Additionally, as part of the fraud, Kyprianou and/or Poyiadjis and other co-conspirators, caused the Company to acquire software companies purportedly with substantial revenues for prices totaling tens of millions of dollars when, in reality, the acquired companies were small, with minimal revenues, and the prices paid to the actual sellers were only a small fraction of the purchase prices approved by AremisSoft's Board of Directors. Kyprianou, however, nevertheless caused AremisSoft to pay the reported purchase prices but converted and looted the funds,

7

approximating U.S.\$20 million, for his personal benefit through accounts at the Bank of Cyprus.

22.    The effect of these and other fraudulent misrepresentations was that the perceived value and profitability of AremisSoft was far higher than its actual value and profitability, with the result that the AremisSoft shares being traded on the open market were artificially inflated in price. Privy to this knowledge, Kyprianou, Poyiadjis and their conspirators secretly and illegally sold their AremisSoft shares at these inflated prices to investors who were not privy to such knowledge and believed the price paid to be a fair and reasonable one. As such, Kyprianou and Poyiadjis acted for their own benefit and not for the benefit of AremisSoft which, along with the investors in AremisSoft, was a victim of the fraudulent scheme.

23.    Kyprianou, by reason of such stock sales on the open market and in private transactions, in breach of his fiduciary duties to AremisSoft, realized over U.S.\$100 million in illicit proceeds, a substantial portion of which he laundered through accounts at Bank of Cyprus.

24.    By May 2001, worldwide attention began to focus on AremisSoft for reporting inflated income. From in or about May 2001, the press coverage of events with respect to the fraud accusations, class action lawsuits against Kyprianou and the Company, and AremisSoft's delisting from NASDAQ, was widespread and notorious throughout the world and known to the Defendant. Specifically, on May 17, 2001, The New York Times reported that the true value of an AremisSoft contract with the Bulgarian government was less than U.S.\$4 million instead of the U.S.\$37.5 million claimed by the Company. By May 24, 2001 at least one class action lawsuit had been

8

filed against AremisSoft and its directors alleging claims of fraud orchestrated by Kyprianou. At the same time, the media began reporting that Kyprianou and Poyiadjis fraudulently misrepresented the value and profitability of AremisSoft, by, *inter alia*, causing AremisSoft (a) to report the receipt of revenue that was almost entirely false, and (b) to announce publicly that the Company had acquired software companies with substantial revenues for prices totaling tens of millions of dollars when, in reality, the acquired companies were small, with minimal revenues, and AremisSoft paid only a small fraction of the announced acquisition prices. Moreover, AremisSoft's second quarter 2001 earnings were scheduled to be released on or about July 30, 2001. However, on July 31, 2001, AremisSoft publicly announced that it was delaying the release of its results indefinitely and that Kyprianou had resigned. As a result, on July 31, 2001, AremisSoft was delisted from the NASDAQ due to, *inter alia*, the failure of the Company to file its Form 10-Q for the second quarter ending on June 30, 2001. The National Association of Securities Dealers, Inc. and the United States Securities and Exchange Commission (the "SEC") immediately commenced investigations of Kyprianou and Poyiadjis.

25.    On or about October 4, 2001, the SEC sued Kyprianou and Poyiadjis in a civil injunction action, alleging that they each secretly sold over 2.1 million shares of their AremisSoft stock in late 2000 in violation of several provisions of the United States securities laws. On October 19, 2001, the Honorable Charles S. Haight, Jr., United States District Judge for the Southern District of New York, issued a preliminary injunction against Roys Poyiadjis and Lycourgos Kyprianou, among

others. The SEC successfully froze U.S.$175 million of Poyiadjis' proceeds that had been hidden in bank accounts in the Isle of Man.

26.    On December 19, 2001, the United States Attorney for the Southern District of New York obtained an indictment against Poyiadjis.

27.    On March 15, 2002, AremisSoft filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code.

28.    On March 22, 2002, the U.S. Attorney's Office filed a civil complaint *in rem* in the U.S. District Court for the Southern District of New York seeking civil forfeiture of the funds in the Isle of Man banks, and on June 3, 2002, the Honorable Denny Chin entered a default judgment ordering forfeiture of the funds to the United States.

29.    On June 24, 2002, a superseding indictment was returned against Kyprianou, Poyiadjis and M.C. Mathews ("Mathews"), the top AremisSoft executive in India, on counts of conspiracy to commit securities fraud, mail fraud and wire fraud, substantive counts of securities fraud (both on the market and insider trading), conspiracy to commit money laundering, and substantive counts of money laundering.

## VIII.  BANK OF CYPRUS' INVOLVEMENT IN THE AREMISSOFT FRAUD

### A.    THE DUTIES OF BANK OF CYPRUS TO INVESTIGATE OR REPORT SUSPICIOUS TRANSACTIONS

30.    AremisSoft was a depositor of Bank of Cyprus. The relationship between a bank and its depositor is that of debtor (bank)-creditor (depositor), and imposes upon the bank the duty to exercise ordinary care in the handling of its customers' accounts. As such, Bank of Cyprus is required to exercise due care and basic diligence to know its customer, which obligations are heightened in

circumstances that are irregular or involve transactions in large sums of money, or which are attended by circumstances that might indicate fraud or other wrongdoing. The duty of ordinary care also requires a bank to conduct an investigation to protect funds from the possible wrongful conduct of a fiduciary, or other defalcation, where the bank has knowledge of such facts and circumstances which should arouse suspicion and, in the exercise of ordinary care, require an investigation.    As a consequence, if at the time of a transaction a fact or circumstance is brought to the knowledge of the bank or its officers or employees which ought to have excited the suspicion and inquiry of an ordinarily careful person, it is the bank's duty to institute such inquiry.    Just as a bank has a duty not to honor a check with knowledge of a breach of fiduciary duty, and a duty not to turn a blind eye to transactions that bear no legitimate business purpose, an international bank with several hundred branches and a presence in New York has a duty not to facilitate U.S. dollar international wire transfers valued at millions of dollars where the bank has, or should have, knowledge or reasonably suspects that the transactions result from some malfeasance.

