UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                        Plaintiff,

       -against-

BANK OF CYPRUS
PUBLIC COMPANY LIMITED,

                      Defendant.

Index No.:  07 CIV 9234 (CSH)

# EXHIBIT 7

DECLARATION OF JOHN FELLAS IN SUPPORT OF BANK OF CYPRUS
PUBLIC COMPANY LIMITED'S MOTION TO DISMISS THE COMPLAINT



United States Department of State
*Bureau for International Narcotics and Law Enforcement Affairs*

# International Narcotics Control Strategy Report

## March 2003

# Table of Contents

**Table of Contents** i

**Common Abbreviations** v

**Section I: Introduction**

    Legislative Basis for the INCSR — I-3
    Presidential Determination No. 2003-14 — I-6

**Section II: Policy and Program Developments**

    Overview for 2002 — II-3
    Next Steps — II-11
    Demand Reduction — II-12
    Methodology for Estimating Illegal Drug Production — II-12
    Status of Potential Worldwide Production — II-13
    Worldwide Illicit Drug Cultivation — II-16
    Worldwide Potential Illicit Drug Production — II-18
    Parties to the 1988 UN Convention — II-20

**Section III: USG Assistance**

    DoS (INL) Budget — III-3
    International Training — III-5
    Drug Enforcement Administration — III-6
    United States Coast Guard — III-18
    United States Customs Service — III-27

**Section IV: South America**

    Argentina — IV-3
    Bolivia — IV-7
    Brazil — IV-12
    Chile — IV-16
    Colombia — IV-19
    Ecuador — IV-31
    Paraguay — IV-37
    Peru — IV-40
    Uruguay — IV-46
    Venezuela — IV-49

**Section V: Canada, Mexico and Central America**

    Belize — V-3
    Canada — V-7
    Costa Rica — V-12
    El Salvador — V-17

# INCSR 2003

**(Canada, Mexico and Central America)**

| | |
|---|---|
| Guatemala | V-21 |
| Honduras | V-28 |
| Mexico | V-31 |
| Nicaragua | V-41 |
| Panama | V-44 |

**Section VI: The Caribbean**

| | |
|---|---|
| Bahamas | VI-3 |
| Cuba | VI-9 |
| Dominican Republic | VI-13 |
| Dutch Caribbean | VI-19 |
| Eastern Caribbean | VI-24 |
| French Caribbean | VI-33 |
| Guyana | VI-35 |
| Haiti | VI-38 |
| Jamaica | VI-41 |
| Suriname | VI-48 |
| Trinidad and Tobago | VI-51 |

**Section VII: Southwest Asia**

| | |
|---|---|
| Afghanistan | VII-3 |
| Bangladesh | VII-9 |
| India | VII-11 |
| Maldives | VII-17 |
| Nepal | VII-18 |
| Pakistan | VII-21 |
| Sri Lanka | VII-27 |

**Section VIII: Southeast Asia and the Pacific**

| | |
|---|---|
| Australia | VIII-3 |
| Burma | VIII-6 |
| Cambodia | VIII-14 |
| China | VIII-18 |
| Fiji & Tonga | VIII-22 |
| Hong Kong | VIII-24 |
| Indonesia | VIII-27 |
| Japan | VIII-29 |
| Laos | VIII-32 |
| Malaysia | VIII-38 |
| Mongolia | VIII-41 |
| North Korea | VIII-43 |
| Palau | VIII-46 |
| Papua New Guinea, Solomon Islands, Vanuatu | VIII-47 |
| Philippines | VIII-48 |
| Singapore | VIII-52 |
| South Korea | VIII-55 |