31.    Further, banks and financial institutions such as Bank of Cyprus, are required under applicable law to file with regulatory authorities suspicious activity reports ("SARs"), or comparable reports, when they detect known or suspected violations of law or suspected transactions that lack a legitimate business purpose, such as money laundering.

32.    The relationship between a bank and its depositor also is contractual in nature, and it is either express or implied according to the terms of the account opening documents and other related agreements that have been executed by signatories of the

11

bank and its depositor. As such, banks are required to adhere to an implied duty of good faith and fair dealing.

**B.     THE ACCOUNTS OF AREMISSOFT,
STILL & LIFE, DENON, SOUTHWOOD AND SEMARK**

33.     At or before the time that AremisSoft became a publicly traded company, Kyprianou caused to be opened at least one bank account in the name of AremisSoft at Bank of Cyprus (0155-41-122750-06), for which he and his co-conspirator, Mathews, as well as Noel Voice ("Voice"), the former Chief Operating Officer, Secretary, and a director of AremisSoft, were the signatories. This account at first was funded by money transferred from AremisSoft's United Kingdom operations. Following AremisSoft's initial public offering ("IPO") on April 22, 1999 which raised, net, approximately U.S.$12.9 million, the account was funded with the bulk of the proceeds from the IPO and by U.S. dollar money transfers from AremisSoft's account at Commerce Bank in New Jersey. Over time, at least eight accounts were maintained in the name of AremisSoft itself at Bank of Cyprus including account nos.: 0155-04-048872-06; 0155-40-008318-06; 0155-41-122750-06; 0155-41-122793-01; 0155-41-145432; 0155-41-162302-01; 0155-02-022005; 0155-42-068156-06, 0155-40-023937. These accounts were primarily funded with U.S. dollars and transactions were in U.S. currency.

34.     From 1999 through 2001, AremisSoft opened numerous other accounts at Bank of Cyprus in the names of several of its subsidiaries and divisions, including AremisSoft (Cyprus) Ltd (account nos.: 0120-01-027717, 0120-01-027768, 0120-01-027717) and AremisSoft EEMEA (account nos.: 0155-40-027355-06, 0155-40-012862, 0155-40-023937). At all times, each of the AremisSoft and AremisSoft

subsidiary accounts at Bank of Cyprus were maintained for the exclusive benefit of AremisSoft.

35.     As early as 1999, Bank of Cyprus knew that Kyprianou was the Chairman of the Board of Directors and CEO of AremisSoft. Moreover, the bank was aware that AremisSoft became a publicly traded United States company on April 22, 1999.

36.     Additionally, Bank of Cyprus knew that Kyprianou, with whom it had a longstanding banking relationship dating at least to 1988, also maintained through 2002 numerous personal accounts at Bank of Cyprus for his benefit, as well as for the benefit of his wife.

37.     Further, as early as 1999, Bank of Cyprus knew that Kyprianou, apart from his personal accounts, had numerous other bank accounts at Bank of Cyprus over which either he had signatory authority or for entities which he personally owned and/or controlled. One such account was in the name of Southwood (a/c 0155-40-008784-06), a Kyprianou alter-ego entity which he controlled and for which Voice, a UK resident and AremisSoft's Secretary, Chief Operating Officer, and director, was identified as the owner of record. Southwood was established in 1997 in the British Virgin Islands ("BVI"), and its sole director was Athos Gavriel, an associate of Kyprianou and a resident of Cyprus.

38.     Since at least February 2000, Bank of Cyprus was aware that large U.S. dollar deposits representing proceeds of sale of AremisSoft stock were deposited in Southwood's account at Bank of Cyprus and from there wired to accounts jointly owned by Kyprianou and his wife at HSBC in London. Specifically, in February 2000,

13

at least U.S.$10,945,458 was deposited in Southwood's account at Bank of Cyprus (a/c 0155-40-008784). These were proceeds of the sale of 201,473 shares of AremisSoft stock by Southwood (Kyprianou) to InfoQuest. Much of this money was then transferred in various wires throughout 2000 from Southwood's Bank of Cyprus account (a/c 0155-40-008784) to an account at HSBC in London jointly owned by Kyprianou and his wife, Hermione Kyprianou (a/c 225151) (the "Joint HSBC Account"). In the normal course of banking due diligence, these early 2000 multi-million U.S. dollar-denominated transactions should have caused Bank of Cyprus to investigate the source of the funds and the relationship between Southwood and Kyprianou - a relationship Kyprianou and likely Bank of Cyprus sought to disguise from AremisSoft and the public by using Voice and Gavriel to pose as frontmen for Southwood.

39.    Another such Kyprianou-controlled account at Bank of Cyprus was in the name of Semark (a/c 0120-41-017102, a/c 0155-41-142808-06 and a/c 0155-40-012447-06), a Kyprianou alter-ego entity for which he and his wife served as sole directors and shareholders at least through October 17, 2001. Semark was established as a Cypriot entity, and its purported beneficial owner was Kurt Sedlmayer ("Sedlmayer"), an Austrian resident and a key co-conspirator in the AremisSoft fraud, and a principal in a Vienna-based company known as Spahn & Partner GmbH ("Spahn & Partner"). Bank of Cyprus documents indicate that Kyprianou and his wife were the only authorized signatories of the Semark account at Bank of Cyprus.

40.    Sedlmayer was involved in fraudulent transactions whereby in the guise of purchasing software companies in India and Dubai, Kyprianou stole millions from

AremisSoft through transfers in accounts at Bank of Cyprus. These transactions include the purported acquisitions of E-Charm and Denon as discussed below.