# Table of Contents

**(Southeast Asia and the Pacific)**
    Taiwan      VIII-57
    Thailand      VIII-59
    Vietnam      VIII-68

**Section IX: Europe and Central Asia**

    Albania      IX-3
    Armenia      IX-6
    Austria      IX-8
    Azerbaijan      IX-11
    Belgium      IX-13
    Bosnia and Herzegovina      IX-17
    Bulgaria      IX-22
    Croatia      IX-25
    Cyprus      IX-28
    Czech Republic      IX-31
    Denmark      IX-34
    Finland      IX-37
    France      IX-40
    Georgia      IX-43
    Germany      IX-45
    Greece      IX-48
    Hungary      IX-51
    Iceland      IX-53
    Ireland      IX-57
    Italy      IX-59
    Kazakstan      IX-62
    Kyrgyz Republic      IX-66
    Latvia      IX-69
    Lithuania      IX-71
    Macedonia, Former Yugoslav Republic of      IX-74
    Malta      IX-78
    Moldova      IX-81
    Netherlands      IX-83
    Norway      IX-90
    Poland      IX-92
    Portugal      IX-95
    Romania      IX-98
    Russia      IX-101
    Slovak Republic      IX-106
    Slovenia      IX-108
    Spain      IX-110
    Sweden      IX-112
    Switzerland      IX-115
    Tajikistan      IX-119
    Turkey      IX-124
    Turkmenistan      IX-129
    Ukraine      IX-129

# INCSR 2003

**(Europe and Central Asia)**

| | |
|---|---|
| United Kingdom | IX-132 |
| Uzbekistan | IX-136 |
| Yugoslavia | IX-139 |

**Section X: Africa and the Middle East**

| | |
|---|---|
| Angola | X-3 |
| Botswana | X-4 |
| Burkina Faso | X-6 |
| Egypt | X-8 |
| Ethiopia | X-11 |
| Ghana | X-13 |
| Iran | X-17 |
| Israel | X-22 |
| Kenya | X-25 |
| Lebanon | X-29 |
| Lesotho | X-32 |
| Madagascar | X-33 |
| Malawi | X-35 |
| Morocco | X-37 |
| Mozambique | X-39 |
| Namibia | X-42 |
| Nigeria | X-43 |
| Saudi Arabia | X-49 |
| Senegal | X-51 |
| South Africa | X-53 |
| Swaziland | X-57 |
| Syria | X-58 |
| Tanzania | X-61 |
| Togo | X-64 |
| Tunisia | X-66 |
| United Arab Emirates | X-68 |
| Zambia | X-71 |
| Zimbabwe | X-73 |

**Section XI: Chemical Controls**

| | |
|---|---|
| Introduction | XI-3 |
| Major Chemical Source Countries | XI-8 |
| Major Drug Countries | XI-15 |

**Section XII: Money Laundering and Financial Crimes**

| | |
|---|---|
| Introduction | XII-3 |
| Appendix: FATF Special Recommendations on Terrorist Financing | XII-82 |
| Country Reports | XII-84 |

# Common Abbreviations

| | |
|---|---|
| ARS | Alternative Remittance System |
| CBRN | Caribbean Basin Radar Network |
| CFATF | Caribbean Financial Action Task Force |
| DEA | Drug Enforcement Administration |
| DOJ | Department of Justice |
| DOS | Department of State |
| ESF | Economic Support Fund |
| EU | European Union |
| FATF | Financial Action Task Force |
| FBI | Federal Bureau of Investigation |
| FinCEN | Financial Crimes Enforcement Network |
| FIU | Financial Intelligence Unit |
| GCC | Gulf Cooperation Council |
| IBC | International Business Company |
| IMF | International Monetary Fund |
| INCSR | International Narcotics Control Strategy Report |
| INM | See INL |
| INL | Bureau of International Narcotics Control and Law Enforcement Affairs |
| IRS | Internal Revenue Service |
| IRS-CID | Internal Revenue Service, Criminal Investigation Division |
| JICC | Joint Information Coordination Center |
| MLAT | Mutual Legal Assistance Treaty |
| MOU | Memorandum of Understanding |
| NBRF | Northern Border Response Force |
| NNICC | National Narcotics Intelligence Consumers Committee |
| OAS | Organization of American States |
| OAS/CICAD | Inter-American Drug Abuse Control Commission |
| OFC | Offshore Financial Center |
| OPBAT | Operation Bahamas, Turks and Caicos |
| PC-R-EV | Council of Europe's Select Committee of Experts on The Evaluation of Anti-Money Laundering Measures |
| UN Convention | 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances |
| UNODCCP | United Nations Office for Drug Control and Crime Prevention |
| USAID | Agency for International Development |
| USG | United States Government |
| | |
| ha | Hectare |
| HCl | Hydrochloride (cocaine) |
| Kg | Kilogram |
| Mt | Metric Ton |