41.    In July 2000 Bank of Cyprus extended a loan of 15.9 million EURO to Aremis Holdings Ltd. ("Aremis Holdings"), a BVI entity of which Kyprianou was at one time sole shareholder and director and at all relevant times beneficial owner. This loan, which was arranged by Kyprianou, was secured by three million shares of AremisSoft common stock, which Kyprianou earlier had transferred to Aremis Holdings and which, at the time, was trading at approximately U.S.$35.00 per share. As a consequence, the Bank of Cyprus, in its normal course of due diligence with respect to the administration of the accounts of Aremis Holdings and AremisSoft, would have become aware of AremisSoft's public filings. Moreover, in the ordinary course of business, a Bank of Cyprus loan officer or other bank official presumably tracked AremisSoft's share price, press releases and other sources of Company information. As such, Bank of Cyprus was aware, at least, *inter alia,* of the fiduciary duties that Kyprianou owed to AremisSoft.

42.    Bank of Cyprus also knew that certain non-Cyprus account holders at the bank were the recipients in 2000 and 2001 of large U.S. dollar deposits from AremisSoft's Bank of Cyprus accounts. These account holders included Still & Life, an Austrian entity (account no.: 0155-41-171476-06), and Denon, a BVI entity (account no.: 0155-40-022418). Neither Still & Life nor Denon had operations in Cyprus. Moreover, Bank of Cyprus knew that, for no apparent reason, these deposits were quickly transferred out of the Still & Life and Denon accounts and into the Semark and Southwood accounts, respectively, controlled by Kyprianou.

43.    At all times Bank of Cyprus was under a duty to know its customer-depositor. Had it fulfilled this obligation and carried out due diligence on Still & Life and Denon, it should have learned that these entities' bank accounts were owned and/or controlled or related to Kyprianou.

44.    All of these transactions from one Bank of Cyprus account to another were made in U.S. currency and facilitated through correspondent banks in New York.

45.    The following table lists the AremisSoft-related entities that maintained accounts at Bank of Cyprus:

| Name on Account | Account Number(s) |
| --- | --- |
| AremisSoft Corporation | 0155-41-122750-06 (USD)<br>0155-40-023937 (EURO) (account name changed in April 2001 to AremisSoft EEMEA)<br>0155-40-008318-06 (USD)<br>0155-41-145432 (EURO)<br>0155-02-022005 (Cyprus Pounds)<br>0155-41-162302 (GBP)<br>0155-04-048872-06<br>0155-41-122793-01<br>0155-42-068156-06 |
| AremisSoft (Cyprus) Ltd. | 0120-01-027717 (Cyprus Pounds)<br>0120-01-027768 (Cyprus Pounds)<br>0120-01-027717 |
| AremisSoft EEMEA | 0155-40-027355-06 (USD)<br>0155-40-012862-06 (USD)<br>0155-40-023937-48 (April 2001 from AremisSoft Corp.) |
| Southwood | 0155-40-008784-06 |
| Semark | 0120-41-017102<br>0155-41-142808-06<br>0155-40-012447-06 |
| Still & Life | 0155-41-171476-06 |
| Denon | 0155-40-022418-06 |

16

46.     According to Bank of Cyprus records, Michalis Korfiotis, a Bank of Cyprus employee working in its International Business Unit in Nicosia, Cyprus, was responsible for the various AremisSoft and other Kyprianou-controlled accounts. Upon information and belief, Korfiotis was Kyprianou's primary contact at the bank and facilitated many of the transactions Kyprianou engaged in at Bank of Cyprus.

47.     As set forth in more detail below, Kyprianou, as part of his fraudulent scheme, used these accounts – in particular, the AremisSoft, Southwood and Semark accounts – to loot AremisSoft assets and launder proceeds of his illegal insider trading. Bank of Cyprus, at a minimum, failed to (i) conduct diligence regarding the purpose of these large transactions to Company insiders or the identity of the transferees where attendant circumstances indicated fraud or other wrongdoing, and (ii) report these suspicious transactions either to AremisSoft or to any regulatory or law enforcement authority.    Instead, Bank of Cyprus facilitated Kyprianou's looting and money-laundering schemes.

### C.     THE ROLE OF BANK OF CYPRUS IN THE FRAUDULENT ACQUISITIONS

#### 1.     The Fraudulent Acquisition of e-ChaRM.

48.     At the end of 2000, Kyprianou caused AremisSoft to engage in the fraudulent e-ChaRM acquisition, which purportedly was the sale by Still & life, an Austrian company, of the stock of e-ChaRM which in turn owned three Indian software companies. The reported purchase price was U.S.$10.9 million.

49.     Without the knowledge or approval of AremisSoft's Board of Directors, which believed the acquisition was worth U.S.$10.9 million, Kyprianou in fact had previously caused AremisSoft to purchase e-ChaRM for only U.S.$290,000. e-ChaRM

was nothing more than an Indian shell company with three (3) small operating software companies – Nortech Infonet Pvt. Ltd., MediSoft Systems, and Acenet Solution. Kyprianou had arranged for the three companies to be acquired by e-ChaRM – a company created expressly for this purpose by Mathews and an India-based accountant, R.K. Dhawan ("Dhawan").

50.    On December 14, 2000, AremisSoft's Bank of Cyprus account shows a debit of U.S.$310,173.03 ($173.03 in banking fees), which was sent to AremisSoft (India) Pvt. Ltd. (Citibank N.A. Mumbai Branch India) (#0051095804) for the acquisition of the underlying e-ChaRM companies and a payment to Dhawan of a U.S.$20,000 "fee."

51.    But as part of his scheme to loot assets from the Company for his personal gain and benefit, on December 27, 2000 Kyprianou caused U.S.$10.9 million to be transferred, in five different tranches, from AremisSoft's Bank of Cyprus account (account no. 0155-41-122750) to an account in the name of Still & Life account no. (0155-41-171476-06) also at the same Bank of Cyprus branch, with the notation "partial payment for e-ChaRM contract."  Still & Life had no offices, employees or operations in Cyprus.  On the same day, at least U.S.$9.9 million was then transferred from the Still & Life Bank of Cyprus account (account no. 0155-41-171476-06) to one of the Semark accounts at Bank of Cyprus (account no. 0155-41-142808) for which Kyprianou had account signing authority.