# United Kingdom

## I. Summary

The United Kingdom (U.K.) is a consumer country of illicit drugs. Like other developed nations, the U.K. faces a serious domestic drug problem. The U.K. is in the fifth year of a ten-year drug strategy to address both the supply and demand aspects of illegal drug use. The U.K. strictly enforces national precursor chemical legislation in compliance with EU regulations. Crime syndicates from around the world tap into the underground narcotics market and use the U.K. as a major shipping route. Legislation introduced in October 2001 to improve the U.K.'s asset forfeiture capabilities took effect in January 2003. The U.K. is party to the 1988 UN Drug Convention.

## II. Status of Country

Cannabis remains the most-used illicit drug in the U.K., but with an estimated 250,000 opiate users, a major concern is heroin and other more harmful drugs (notably powder and crack cocaine). Cocaine use seems to have been on the increase over the last five years, especially among young people. The U.K.'s latest surveys on drug use show that in 2001/02 about 12 percent of those aged 16-59 reported having used drugs in the last year, with 28 percent of 16-19 year-olds reporting drug use in the last year. Virtually all parts of the U.K., including many rural areas, confront the problem of drug addiction to at least some degree. Based on recent statistics that showed an increase in drug-related deaths, the U.K. government launched a specific Action Plan to Reduce Drug-Related Deaths on November 13, 2001. The plan calls for a three to five-year program of campaigns, surveillance, and research that will play a key role in achieving the government's objective to reduce drug-related deaths by 20 percent by 2004. The Government issued an updated drug strategy paper in November 2002 that further refines its targets for education and treatment. In December 2002, it also announced a program to specifically target crack use, the National Crack Action Plan, which will focus on breaking up supply networks, improve crack-related education programs, and expand treatment opportunities.

The National Criminal Intelligence Service (NCIS) reports that Britain faces its worst-ever threat from national and international organized crime. Drugs are linked to about 80 percent of all organized crime in London, and about 60 percent of U.K. crime overall.

## III. Country Actions Against Drugs in 2002

**Policy Initiatives.** In 2002 the British government continued its ten-year strategy program, first launched in 1998, that emphasizes that all sectors of society should work together to combat drugs. Drug problems do not occur in isolation, but are often linked to other social problems. Trends in responding to drug abuse with government programs reflect wider U.K. government reforms in the welfare state, education, employment, health, immigration, criminal justice, and economic sectors.

The strategy focuses on Class A (i.e., hard) drugs and has four emphases: to help young drug abusers to resist drug misuse to permit them to reach their full potential in society; to protect communities from drug-related, antisocial and criminal behavior; to enable people with drug problems to recover and live healthy, crime-free lives; and to limit access to narcotics on the streets. Key performance targets were set in each of these four areas and updated in the November 2002 drug strategy. The most controversial aspect of the updated strategy is the decision to downgrade cannabis to a Class C drug. The final legislation implementing this downgrade is expected to be enacted in mid-2003 and to also include a proposed increase in penalties for production and trafficking in all Class C substances. Notwithstanding these amendments, the U.K. government has emphasized that it continues to regard cannabis as a harmful substance and has no intention of either decriminalizing or legalizing its production, supply, or possession.

A range of drug-prevention activities that target young people has already been undertaken. In particular, a program to develop new drug-prevention services for young people at risk of drug misuse will be an integral component of the 26 Health Action Zones (a broader health-policy initiative). The U.K. is rapidly expanding treatment services and believes it is on track to meet the target of doubling the number of people in treatment by 2008. The number of people entering treatment has increased by about 8 percent per year since 1999, and an additional U.S. $350 million (British Pounds Sterling (BPS) 214 million) has been allocated over the next three years for both community and prison treatment programs. Treatment will be based on education, harm reduction, and prescriptive and rehabilitative services that are tailored to individual needs and supported by the health and social care agencies. By March 2004, the U.K. plans to have drug education policies and education programs in all schools and, by March 2006, will complete a quality assessment of all programs and materials, introducing improvements as needed.

Legislation was passed in 2000 under the Criminal Justice and Court Services Act, which gives police the power to test criminal suspects for Class A drug use when an offense may be linked to hard-drug misuse. Courts will be required to weigh a positive test result when deciding bail, and testing will be extended to offenders serving community sentences and those on parole.