52.    At no time did Bank of Cyprus question why on the day its customer, AremisSoft, transferred U.S.$10.9 million to the account of Still & Life, ostensibly for the acquisition of e-ChaRM, U.S.$9.9 million was converted to Kyprianou's Semark

account. By knowingly remaining silent in the face of such suspicious activity, Bank of Cyprus facilitated Kyprianou's looting of U.S.$9.9 million of AremisSoft's funds.

53. In addition, Bank of Cyprus failed in its obligation to know its customer and conduct diligence on Still & Life which would have revealed that it was a Kyprianou-related entity.

### 2. The Fraudulent Acquisition of Denon.

54. Similar to the e-ChaRM fraud, Denon was reported as an acquisition of U.S.$7.34 million when, in fact, Kyprianou caused AremisSoft to secretly acquire the underlying company, Vision Group LLC ("Vision Group"), a UAE company located in Dubai, for only U.S.$250,000.

55. Yet, on December 28, 2000, Bank of Cyprus records detail four separate wire transfers from AremisSoft's Bank of Cyprus corporate cash account to a Denon account at Bank of Cyprus (account no. 0155-40-022418) totaling approximately U.S.$7.34 million. Like Still & Life, Denon, a BVI entity, had no offices, employees or operations in Cyprus. On that same day approximately U.S.$7.24 million was transferred from Denon's Bank of Cyprus account (account no. 0155-40-022418) to Southwood's Bank of Cyprus account (account no. 0155-40-008784-06).

56. Denon was formed by Sedlmayer, the principal in Spahn & Partner and purported beneficial owner of Semark who was a co-conspirator with Kyprianou in many frauds perpetrated on AremisSoft..

57. Given the February 2000 deposit into Southwood's Bank of Cyprus account of millions of U.S. dollars in proceeds of AremisSoft stock sales to InfoQuest and subsequent transfer of much of those proceeds to the Kyprianous' joint HSBC London account (*see* paragraph 39 *supra*), there is no question that Bank of Cyprus

was aware the Kyprianou owned and controlled Southwood. Despite this knowledge, Bank of Cyprus willfully failed to question why on the day its customer, AremisSoft, transferred U.S.$7.34 million to the account of Denon, U.S.$7.24 million was converted to Kyprianou's Southwood account. Bank of Cyprus intentionally remained silent in the face of this suspicious activity, thereby again facilitating Kyprianou's looting of U.S.$7.24 million from AremisSoft.

58.    In March 2001, Bank of Cyprus transferred on Kyprianou's order U.S.$1,539,967.50 of the illicit Denon proceeds from Southwood's Bank of Cyprus account to the Kyprianous' joint HSBC Account in London through correspondent banks in New York

59.    As with Still & Life, Bank of Cyprus failed in its obligation to know its customer and conduct diligence on Denon which would have revealed that it too was a Kyprianou-related entity.

60.    Having maintained accounts for AremisSoft, Still & Life, Denon, Semark and Southwood, Bank of Cyprus, at a minimum, intentionally failed to raise any concerns or questions with respect to the rapid transfers of millions of dollars from AremisSoft accounts, through accounts of non-Cyprus entities, and ultimately to accounts controlled by Kyprianou.

61.    The transfers described constituted a theft and looting by Kyprianou of almost U.S.$20 million of AremisSoft's funds which Bank of Cyprus allowed to occur.

## D.  THE ROLE OF BANK OF CYPRUS IN LAUNDERING THE PROCEEDS OF KYPRIANOU'S FRAUD AND BREACH OF FIDUCIARY DUTY

### 1.  Southwood Management Ltd. at Bank of Cyprus

62.    As noted above, Southwood is and/or was a company incorporated in the BVI in 1997 and maintained bank accounts at the Bank of Cyprus.  In the ordinary exercise of due care and basic diligence attendant to its obligations to know its customer, and the heightened due diligence obligations occasioned by various suspicious circumstances including large U.S. currency transfers from AremisSoft to Kyprianou through other accounts, Bank of Cyprus had a duty to learn the owner of the Southwood account and thus had knowledge that Kyprianou controlled Southwood.

63.    With the assistance of Bank of Cyprus, and through the use of Bank of Cyprus bank accounts, Kyprianou transferred or directed the transfer of at least an additional U.S.$11.9 million of AremisSoft's corporate cash to Southwood's bank accounts (exclusive of the AremisSoft stock sale proceeds and transfers through Denon discussed above).  The following table details cash transfers from AremisSoft's corporate cash account at Bank of Cyprus (account no. 0155-41-122750) or other AremisSoft account to Southwood Management:

| Date of Transfer | Amount of Transfer | Destination Southwood Management Account |
|---|---|---|
| 7/13/1999 | U.S.$1,040,000 | Bank of Cyprus:  0155-40-008784 |
| 4/14/2000 | 2,000,000 | Bank of Cyprus:  0155-40-008784 |
| 5/10/2000 | 1,500,000 | Bank of Cyprus:  0155-40-008784 |
| 6/30/2000 | 30,000 | Bank of Cyprus:  0155-40-008784 |
| 7/12/2000 | 23,688 | Bank of Cyprus:  0155-40-008784 |
| 7/26/2000 | 30,000 | Bank of Cyprus:  0155-40-008784 |
| 11/6/2000 | 365,000 | Bank of Cyprus:  0155-40-008784 (from AremisSoft account 0155-41-162302) |
| 1/22/2001 | 100,000 | Bank of Cyprus:  0155-40-008784 |
| 2/1/2001 | 2,100,000 | Bank of Cyprus:  0155-40-008784 |
| 2/1/2001 | 200,000 | Bank of Cyprus:  0155-40-008784 |
| 2/22/2001 | 200,000 | Bank of Cyprus:  0155-40-008784 |

| Date of Transfer | Amount of Transfer | Destination Southwood Management Account |
|---|---|---|
| 3/9/2001 | 863,000 | Bank of Cyprus: 0155-40-008784 |
| 3/9/2001 | 535,000 | Bank of Cyprus: 0155-40-008784 |
| 3/9/2001 | 300,000 | Bank of Cyprus: 0155-40-008784 |
| 3/9/2001 | 1,367,000 | Bank of Cyprus: 0155-40-008784 |
| 3/9/2001 | 1,005,000 | Bank of Cyprus: 0155-40-008784 |
| 4/2/2001 | 286,963 | Bank of Cyprus: 0155-40-008784 |
| Total | U.S.$11,945,651 | |