Expenditures under the updated drug strategy will increase 21 percent from a planned U.S. $1.7 billion (BPS 1.026 billion) in 2002 to U.S. $2.05 billion (BPS 1.24 billion) in 2003, followed by annual increases to U.S. $2.5 billion (BPS 1.5 billion) by April 2005. Drug treatment expenditures are targeted to increase 31 percent by 2005, and expenditures on programs for young people will rise 59 percent. The largest increase will come in spending on community programs – 234 percent.

**Accomplishments.** The Drug Treatment and Testing Order is a community-based sentence, authorizing local courts to require offenders to undergo treatment and submit to mandatory and random drug testing. The Order began as a pilot program in September 1998 in three areas of England. In October 1, 2000, after the pilot program demonstrated that the combination of treatment and random testing (to monitor progress) significantly reduced illegal drug use and criminal activity of offenders subject to the Order, it was rolled out nationally in England and Wales. By March 2001, over 1,200 orders had been made, with an additional 4,851 orders made between April 2001 and March 2002. All police forces in England and Wales now have arrest referral schemes aimed at identifying drug abusers at the point of arrest and referring them into treatment or other programs. Between October 2000 and September 2001 (latest figures), arrest referral workers screened 48,810 arrestees in England and Wales. Over half (51 percent) had never previously received drug treatment.

In January 1999, the Home Secretary announced a new initiative to reduce smuggling of drugs into prisons, and the government launched a prison service drug treatment program. Counseling, assessment, referral, advice, and care/treatment services (CARATs) are now available in every prison in England and Wales and the annual caseload is likely to exceed the target of 20,000 full assessments for 2002.

**Law Enforcement Efforts.** U.K. forfeiture law (known in U.K. law as "confiscation") applies to proceeds of all indictable offenses and a small number of specified offences. The United States enjoys good law enforcement cooperation from the U.K.. The U.K. honors U.S. asset seizure requests and was one of the first countries to enforce U.S. civil forfeiture judgments. In response to a request from Prime Minister Blair to assess the Government's efforts at confiscating criminal proceeds, in June 2000, the Cabinet Office of Performance and Innovation Unit (PIU) published a detailed report entitled "Recovering the Proceeds of Crime." The report essentially criticized the effectiveness of the U.K.'s efforts both in pursuing and collecting on confiscation orders and found that existing powers to accomplish that task were under-used. The PIU among other things, proposed the creation of a national confiscation agency dedicated to recovering criminal assets, the adoption of civil forfeiture laws, and the promotion of greater international cooperation. Incorporating many of the recommendations in the PIU report, the Proceeds of Crime Bill was enacted in July 2002. The U.K. government has also published its first Asset Recovery Strategy.

There is a significant lag in the appearance of drug seizure statistics in the U.K.. The latest full-year statistics available are from CY2000, but trends apparent in these statistics continued through 2002. In 2000, the total number of seizures of "Class A", hard drugs rose by 10 percent from the preceding year. Heroin was the most frequently seized Class A drug, followed by ecstasy, powder cocaine, and crack cocaine. U.K. authorities seized 3,382 Kg. of heroin in 2000, a 44 percent increase over 1999, and a new record. Cocaine and crack seizures together totaled a record 3,970 Kg in 8,620 cases. Ecstasy seizures were up 46 percent to 6.5 million pills. Police and Customs seized 74 metric tons of cannabis, a 4 percent increase from 1999.

**Corruption.** Narcotics-related corruption of public officials at all levels is not considered a problem in the U.K.. When identified, corrupt officials are vigorously prosecuted.