64.    Many of these transactions were in U.S dollar-denominated transactions which was facilitated through correspondent banks in New York.

65.    Plaintiffs have no record of services rendered for these payments, and the transfers make no economic sense.    Southwood was neither a vendor nor a customer of AremisSoft.  Nevertheless,  Bank of Cyprus intentionally took no action to question why millions of dollars were being transferred from its customer-depositor, AremisSoft, to an entity that Bank of Cyprus knew was controlled by Kyprianou.

### 2.    Semark Consultancy Services, Ltd. at Bank of Cyprus

66.    As stated above, Semark was a Cyprus company with Kyprianou and his wife serving as the sole directors and with Kyprianou having signatory control over Semark's bank accounts at Bank of Cyprus.

67.    Resembling the AremisSoft-Southwood transactions, for no discernible business purpose and for no apparent services rendered, Kyprianou converted more than U.S.$10 million of AremisSoft corporate cash to Semark.  The following table details cash transfers from AremisSoft's corporate cash account at Bank of Cyprus (account no. 0155-41-122750) to Semark:

| Date of Transfer | Amount of Transfer | Destination Semark Consultancy Account at Bank of Cyprus |
|---|---|---|
| 5/03/1999 | U.S.$ 800,000 | 0120-41-017102 |
| 12/27/1999 | 1,735,335 | 0155-40-012447 |

| Date of Transfer | Amount of Transfer | Destination Semark Consultancy Account at Bank of Cyprus |
|---|---|---|
| 12/27/1999 | 952,874 | 0155-40-012447 |
| 1/19/2000 | 190,000 | 0155-40-012447 |
| 1/18/2001 | 1,100,000 | 0155-41-142808 |
| 3/9/2001 | 365,000 | 0155-41-142808 |
| 3/9/2001 | 860,000 | 0155-41-142808 |
| 3/9/2001 | 1,415,000 | 0155-41-142808 |
| 3/9/2001 | 1,355,000 | 0155-41-142808 |
| 3/9/2001 | 1,235,000 | 0155-41-142808 |
| Total | U.S.$10,008,209 | |

68.    On March 14, 2001, Bank of Cyprus also allowed the transfer of at least U.S.$2,459,967.50 from Semark's accounts into the Kyprianous' Joint HSBC Account. This U.S. dollar-denominated transaction was facilitated through correspondent banks in New York.

69.    The Bank of Cyprus failed to investigate or to report or question why these millions of U.S. dollars were being transferred from its depositor, AremisSoft, to an entity which the Bank of Cyprus knew was controlled by Kyprianou, with a portion of the money then further transferred directly to a Kyprianou personal account.  Such transfers in the names of different shell entities in such a short period of time bear the classic hallmarks of money laundering.

70.    Based on the forgoing, and in disregard of its duties of diligence and care, as well as its contract obligations to AremisSoft as depositor, Bank of Cyprus allowed Kyprianou to engage in transactions whereby he transferred tens of millions of U.S. dollars from AremisSoft to his own accounts in breach of his fiduciary duties to AremisSoft.

### E.    THE ROLE OF BANK OF CYPRUS UK IN LAUNDERING THE PROCEEDS OF KYPRIANOU'S FRAUD

71.    Kyprianou and his wife opened accounts at Bank of Cyprus in London in August 2001 with funds transferred from HSBC.    At that time, HSBC was concerned by the widespread media reports concerning allegations about Kyprianou's involvement in the AremisSoft fraud and the likelihood of his laundering money, and had closed his account and terminated its banking relationship with Kyprianou.

72.    As detailed in paragraph 24 *supra,* since in or about May 2001 there were widespread news reports concerning Kyprianou and the fraud that had been perpetrated on AremisSoft.    Yet, despite these public allegations against Kyprianou, which led even HSBC to terminate its relations with Kyprianou, the Bank of Cyprus permitted Kyprianou to open numerous accounts in his name and in the names of his wife and children at its London branch without inquiring about the source of funds and why HSBC had closed the account relationship with Kyprianou.

73.    For a period of approximately three years, Bank of Cyprus knowingly allowed Kyprianou, and those acting on his behalf, to use its accounts to launder money in furtherance of his fraudulent scheme until the accounts, including the Semark and Southwood accounts, were virtually emptied out in 2004 and 2005.

74.    The numerous transfers of funds made by the Kyprianous through their accounts at Bank of Cyprus bore all the classic hallmarks of money laundering.    The activity in the accounts were especially suspicious in light of the numerous public allegations of fraud against Kyprianou made after May 2001. As detailed below, for no discernible business purpose, significant amounts of money were transferred into and out of many different accounts with great frequency.    The sheer volume of the

transactions alone raises serious questions concerning the legitimacy of the account activity.

75.    Bank of Cyprus was aware that Kyprianou's accounts, over the course of the period August 2001 through 2004, were being used to further the massive international fraud. In fact, a small group of Bank of Cyprus employees in London were aware of the irregularity of the transactions and voiced their concerns in their own internal documents. The management of the Bank of Cyprus, however, ignored these concerns and instead facilitated each one of Kyprianou's numerous money laundering transactions.