**Agreements and Treaties.** The U.S. and the U.K. have a long-standing extradition treaty and a mutual legal assistance treaty (MLAT) and a judicial narcotics agreement, which the U.K. has extended to some of its dependencies. The U.S. and the U.K. also have a judicial narcotics agreement and an MLAT relating to the Cayman Islands, and which extends to Anguilla, the British Virgin Islands, Montserrat, and the Turks and Caicos Islands. The United States and the U.K. are also party to a 1928 agreement for the direct exchange of information regarding the traffic in narcotic drugs and a 1981 agreement to facilitate the interdiction by the United States of U.K. vessels suspected of trafficking in drugs. The U.K. is a party to the 1988 UN Drug Convention, the 1961 UN Single Convention, as amended by the 1972 Protocol, and the 1971 UN Convention on Psychotropic Substances. The U.S.-U.K. Customs Mutual Assistance Agreement (CMAA) dates from 1989. In December 2000, the U.K. signed but has not yet ratified the UN Convention against Transnational Organized Crime, the Protocol to Prevent, Suppress and Punish Trafficking in Persons, and the Protocol Against the Smuggling of Migrants.

**Cultivation/Production.** Cannabis is cultivated in limited quantities for personal use, and occasionally sold commercially. Most illicit amphetamines and MDMA (Ecstasy) are trafficked from continental Europe, but some are manufactured in the U.K. in limited amounts. Authorities destroy crops and clandestine facilities as detected.

**Drug Flow/Transit.** Steady supplies of heroin and cocaine enter the U.K.. Although some 90 percent of heroin in the U.K. (amounting to around 30 tons a year) normally comes from Southwest Asia, chiefly Afghanistan, the quantity of opiates that entered the U.K. in 2001 was distorted by the ban on opium poppy cultivation in Afghanistan instituted by the Taliban in July 2000, and thereafter effectively enforced. Trafficking was not banned, however, and supplies of Afghan opium stock from previous years' crops were released and supplied to the markets in Western Europe and the U.K.. This situation resulted in an initial decline in opiates reaching the U.K., followed by a sharp increase from depressed levels, beginning in the fall of 2001, and continued through 2002.

A significant amount of the heroin that reaches the U.K. is handled at some point by U.K.-based Turkish criminal groups, although Turkish criminals in the Netherlands and Belgium also channel heroin to the U.K.. Pakistani traffickers also play a significant part; a large amount of the heroin they import, normally in small amounts by air couriers traveling direct from Pakistan, is destined for British cities where there are large South Asian populations. Caribbean criminals (primarily West Indians or British nationals of West Indian decent) are increasingly involved in the supply and distribution of heroin as well as cocaine. Most heroin probably enters the U.K. through ports in the southeast, although some enters through major U.K. airports with links to Turkey, Northern Cyprus, and Pakistan.

Hashish comes to the U.K. primarily from Morocco. Cocaine imports are estimated at 25-40 tons a year and emanate chiefly from Colombia. Supplies of both cocaine and crack cocaine reach the U.K. market in a variety of ways. Around 75 percent of cocaine is thought to be carried across the Channel from consignments shipped from Colombia to mainland Europe and then brought to the U.K. concealed in trucks or private cars, or by human couriers or "mules." Traffickers based in the U.K. are the organizers. The Caribbean, chiefly Jamaica, is a major transshipment point from Colombia with import to the U.K. being achieved by air freight and by increasing numbers of couriers, normally women, attempting to

conceal internally (i.e., through swallowing in protective bags) up to 0.5 kilogram at a time. The synthetic drug supply originates out of Western and Central Europe. Amphetamines, Ecstasy, and LSD have been traced to sources in the Netherlands and Poland, with some originating in the U.K..

The U.K. has taken responsibility for coordinating international assistance to help the Transitional Afghan Government's counternarcotics efforts. Starting with the 2003 crop, the aim is to reduce by 2008 opium production by 70 percent and completely eliminate it by 2013. A combination of measures will be employed that includes improving security and law enforcement capacity and implementing reconstruction programs to encourage farmers away from poppy cultivation.

In Iran, the U.K. helps fund a UN counternarcotics program, as well as offers bilateral assistance for drug interdiction efforts. The UN project covers training and equipment primarily to strengthen counternarcotics work at Iran's borders with Afghanistan and Pakistan. British assistance includes direct training (by HM Customs and Excise) and equipment to strengthen Iran's exit border with Turkey, which fills gaps that the UNODC's project does not meet.