76.    On October 5, 2001, the Operations Department at the London branch of Bank of Cyprus was in possession of a Bloomberg news release that disclosed the allegations of fraud against Kyprianou; set forth that a New York federal judge had frozen the assets of Kyprianou; and highlighted the portion of the release that reported the judge "directed them to return the proceeds of their illegal stock sales."

77.    Yet the flurry of activity that followed in the Kyprianou accounts did not disturb the management of Bank of Cyprus. Specifically, on October 10, 2001, alone, Kyprianou requested that Bank of Cyprus cancel the auto transfer from his personal account to his property account, and further instructed that transfers would instead be made from his wife's account. Kyprianou also requested the Bank of Cyprus to send £25,000 from his sole account (309604-060) to CEI in Switzerland *without showing the remitter's name*. Acknowledging the irregularity of such instructions, a Bank of Cyprus employee, Maro Georgiou ("Georgiou"), memorialized these instructions received from Kyprianou in an October 10, 2001 memorandum to

Soteris Antoniades ("Antoniades"), the bank's Assistant General Manager and Head of Operations. Georgiou requested of his superior, "in view of the latest developments please give me your instructions," referring to the latest news regarding their client's fraudulent activities.

78.    Another Bank of Cyprus employee, Christopher Davies ("Davies"), in an internal e-mail dated October 10, 2001, states: "(re)... lycourgos -- I have discussed with [Bank of Cyprus Legal Advisor] Stephen Byrne, and have reported to NCIS [National Criminal Intelligence Services] today. Clearly, the Bloomberg report is a suspicion. We have no basis not to pay according to instructions as yet, but we must make sure that instruction were absolute complete according to SWIFT rules. On the cheque paid into a single rather than a joint name, we wonder whether these is a basis for reversing this to a new account to protect the wife."

79.    Of course Mr. Davies in London was not aware of the prior looting of AremisSoft by Kyprianou in connection with the e-ChaRM and Denon transactions and did not include such information in his report to NCIS. Bank of Cyprus, however, necessarily knew of all such suspicious transfers. It did nothing then and did nothing in the face of Mr. Davies' alarm. It then could have put a hold on Kyprianou's accounts. Instead, Bank of Cyprus allowed additional transfers by Kyprianou thereby frustrating the ability of AremisSoft to obtain disgorgement from him.

80.    By October 10, 2001, Defendant knew that Kyprianou and Mrs. Kyprianou were requesting irregular activity in their accounts and still serviced those accounts and facilitated their transfers for approximately three more years. The management of Bank of Cyprus ignored not only the growing mountain of public

evidence demonstrating Kyprianou's fraud against AremisSoft but also the voices of its own internal staff.

81.    On October 17, 2001, Georgiou expressed concern to Mrs. Kyprianou about Kyprianou's activities in a letter wherein Georgiou wrote of the allegations against her husband: "In view of the recent press reports concerning your husband's business affairs in the US and pending any investigation that might be conducted against him or other members of his family, the Bank has decided … to withdraw with immediate effect, the overdraft and credit card facility that have been agreed between us." Still, Bank of Cyprus, while seeking to protect itself, allowed Kyprianou to otherwise continue to engage in transactions with the money he had wrongfully obtained.

82.    On or about April 9, 2002, Kyprianou transferred £645,534.51 from an account he held at Lloyds TSB Bank in Geneva, Switzerland ("Lloyds TSB"), into one of Mrs. Kyprianou's accounts at Bank of Cyprus (account no. 309602-060).    This Lloyds TSB account ultimately had been used by Kyprianou to launder more than U.S.$44 million worth of his illegal insider trading proceeds in AremisSoft common stock.

83.    On the same day, for no apparent reason, the £645,534.51 was moved into another Bank of Cyprus account maintained by Mrs. Kyprianou (account no. 309620-750).    On the next day, April 10, 2002, £126,000 of the £645,534.51 was transferred to Lycourgos Kyprianou's property account at Bank of Cyprus and then remitted to an account identified as "UG Business Account," which Kyprianou controlled at Lloyds TSB.    Additionally, £550,000.00 of the £645,534.51 was

transferred to Mrs. Kyprianou's money market account (account no. 309602-791) at Bank of Cyprus.

84.    On or about June 27, 2002, Georgiou distributed an internal memorandum attaching a news release from Cyprus stating that Kyprianou had been charged in New York with money laundering, accounting irregularities and insider trading information on stocks and shares. This memorandum, which was addressed to Antoniades, the bank's assistant general manager and head of operations, states: "Further to previous correspondence and in view of fresh information from Cyprus press, as per attached copy, please advise me whether any action should be taken regarding the operation of the accounts in the name of the above."

85.    In spite of what the Bank of Cyprus knew, the transfers into and out of the Kyprianou accounts continued. On or about July 1, 2002, £125,000 from the purported "known sale of a property in the name of [Mrs. Kyprianou]" passed through Mrs. Kyprianou's account at the Bank of Cyprus into her husband's property account at the same bank (a/c 309607-06) and then was transferred to Lloyds TSB (account no. 1984203212) in the name of UG Business Account.

86.    As there was no discernible legitimate purpose served by any of these transactions, some Bank of Cyprus employees grew increasingly concerned. Nevertheless, in an e-mail dated July 2, 2002, Davies assures Georgiou that:

> [t]he proceeds pass via her account to the Kyprianou property account. There are no grounds to believe that these funds belong to a third party, and no reason to link this to proceedings in US against the customer. The transaction may therefore proceed. You should be aware that we have reported Mr. Kyprianou to NCIS under normal money laundering procedures last October. They have not indicated that we should not deal with him. I will also report this transaction.