**Domestic Programs (Demand Reduction).** The U.K. Government's demand reduction efforts focus on school and other community-based programs to educate young people and to prevent them from ever starting on drugs. Guidelines were enacted in November 1998 to help teachers and youth-workers warn young people about the dangers of drugs. The Drug Prevention Advisory Service (DPAS) was established in 1999 to provide school and community teams to give specialist prevention advice to all locally based drug action teams. The Standing Conference on Drug Abuse has also published guidance for teachers on managing drug problems in school, and the Positive Futures initiative set up in March 2000 aims to divert vulnerable young people away from drugs and crime through involvement in sport. On-going results from all these programs show reductions in criminal activity and truancy and improved community awareness.

## IV. U.S. Policy Initiatives and Programs

**Bilateral Cooperation.** The U.K. plays a leading role within the EU in combating drugs. Under the 1998 U.K. presidency, work was begun on a new EU drug strategy for 2000-2004; the Cardiff European Council (June 1998) endorsed its essential elements. In a speech to the Scottish Parliament in March 2000, Prime Minister Tony Blair spoke of his concern about the serious drug problems that EU member states share with applicant countries. He called for EU action against drugs to be given a much higher priority and made a number of proposals for member states to increase exchange of information, develop common key indicators for measuring their progress in tackling drug-related problems, make early progress in developing common sanctions for drug traffickers, and provide more practical help to the EU candidate countries in dealing with their drug problems.

These and other proposals were subsequently included within the EU Action Plan on Drugs 2000-2004, developed under the Portuguese Presidency and approved by the European Council at Feira in June 2000. The U.K. has acted swiftly to increase its assistance to EU applicant countries, particularly those on the heroin smuggling route through the Balkans, including an 18-month, cooperative counternarcotics program with Bulgaria. The U.K. and Spain are also creating a joint investigation team aimed at cracking down on traffickers who smuggle cocaine from Colombia to Spain and on into the U.K..

The U.K. attended the International Conference on Reconstruction to Afghanistan in January of 2002 and pledged to give U.S. $330 million (BPS 200 million) to Afghanistan over four years. Through the Department for International Development (DFID), U.S. $107 million (BPS 65 million) have already been given to Afghanistan for humanitarian and reconstruction purposes.

**The Road Ahead.** The United States looks forward to continued close cooperation with the U.K. on all counternarcotics fronts.

The government monitors registered charities and requires the organizations to keep records of donations and beneficiaries. The Ministry of Labor and Social Affairs regulates charities and charitable organizations in UAE.

The UAE is noted for its growing free trade zones (FTZs). There are well over a hundred multinational companies located in the FTZs with thousands of individual trading companies. The FTZs permit 100 percent foreign ownership, no import duties, full repatriation of capital and profits, no taxation, and easily obtainable licenses. Companies located in the free trade zones are treated as being offshore or outside the UAE for legal purposes.

The UAE is a party to the 1988 UN Drug Convention, and it has entered into a series of bilateral agreements on mutual legal assistance. The UAE is a member of the Gulf Cooperation Council, which is a member of the Financial Action Task Force (FATF). The UAE has been generally receptive to U.S. Government overtures to cooperate on money laundering issues, and has welcomed money laundering-related training and visits by U.S. officials.

The United States and the UAE continue to share information on exchanging records in connection with terrorist financing and other money laundering cases on an ad hoc basis. The AMLSCU has conducted more than 55 workshops in 2002 jointly with U.S., German, UK, and other international banking authorities.

Following the September 11 terrorist attacks in the United States and revelations that terrorists had moved funds through the UAE, Emirati authorities acted to address potential vulnerabilities, and in close concert with the United States, to freeze the funds of groups with terrorist links. The UAE Government has demonstrated that it recognizes the need to implement an effective anti-money laundering system to protect the nation's security and has begun constructing a far-reaching anti-money laundering program. However, there remain areas requiring further action. The UAE should criminalize terrorist financing to ensure that its financial institutions are not misused by terrorist organizations or their supporters. The government should continue with its efforts to examine trade-related and alternative remittance money laundering vulnerabilities. There is currently an over-reliance on suspicious transaction reports to generate money laundering investigations. Law enforcement and customs officials should begin to take the initiative to recognize money laundering activity and proactively develop cases.