87.    Furthermore, in an e-mail dated July 1, 2002, Antoniades wrote to Davies and Stephen Byrne that "Maro Georgiou has just seen me to alert me to the fact that she has been told to expect a fax transmission in relation to [L. Kyprianou] for the sum of £180K [£180,000], in relation to an investment. *The monies will be covered by a transfer from his wife's account. Given the case in New York can we re-examine the issue of whether there is a constructive trust and/or an issue for an NCIS report. This will need to be looked at quickly so that we can take a view as to whether to act on the customers instructions or not.*" (Emphasis added.)

88.    The return e-mail from Davies demonstrates that an NCIS report had been made on October 10, 2001, yet the bank still transferred £37,000 at that time. Davies states: "Having reported, we are not necessarily assumed to know that the funds are not Mr. K's, so we are not necessarily vulnerable to constructive trust. We have however demonstrated publicly that we are 'suspicious.' We are able to approach NCIS for further guidance should another transfer request comes [sic] in. . . That would be my advice here-report to NCIS again before paying away." Plainly the Bank of Cyprus was interested only in protecting its own appearance and not in preventing Kyprianou's money laundering done to evade his creditors, just as Defendant had closed its eyes to Kyprianou's theft of millions from AremisSoft.

89.    Once again, Bank of Cyprus facilitated the transaction, and various other suspicious transactions continued.

90.    On July 3, 2002, a Fixed Deposit Instruction was given on Mrs. Kyprianou's account (account no. 309602-791) to transfer £128,000 to her husband's property account (account no. 309607-060).

29

91.     On October 17, 2002, news organizations worldwide reported that Kyprianou had been arrested in Cyprus. Bank of Cyprus could no longer ignore its customer's blatant flouting of the law. In an internal Bank of Cyprus memorandum, Georgiou inquired whether the third party mandate on Kyprianou's property account was still valid.

92.     On February 4, 2003, a series of e-mails circulated in the Bank of Cyprus concerning a request to open a special tracker account for Mrs. Kyprianou to accommodate incoming funds in the amount of £750,000. Christian Kreps of Bank of Cyprus voiced his concern when he wrote: "I am not at all happy about this, and I do not believe we should be accepting funds on this basis unless we have an explanation of why money can't be applied directly to destination account. Please consider and revert."

93.     Nevertheless, once again, the management of Bank of Cyprus enabled a flurry of activity to occur in the Kyprianou accounts. Between February 7, 2003, and March 20, 2003, millions of dollars were transferred between Mrs. Kyprianou's various accounts.

94.     Bank of Cyprus was aware of the allegations of Kyprianou's involvement in the AremisSoft fraud and concerns of his laundering of illicit proceeds. Despite knowledge of these red flags, and in violation of its duty of care in handling accounts and in failing to prevent fraudulent transactions from taking place under circumstances where it suspects violations of law, Bank of Cyprus continued to facilitate Kyprianou's breach of fiduciary duties. In addition, by not taking steps to

end the fraudulent transactions, Bank of Cyprus frustrated the efforts of AremisSoft –
its depositor- to trace and recover the proceeds of Kyprianou's fraud on the Company.

## IX.    STATEMENT OF CLAIMS AGAINST BANK OF CYPRUS
### COUNT I
### AIDING AND ABETTING BREACH OF KYPRIANOU'S FIDUCIARY DUTY

95.    Plaintiffs repeat and reallege and incorporate by reference herein the
entirety of the allegations contained in the foregoing paragraphs.

96.    In his capacity as CEO and Chairman of the Board of AremisSoft,
Kyprianou was entrusted to conduct the affairs of the Company in a manner that would
protect the rights of the Company.  Authorized representatives and/or employees of
Bank of Cyprus had actual knowledge that Kyprianou, as AremisSoft's CEO, had a
fiduciary duty with respect to the Company and had breached that duty through a
pattern of actions that included, without limitation, looting AremisSoft assets and
money laundering.

97.    Bank of Cyprus aided and abetted Kyprianou's breaches of fiduciary
duty by knowingly permitting Kyprianou, through the rapid transfers of millions of
U.S. dollars from AremisSoft to intermediary account holders and ultimately to
accounts owned or controlled by him, to convert AremisSoft funds for his own use.

98.    Bank of Cyprus further aided and abetted Kyprianou's breaches of
fiduciary duty by knowingly permitting Kyprianou to launder tens of millions of U.S.
dollars that represented the proceeds of his insider trading activities through the
AremisSoft, Southwood and Semark accounts he controlled at Bank of Cyprus.
Kyprianou, under Delaware law, is required to disgorge said proceeds to AremisSoft.

99.     The funds Kyprianou looted and laundered in breach of the fiduciary duties he owed to AremisSoft were Company assets which, through Bank of Cyprus' knowing assistance and complicity, Kyprianou was able to convert to his personal gain and benefit.   If Bank of Cyprus had disclosed these suspicions to appropriate banking authorities and/or to AremisSoft's Board of Directors and put a hold on the accounts instead of facilitating Kyprianou's fraudulent transfers, the fraudulent scheme would have been uncovered as early as 1999 and millions of dollars in damages to AremisSoft and its shareholders would have been averted.   Thus, the actions of Bank of Cyprus both delayed discovery of Kyprianou's scheme, resulting in further losses, and deepened the Company's own insolvency.

100.     As a foreseeable consequence of aiding and abetting Kyprianou's breaches of fiduciary duty, AremisSoft and its investors have suffered substantial harm and damage proximately caused by the wrongful conduct of Bank of Cyprus in an amount to be proven at trial, but not less than $50 million.

## COUNT II
## CONSTRUCTIVE TRUSTEE

101.     Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

102.     By entering into a depositor relationship with AremisSoft, Bank of Cyprus was entrusted with AremisSoft's funds on deposit with the Bank.   As a debtor and trustee of AremisSoft's funds, Bank of Cyprus was under a duty to exercise care in the handling of AremisSoft's accounts and to protect funds from the possible wrongful conduct of a fiduciary where the bank has knowledge of such facts and circumstances

which should have aroused suspicion, and thereupon to conduct an appropriate investigation of the events giving rise to the suspicion.