**United Kingdom.** The United Kingdom (UK) plays a leading role in European and world finance and remains attractive to money launderers because of the size, sophistication, and reputation of its financial markets. Although drugs are still the major source of illegal proceeds for money laundering, the proceeds of other offenses, such as financial fraud and the smuggling of goods, have become increasingly important. The past few years have witnessed the movement of cash placement away from High Street banks and mainstream financial institutions. Criminals continue to use bureaux de change (small tourist-type currency exchanges), cash smuggling in and out of the UK, professional money launderers (including solicitors and accountants), and the purchase of high-value assets as disguises for illegally obtained money.

The UK has implemented the provisions of the European Union's Directive on the prevention of the use of the financial system for the purpose of money laundering and the Financial Action Task Force (FATF) Forty Recommendations on Money Laundering. Narcotics-related money laundering has been a criminal offense in the UK since 1986. The laundering of proceeds from all other crimes is criminalized by subsequent legislation. Banks and non-bank financial institutions in the UK must report suspicious transactions.

Bank supervision falls under the Financial Services Authority (FSA). The FSA's primary responsibilities are in areas relating to the safety and soundness of the institutions in its jurisdiction. The FSA also plays an important part in the fight against money laundering through its continued involvement in the authorization of banks, and investigations of money laundering activities involving banks. The FSA administers a civil-fines regime and has prosecutorial powers. The FSA has the power to make regulatory

rules with respect to money laundering, and to enforce those rules with a range of disciplinary measures (including fines) if the institutions fail to comply.

The UK's banking sector provides accounts to residents and non-residents, who can open accounts through private banking activities or various intermediaries that often advertise on the Internet, and also offer various offshore services. Private banking constitutes a significant portion of the British banking industry. Both resident and nonresident accounts are subject to the same reporting and record keeping requirements. Individuals typically open non-resident accounts for a tax advantage or for investment purposes.

In November 2001, money laundering regulations were extended to money service bureaus (e.g., bureaux de change, money transmission companies). The UK Government plans to bring more areas of the financial services industry into the regulated sector, making them subject to suspicious transactions reporting requirements. These areas of the industry would include attorneys, solicitors, real estate agents, and dealers in high value goods. Sectors of the betting and gaming industry that are not currently regulated are being encouraged to establish their own codes of practice, including a requirement to disclose suspicious transactions.

On July 24, 2002, the Proceeds of Crime Act 2002 was enacted, and it did not become effective until January 1, 2003. The legislation enhances the efficiency of the forfeiture process, and increases the recovered amount of illegally obtained assets. The Act consolidates existing laws on forfeiture and money laundering into a single piece of legislation and perhaps most importantly, creates civil asset forfeiture system for the proceeds of unlawful conduct. It also creates the Assets Recovery Agency (ARA), to enhance the financial investigators' power to request information from any bank about whether it holds an account for a particular person. The Act provides for confiscation orders related to people who benefit from criminal conduct, and for restraint orders to prohibit dealing with property; and allows the recovery of property that is, or represents, property obtained through unlawful conduct, or that is intended to be used in unlawful conduct.

Further, the Act gives standing to overseas requests and orders concerning property believed to be the proceeds of criminal conduct. The Act also provides the ARA with a national standard for training investigators, and gives greater powers of seizure at a lower standard of proof. Additionally, it creates for the regulated sector a new imprisonable offense of failing to disclose suspicious transactions in respect to all crime, not just narcotics- or terrorism-related crimes, as was the case previously. Along with the Proceeds of Crime Act of 2002 came an expansion of investigative powers relative to large movements of cash in the United Kingdom. In light of this, Her Majesty's (HM) Customs has increased its national priorities to include investigating the movement of cash through money exchange houses and identifying unlicensed money remitters.

Suspicious transaction reports (STRs) are filed with the Economic Crime Bureau (ECB) of the National Criminal Intelligence Service (NCIS). The NCIS serves as the UK's Financial Intelligence Unit (FIU). The ECB analyzes reports, develops intelligence, and passes information to police forces and Her Majesty's Customs and Excise for investigation. In 2001, the ECB received approximately 32,000 STRs. The ECB estimates it will receive roughly 65,000 STRs in 2002.