103.    In disregard of its duties and obligations, Bank of Cyprus knowingly permitted AremisSoft assets to be converted and looted by Kyprianou into accounts he controlled and maintained at Bank of Cyprus.

104.    As such, to the extent any such AremisSoft funds are still retained in accounts at Bank of Cyprus, Bank of Cyprus is a liable as a constructive trustee of AremisSoft's assets.

105.    As a foreseeable consequence of aiding and abetting Kyprianou's looting and diversion of AremisSoft's assets, AremisSoft and its investors have suffered substantial harm and damage proximately caused by the wrongful conduct of Bank of Cyprus in an amount to be proven at trial.

106.    Plaintiffs herein have separately sued Kyprianou for damages incurred by reason of his wrongful conduct.    Allowed losses of the beneficiaries of the AremisSoft Trust are approximately U.S.$500 million, plus interest, legal fees and disbursements, and costs of administration of the AremisSoft Trust, less actual distributions to the beneficiaries.

107.    Kyprianou maintains, directly or indirectly for his benefit, accounts at the Bank of Cyprus, including accounts which at present are unknown to Plaintiffs. All such accounts have been frozen by reason of a Mareva injunction issued by the Court in Cyprus.

108.    By reason of the above, Bank of Cyprus is the constructive trustee of all accounts in which Kyprianou has a direct or indirect interest, whether legal or

beneficial, and is liable to retain all such accounts for the benefit of Plaintiffs as Co-Trustees of the AremisSoft Trust.

## COUNT III
## BREACH OF CONTRACT

109.    Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

110.    The relationship between Bank of Cyprus and its depositor, AremisSoft, was contractual in nature. As such, Bank of Cyprus was required to adhere to an implied duty of good faith and fair dealing.

111.    Bank of Cyprus failed to adhere to this duty and thus breached its contract with its depositor, AremisSoft, by neither inquiring with nor alerting AremisSoft to obvious and suspicious activities with respect to its accounts.

112.    Through the failure of authorized officials and/or employees of Bank of Cyprus to alert AremisSoft to either known facts or suspicions that its funds were being converted, laundered and mingled with funds belonging to Kyprianou, his family or the various entities controlled by Kyprianou, Bank of Cyprus breached its contractual obligations to AremisSoft and caused substantial loss to the Company.

113.    As a foreseeable consequence of this breach by Bank of Cyprus, AremisSoft and its investors have suffered substantial harm and damage proximately caused by the wrongful conduct of Bank of Cyprus in an amount to be proven at trial, but not less than $50 million.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

114.    Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

115.    Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.

116.    By reason of the facts alleged herein, including Bank of Cyprus' failure to alert AremisSoft to obvious and suspicious activities with respect to its accounts, and its actions in allowing AremisSoft assets to be converted, laundered, and mingled with funds belonging to Kyprianou and others, Bank of Cyprus deprived AremisSoft of its right to receive benefits under their agreement.

117.    As a foreseeable consequence of Bank of Cyprus' breach of the implied covenant of good faith and fair dealing, AremisSoft and its investors have suffered substantial harm and damage proximately caused by the wrongful conduct of Bank of Cyprus in an amount to be proven at trial, but not less than $50 million.

## COUNT V
## NEGLIGENCE

118.    Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

119.    At all times Bank of Cyprus was under a duty to exercise ordinary care in the handling of its customers' accounts and basic diligence to know its customer. The obligations were heightened in circumstances that are irregular or involve transactions in large sums of money, or which are attended by circumstances that might indicate fraud or other wrongdoing.

120.    Bank of Cyprus breached this duty when it allowed transfers of millions of dollars through accounts at its bank in the names of various account holders without ascertaining the ultimate true identity of the person or entity that owned or controlled these accounts, such as the accounts in the name of Still & Life and Denon. Had Bank of Cyprus conducted this basic due diligence it would have ascertained that Still & Life and Denon were controlled and/or related to Kyprianou which should have alerted them to the suspicious nature of transfers of AremisSoft funds through these accounts.

121.    Beyond the failure to know its customer, Bank of Cyprus was negligent in allowing transfers through accounts at the bank of millions of dollars that eventually were transferred to accounts owned and controlled by Kyprianou when it was aware of suspicions and allegations of fraud and wrongdoing involving Kyprianou. Under such attendant circumstances, Bank of Cyprus was under a duty of care to conduct an investigation to protect funds from possible wrongful conduct or other defalcation. Bank of Cyprus failed to do this.

122.    In disregard of its duties and obligations, Bank of Cyprus negligently permitted Kyprianou to convert and loot millions of dollars in AremisSoft assets.

123.    As a foreseeable consequence of Bank of Cyprus's negligence, AremisSoft and its investors have suffered substantial harm and damage proximately caused by the wrongful conduct of Bank of Cyprus in an amount to be proven at trial, but not less than $50 million.

## VIII.   RELIEF REQUESTED

**WHEREFORE,** the Plaintiffs respectfully request:

1.   that judgment be entered for Plaintiffs on each Count of this Complaint in an amount to be determined at trial, but not less than $50 million;

2.   that the Court order the relief sought by the Plaintiffs in each Count, together with interest, costs, and attorneys fees;

3.   that the Court order a constructive trust be placed on all AremisSoft assets and accounts in which Kyprianou has a direct or indirect interest, whether legal or beneficial, in the possession, custody or control of the Bank of Cyprus;

4.   that the Court award such further relief as it may deem just and appropriate.

## IX.   JURY TRIAL

Plaintiff demands a trial by jury.

Dated:        New York, New York
              September 25, 2006

                              GREENBERG TRAURIG, LLP

                              By: _Ronald D. Lefton_
                              Hal M. Hirsch (HH 0417)
                              Ronald D. Lefton (RL 2666)
                              200 Park Avenue
                              New York, New York 10166
                              (212) 801-9200

                              *Attorneys for the AremisSoft Corporation*
                              *Liquidating Trust*