The Terrorism (United Nations Measures) Order 2001 makes it an offense for any individual, without a license from the Treasury, to make any funds for financial or related services available, directly or indirectly, to, or for the benefit of, a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism. The Order also makes it an offense for a bank or building society to fail to disclose to the Treasury a suspicion that a customer or entity, with whom the institution has had dealings since October 10, 2001, is attempting to participate in acts of terrorism. The Anti-Terrorism, Crime, and Security Act 2001 provides for the freezing of assets.

As a direct result of the events of September 11, 2001, the ECB established a separate Terrorist Finance Team (TFT) to maximize the effect of reports from the regulated sector. The TFT chairs a law

enforcement group to provide outreach to the financial industry concerning requirements and typologies. The operational unit that responds to the work and intelligence development of the TFT has seen a threefold increase in staffing levels directly due to the amount of work that is being produced. The Metropolitan Police responded to the growing emphasis on terrorist financing by expanding the focus and strength of their specialist financial unit dedicated to this area of investigations. This unit is now called the National Terrorist Financing Investigative Unit (NTFIU).

On November 19, 2002, Chancellor Gordon Brown ordered financial institutions in the UK to freeze funds belonging to the Benevolence International Foundation (BIF). BIF's Chief Executive, Enaam Arnaout, a Syrian-born U.S. citizen, was recently indicted in the United States for running a racketeering enterprise, conspiracy to launder money, money laundering, wire and mail fraud, and providing material support to organizations, including Usama Bin Ladin's terror network.

The UK cooperates with foreign law enforcement agencies investigating narcotics-related financial crimes. The UK is a party to the 1988 UN Drug Convention and is a member of FATF and the European Union. In January 2000, the UK signed the UN International Convention for the Suppression of the Financing of Terrorism and later ratified the Convention on March 7, 2001. In December 2000, the UK signed, but has not yet ratified, the UN Convention against Transnational Organized Crime, which is not yet in force internationally. The NCIS is an active member of the Egmont Group and has information sharing arrangements in place with the FIUs of the United States, Belgium, France, and Australia. The Mutual Legal Assistance Treaty (MLAT) between the UK and the United States has been in force since 1996. The United and UK recently negotiated an asset sharing agreement that is merely awaiting signature by the appropriate parties. The UK also has an MLAT with the Bahamas. Additionally, there is an MOU between the U.S. Customs Service and HM Customs and Excise.

The UK should continue the strong enforcement of its comprehensive anti-money laundering program and its active participation in international organizations to combat the domestic and global threat of money laundering.

**Uruguay.** In the past, Uruguay's strict bank secrecy laws, liberal currency exchange regulations, and overall economic stability made it vulnerable to money laundering, although its extent and exact nature were unknown. In 2002, however, banking scandals and mismanagement, along with massive withdrawals of Argentine deposits led to a near collapse of the Uruguayan banking system, and an end to Uruguay's role as a regional financial center. This probably serves to greatly diminish the attractiveness of Uruguayan financial institutions to money launderers in the foreseeable future. Over the last five years, the Government of Uruguay (GOU) has instituted several legislative and regulatory reforms in connection with the further consolidation of its anti-money laundering program. In May 2001, it enacted Law 17,343, which extended the predicate offenses for money laundering beyond narcotics-trafficking and corruption to include terrorism, smuggling (above the threshold of $20,000); illegal trafficking in weapons, explosives and ammunition; trafficking in human organs, tissues or medications; trafficking in human beings; extortion; kidnapping; bribery; trafficking in nuclear and toxic substances; and illegal trafficking in animals or antiques. The courts have the power to seize and later confiscate property, products or financial instruments linked to money laundering activities.

The deputy chief of staff of the President works with the National Drug Board, which is the senior authority directing anti-money laundering policy. The Center for Training on Money Laundering serves as a forum for discussion and advice on policy as well as allowing private sector input. The Financial Information and Analysis Unit (UIAF), which works with Central Bank personnel, acts as a Financial Intelligence Unit, receiving, analyzing, and remitting to judicial authorities suspicious transaction reports. The Ministry of Finance and Economics, the Ministry of the Interior (via the police force), and the Ministry of Defense (via the Naval Prefecture) also participate in anti-money laundering efforts. The private sector has also developed self-regulatory measures against money laundering such as the Codes of Conduct approved by the Association of Banks and the Chamber of Financial Entities (in 1997), the Association of Exchange Houses (2001), and the Securities Market (2002).