UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                         Plaintiff,

      -against-

BANK OF CYPRUS
PUBLIC COMPANY LIMITED,

                         Defendant.

Index No.: 07 CIV 9234 (CSH)

# EXHIBIT 8

DECLARATION OF JOHN FELLAS IN SUPPORT OF BANK OF CYPRUS
PUBLIC COMPANY LIMITED'S MOTION TO DISMISS THE COMPLAINT



United States Department of State

*Bureau for International Narcotics and Law Enforcement Affairs*

# International Narcotics Control Strategy Report

Volume II

Money Laundering and Financial Crimes

March 2006

*Embargoed until*
*March 1, 2006*
*2:00 p.m.*

# Table of Contents
## Volume II

**Legislative Basis for the INCSR** ................................................................................... 3
**Introduction** ........................................................................................................................ 4
   *Building Awareness and Acceptance*............................................................................ 5
   *Engineering Structural Change*..................................................................................... 6
   *Operationalizing Efforts*................................................................................................. 8
**Bilateral Activities** ........................................................................................................... 10
   *Training and Technical Assistance* ............................................................................. 10
   *Department of State* ..................................................................................................... 10
      International Law Enforcement Academies (ILEAs) .................................................. 11
   *Board of Governors of the Federal Reserve System (FRB)* ..................................... 14
   *Bureau of Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS)* ........................................................................................ 14
   *Drug Enforcement Administration (DEA), Department of Justice* .................................. 15
   *Federal Bureau of Investigation (FBI), Department of Justice*........................................... 16
   *Federal Deposit Insurance Corporation (FDIC)* ......................................................... 17
   *Financial Crimes Enforcement Network (FinCEN), Department of Treasury*................... 17
   *Internal Revenue Service (IRS), Department of Treasury*......................................... 19
   *Office of the Comptroller of the Currency (OCC), Department of Treasury*..................... 21
   *Office of Prosecutorial Development Assistance and Training & the Asset Forfeiture and Money Laundering Section (OPDAT and AFMLS), Department of Justice*........ 22
      Training and Technical Assistance ............................................................................ 22
      Money Laundering/Asset Forfeiture ......................................................................... 23
      Organized Crime ....................................................................................................... 24
      Fraud/Anticorruption.................................................................................................. 24
      Terrorism/Terrorist Financing.................................................................................... 25
   *Office of Technical Assistance (OTA), Treasury Department* ........................................... 26
      Assessing Training and Technical Assistance Needs ............................................... 27
      Anti-Money Laundering and Antiterrorism Financing Training.................................... 27
      Support for Financial Intelligence Units ..................................................................... 28
      Casino Gaming ......................................................................................................... 28
      Regional and Resident Advisors ............................................................................... 29
**Treaties and Agreements** ................................................................................................ 29
   *Treaties*............................................................................................................................ 29
   *Agreements*..................................................................................................................... 30
   *Asset Sharing* ................................................................................................................. 30
**Multi-Lateral Organizations & Programs** ..................................................................... 31
   *The Organization of American States Inter-American Drug Abuse Control Commission (OAS/CICAD) Group of Experts to Control Money Laundering* ................................. 31
   *Pacific Islands Forum* .................................................................................................... 32
   *United Nations Global Programme against Money Laundering* ...................................... 32

**Major Money Laundering Countries** ................................................................................. 35
   *Vulnerability Factors* .............................................................................................................. 36
   *Changes in INCSR Priorities for 2005* ................................................................................. 37
   *Country/Jurisdiction Table* .................................................................................................... 39
   *Comparative Table* ................................................................................................................ 42

**Country Reports** ................................................................................................................. 51
   Afghanistan ............................................................................................................................ 51
   Albania .................................................................................................................................... 54
   Algeria ..................................................................................................................................... 57
   Angola ..................................................................................................................................... 59
   Antigua and Barbuda ............................................................................................................. 60
   Argentina ................................................................................................................................ 62
   Aruba ....................................................................................................................................... 65
   Australia .................................................................................................................................. 68
   Austria ..................................................................................................................................... 72
   Bahamas ................................................................................................................................. 76
   Bahrain .................................................................................................................................... 78
   Bangladesh ............................................................................................................................. 82
   Barbados ................................................................................................................................. 83
   Belarus .................................................................................................................................... 85
   Belgium ................................................................................................................................... 88
   Belize ....................................................................................................................................... 92
   Bermuda ................................................................................................................................. 96
   Bolivia ..................................................................................................................................... 99
   Bosnia and Herzegovina ..................................................................................................... 102
   Botswana .............................................................................................................................. 105
   Brazil ..................................................................................................................................... 107
   British Virgin Islands ........................................................................................................... 111
   Brunei .................................................................................................................................... 112
   Bulgaria ................................................................................................................................. 114
   Burma .................................................................................................................................... 118
   Cambodia ............................................................................................................................. 120
   Canada ................................................................................................................................. 122
   Cayman Islands ................................................................................................................... 124
   Chile ...................................................................................................................................... 126
   China, People's Republic of ............................................................................................... 129
   Colombia .............................................................................................................................. 132
   Comoros ............................................................................................................................... 137
   Cook Islands ........................................................................................................................ 139
   Costa Rica ............................................................................................................................ 142
   Côte d'Ivoire ......................................................................................................................... 143
   Cyprus .................................................................................................................................. 147
   Czech Republic ................................................................................................................... 152
   Djibouti ................................................................................................................................. 156
   Dominica .............................................................................................................................. 158
   Dominican Republic ............................................................................................................ 160
   Ecuador ................................................................................................................................ 162
   Egypt, The Arab Republic of .............................................................................................. 164
   El Salvador ........................................................................................................................... 167
   Ethiopia ................................................................................................................................ 169
   France ................................................................................................................................... 170
   Germany ............................................................................................................................... 173
   Gibraltar ................................................................................................................................ 175
   Greece .................................................................................................................................. 177

# Table of Contents

| | |
|---|---|
| Grenada | 180 |
| Guatemala | 182 |
| Guernsey | 186 |
| Guyana | 189 |
| Haiti | 191 |
| Honduras | 193 |
| Hong Kong | 196 |
| Hungary | 200 |
| India | 204 |
| Indonesia | 208 |
| Iran | 212 |
| Iraq | 212 |
| Ireland | 214 |
| Isle of Man | 217 |
| Israel | 220 |
| Italy | 222 |
| Jamaica | 225 |
| Japan | 227 |
| Jersey | 230 |
| Jordan | 233 |
| Kenya | 234 |
| Korea, Democratic Peoples Republic of | 235 |
| Korea, Republic of | 236 |
| Kuwait | 239 |
| Laos | 243 |
| Latvia | 244 |
| Lebanon | 248 |
| Lesotho | 251 |
| Liechtenstein | 252 |
| Luxembourg | 254 |
| Macau | 258 |
| Malawi | 262 |
| Malaysia | 263 |
| Marshall Islands | 266 |
| Mexico | 268 |
| Monaco | 272 |
| Morocco | 274 |
| Mozambique | 276 |
| The Netherlands | 278 |
| Netherlands Antilles | 284 |
| Nicaragua | 286 |
| Nigeria | 289 |
| Pakistan | 293 |
| Palau | 294 |
| Panama | 297 |
| Paraguay | 300 |
| Peru | 305 |
| Philippines | 308 |
| Poland | 313 |
| Portugal | 316 |
| Qatar | 319 |
| Romania | 321 |
| Russia | 325 |
| Samoa | 330 |
| Saudi Arabia | 333 |
| Serbia and Montenegro | 335 |

Seychelles ........................................................................................................................... 339
Sierra Leone ....................................................................................................................... 340
Singapore ........................................................................................................................... 341
Slovakia .............................................................................................................................. 345
South Africa ........................................................................................................................ 348
Spain .................................................................................................................................. 350
St. Kitts and Nevis .............................................................................................................. 353
St. Lucia ............................................................................................................................. 355
St. Vincent and the Grenadines ......................................................................................... 356
Swaziland ........................................................................................................................... 358
Switzerland ......................................................................................................................... 359
Syria ................................................................................................................................... 364
Taiwan ................................................................................................................................ 367
Tanzania ............................................................................................................................. 370
Thailand .............................................................................................................................. 372
Turkey ................................................................................................................................. 376
Turks and Caicos ................................................................................................................ 380
Uganda ............................................................................................................................... 381
Ukraine ............................................................................................................................... 382
United Arab Emirates ......................................................................................................... 387
United Kingdom .................................................................................................................. 392
Uruguay .............................................................................................................................. 394
Uzbekistan .......................................................................................................................... 397
Vanuatu .............................................................................................................................. 401
Venezuela ........................................................................................................................... 403
Vietnam .............................................................................................................................. 406
Yemen ................................................................................................................................ 408
Zambia ............................................................................................................................... 410
Zimbabwe ........................................................................................................................... 411

# Common Abbreviations

| | |
|---|---|
| AML | Anti-Money Laundering |
| APG | Asia/Pacific Group on Money Laundering |
| ARS | Alternative Remittance System |
| CFATF | Caribbean Financial Action Task Force |
| CTF | Counter-Terrorist Financing |
| CTR | Currency Transaction Report |
| DEA | Drug Enforcement Administration |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DOS | Department of State |
| EAG | Eurasian Group to Combat Money Laundering and Terrorist Financing |
| ESAAMLG | Eastern and Southern Africa Anti-Money Laundering Group |
| EU | European Union |
| FATF | Financial Action Task Force |
| FBI | Federal Bureau of Investigation |
| FinCEN | Financial Crimes Enforcement Network |
| FIU | Financial Intelligence Unit |
| GAFISUD | Financial Action Task Force Against Money Laundering In South America |
| GIABA | Inter-Governmental Action Group against Money Laundering |
| IBC | International Business Company |
| IFI | International Financial Institution |
| IMF | International Monetary Fund |
| INCSR | International Narcotics Control Strategy Report |
| INL | Bureau for International Narcotics and Law Enforcement Affairs |
| IRS | Internal Revenue Service |
| IRS-CID | Internal Revenue Service, Criminal Investigative Division |
| MENAFATF | Middle Eastern and Northern African Financial Action Task Force |
| MLAT | Mutual Legal Assistance Treaty |
| MOU | Memorandum of Understanding |
| NCCT | Non-Cooperative Countries or Territories |
| OAS | Organization of American States |
| OAS/CICAD | OAS Inter-American Drug Abuse Control Commission |
| OFC | Offshore Financial Center |
| PIF | Pacific Islands Forum |
| SAR | Suspicious Activity Report |
| STR | Suspicious Transaction Report |
| UN Drug Convention | 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances |
| UNGPML | United Nations Global Programme against Money Laundering |
| UNODC | United Nations Office for Drug Control and Crime Prevention |
| UNSCR | United Nations Security Council Resolution |
| USAID | Agency for International Development |
| USG | United States Government |

# MONEY LAUNDERING AND FINANCIAL CRIMES

---

The 2006 report on Money Laundering and Financial Crimes is a legislatively mandated section of the U.S. Department of State's annual International Narcotics Control Strategy Report. This 2006 report on Money Laundering and Financial Crimes is based upon the contributions of numerous U.S. Government agencies and international sources. A principal contributor is the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN), which, as a member of the international Egmont Group of Financial Intelligence Units, has unique strategic and tactical perspective on international anti-money laundering developments. FinCEN is the primary contributor to the individual country reports. Another key contributor is the U.S. Department of Justice's Asset Forfeiture and Money Laundering Section (AFMLS) of Justice's Criminal Division, which plays a central role in constructing the Money Laundering and Financial Crimes Comparative Table and provides international training. Many other agencies also provided information on international training as well as technical and other assistance including the following: Department of Homeland Security's Bureau of Immigration and Customs Enforcement; Department of Justice's Drug Enforcement Administration, Federal Bureau of Investigation, and Office for Overseas Prosecutorial Development Assistance; Treasury's Internal Revenue Service, the Office of the Comptroller of the Currency, and the Office of Technical Assistance. Also providing information on training and technical assistance are the independent regulatory agencies, Federal Deposit Insurance Corporation, and the Federal Reserve Board.

## Cyprus

Cyprus has been divided since the Turkish military intervention of 1974, following a coup d'etat directed from Greece. Since then, the southern part of the country has been under the control of the Government of the Republic of Cyprus. The northern part is controlled by a Turkish Cypriot administration that in 1983 proclaimed itself the "Turkish Republic of Northern Cyprus (TRNC)." The U.S. Government recognizes only the Government of the Republic of Cyprus, and does not recognize the "TRNC".

Republic of Cyprus. The Republic of Cyprus is a major regional financial center with a robust financial services industry, both domestic and offshore, which contributes about 6.1 percent of the country's gross domestic product. Like other such centers, it remains vulnerable to international money laundering activities. Fraud and, to some extent, narcotics trafficking are the major sources of illicit proceeds laundered in Cyprus. Casinos, Internet gaming sites, and bearer shares are not permitted in the Government of Cyprus (GOC)-controlled area of Cyprus, although sports betting halls are allowed.

The development of the offshore financial sector in Cyprus has been facilitated by the island's central location, a preferential tax regime, double tax treaties with 33 countries (including the United States, several European Union (EU) nations, and former Soviet Union nations), a labor force particularly well trained in legal and accounting skills, a sophisticated telecommunications infrastructure, and relatively liberal immigration and visa requirements. In July 2002, Cyprus introduced a major amendment to its tax laws resulting in a uniform tax rate of 10 percent for all enterprises in Cyprus, irrespective of the permanent residence of their owners. This tax revision effectively lifted the distinction between local companies and offshore international business companies (IBCs). Both the prohibition from doing business locally and the preferential tax treatment that distinguished IBCs from local companies have been abolished. A grandfather clause that had allowed existing IBCs to maintain their former tax status of 4.25 percent for a transitional period expired at the end of 2005. As of 1 January 2006, the legal distinction between domestic companies and off shore IBCs ceased.

Similar provisions were introduced for offshore International Banking Units (IBUs), branches or subsidiary companies of established foreign banks, which had cumulative assets of $16.3 billion at the end of 2005. As with the IBCs, the distinction between domestic banks and IBUs ceased on January 1, 2006 upon the expiration of a transition period that had allowed preferential (4.25. percent) tax treatment for IBUs established before 2002. IBUs can do business locally, but for the time being may not offer any banking services whatsoever in Cypriot pounds to either residents or non-residents. This restriction may soon be lifted, as evidenced by the Central Bank's November 2005 decision to require IBUs to hold two percent of their deposits in local currency as minimum reserves with the Central Bank. IBUs are required to adhere to the same legal, administrative, and reporting requirements as domestic banks. The GOC is currently revising its policy regarding the licensing of new foreign-owned bank branches or subsidiaries. Details are not yet available, but Cyprus has become much more selective in terms of aiming to attract only banks from jurisdictions with proper supervisory authorities. IBUs must have a physical presence in Cyprus and cannot be shell banks. Once an IBU has registered in Cyprus, it is subject to a yearly on-site inspection by the Central Bank. The GOC-controlled area of Cyprus hosts 12 domestic banks, and 26 IBUs.

Since May 2004, when Cyprus joined the EU, banks licensed by competent authorities in EU countries may establish branches in Cyprus or provide banking services on a cross-border basis without obtaining a license from the Central Bank of Cyprus, under the EU's "single passport" principle. By the end of 2005, three EU banks that had already been operating as IBUs had elected to continue their presence in Cyprus under the "single passport" arrangement.

Over the past nine years, Cyprus has put in place a comprehensive anti-money laundering legal framework that comports with international standards. The GOC continues to revise these laws to

meet evolving international standards. In 1996, the GOC passed the Prevention and Suppression of Money Laundering Activities Law. This law criminalizes both drug and non-drug-related money laundering, provides for the confiscation of proceeds from serious crimes, codifies actions that banks and non-bank financial institutions must take (including customer identification), and mandates the establishment of a Financial Intelligence Unit (FIU). The anti-money laundering law authorizes criminal (but not civil) seizure and forfeiture of assets. Subsequent amendments to the 1996 law broadened its scope by eliminating the separate list of predicate offenses (now defined as any criminal offense punishable by a prison term exceeding one year), addressing government corruption, and facilitating the exchange of financial information with other FIUs, as well as the sharing of assets with other governments. A law passed in 1999 criminalizes counterfeiting bank instruments, such as certificates of deposit and notes.

Amendments passed in 2003 and 2004 implement the EU's Second Money Laundering Directive. These amendments authorize the FIU to instruct banks to delay or prevent execution of customers' payment orders; extend due diligence and reporting requirement to auditors, tax advisors, accountants, and, in certain cases, attorneys, real estate agents, and dealers in precious stones and gems; permit administrative fines of up to $6,390; and increase bank due diligence obligations concerning suspicious transactions and customer identification requirements, subject to supervisory exceptions for specified financial institutions in countries with equivalent requirements.

Also in 2003, the GOC enacted new legislation regulating capital and bullion movements and foreign currency transactions. The new law requires all persons entering or leaving Cyprus to declare currency (whether local or foreign) or gold bullion worth approximately $15,500 or more. This sum is subject to revision by the Central Bank. This law replaces exchange control restrictions under the Exchange Control Law, which expired on May 1, 2004.

The supervisory authorities for the financial sector are the Central Bank of Cyprus, the Securities Commission of the Stock Exchange, the Superintendent of Insurance, the Superintendent of Cooperative Banks, the Councils of the Bar Association and the Institute of Certified Public Accountants. The supervisory authorities may impose administrative sanctions if the legal entities or persons they supervise fail to meet their obligations as prescribed in Cyprus's anti-money laundering laws and regulations.

All banks must report to the Central Bank, on a monthly basis, individual cash deposits exceeding approximately $21,200 in local currency or approximately $10,000 in foreign currency. Bank employees currently are required to report all suspicious transactions to the bank's compliance officer, who determines whether to forward the report to the Unit for Combating Money Laundering (MOKAS), the Cypriot FIU, for investigation. Banks retain reports not forwarded to MOKAS, and these are audited by the Central Bank as part of its regular on-site examinations. Banks must file monthly reports with the Central Bank indicating the total number of suspicious activity reports (SARs) submitted to the compliance officer, and the number forwarded by the compliance officer to MOKAS. By law, bank officials may be held personally liable if their institutions launder money. Cypriot law protects reporting individuals with respect to their cooperation with law enforcement. Banks must retain transaction records for five years.

In recent years the Central Bank has introduced many new regulations aimed at strengthening anti-money laundering vigilance in the banking sector. Among other things, banks are required to (1) ascertain the identities of the natural persons who are the "principal/ultimate" beneficial owners of corporate or trust accounts; (2) obtain as quickly as possible identification data on the natural persons who are the "principal/ultimate" beneficial owners when certain events occur, including an unusual or significant transaction or change in account activity; a material change in the business name, officers, directors and trustees, or business activities of commercial account holders; or a material change in the customer relationship, such as establishment of new accounts or services or a change in the authorized

signatories; (3) adhere to the October 2001 paper of the Basel Committee on Banking Supervision on "Customer Due Diligence for Banks"; and (4) pay special attention to business relationships and transactions involving persons from jurisdictions identified by the Financial Action Task Force (FATF) as non-cooperative. This list is updated regularly in line with the changes effected to the list of non-cooperative countries and territories by the FATF.

In November 2004, the Central Bank issued a revised money laundering guidance note that places several significant new obligations on banks, including requirements to develop a customer acceptance policy; renew customers' identification data on a regular basis; construct customers' business profiles; install computerized risk management systems in order to verify whether a customer constitutes a "politically exposed person"; provide full details on any customer sending an electronic transfer in excess of $1,000; and implement (by June 5, 2005) adequate management information systems for on-line monitoring of customers' accounts and transactions. Cypriot banks have responded by adopting dedicated electronic risk management systems, which they typically use to target transactions to and from high-risk countries. Cyprus's Exchange Control Law expired on May 1, 2004, ending Central Bank review of foreign investment applications for non-EU residents. Individuals wishing to invest on the island now apply through the Ministry of Finance. The Ministry also supervises collective investment schemes.

The Central Bank also requires compliance officers to file an annual report outlining measures taken to prevent money laundering and to comply with its guidance notes and relevant laws. In addition, the Central Bank is legally empowered to conduct unannounced inspections of bank compliance records. In July 2002, the U.S. Internal Revenue Service (IRS) officially approved Cyprus's "know-your-customer" rules, which form the basic part of Cyprus' anti-money laundering system. As a result of the above approval, banks in Cyprus that may be acquiring United States securities on behalf of their customers are eligible to enter into a "withholding agreement" with the IRS and become qualified intermediaries.

MOKAS, the Cypriot FIU, was established in 1997. MOKAS is responsible for receiving and analyzing SARs and for conducting money laundering or financial fraud investigations. A representative of the Attorney General's Office heads the unit and its 20-member staff includes 14 full-time personnel, three part-time police officers, and three part-time Customs officers. However, MOKAS staffing is not sufficient to allow it to meet all its responsibilities. Plans to hire eight additional full-time employees have consistently been put on hold due to GOC-wide hiring freezes. MOKAS cooperates closely with FinCEN and other U.S. Government agencies in money laundering investigations.

All banks and non-bank financial institutions-insurance companies, the stock exchange, cooperative banks, lawyers, accountants, and other financial intermediaries-must report suspicious transactions to MOKAS. Sustained efforts by the Central Bank and MOKAS to strengthen reporting have resulted in an increase in the number of SARs being filed from 25 in 2000 to 144 in 2005 (through 14 December). During 2005 MOKAS received 190 information requests from foreign FIUs, other foreign authorities, and INTERPOL. Nine of the information requests were related to terrorism, although not specifically involving Cyprus. MOKAS evaluates evidence generated by its member organizations and other sources to determine if an investigation is necessary. It has the power to suspend financial transactions for an unspecified period of time as an administrative measure. MOKAS also has the power to apply for freezing or restraint orders affecting any kind of property, at a very preliminary stage of an investigation. In 2005, for the first time, MOKAS issued several warning notices, based on its own analysis, identifying possible trends in criminal financial activity. These notices have already produced results, including the closure of dormant bank accounts. MOKAS conducts anti-money laundering training for Cypriot police officers, bankers, accountants, and other financial professionals. Training for bankers is conducted in conjunction with the Central Bank of Cyprus Since late 2003, the MOKAS

computer network has been connected with that of the central government, thus giving MOKAS direct access to other GOC agencies and ministries.

During 2005, MOKAS opened 373 cases and closed 134. Reportedly, there was an undetermined number of successful prosecutions. During the same period, it issued 16 Information Disclosure Orders (typically involving judiciary proceedings in courts abroad), 12 administrative orders for postponement of transactions, and nine freezing orders, resulting in the freezing of $1,680.000 in bank accounts and 11 pieces of real estate. Additionally, during 2005 MOKAS issued two confiscation orders for a total amount of $42,000 (in one of the cases, the GOC shared the money with another jurisdiction that had been involved). Government actions to seize and forfeit assets have not been politically or publicly controversial, nor have there been retaliatory actions related to money laundering investigations, cooperation with the United States, or seizure of assets. There have been at least ten convictions recorded under the 1996 Anti-Money Laundering law, and a number of other cases are pending.

On November 30, 2001, Cyprus became a party to the UN International Convention for the Suppression of the Financing of Terrorism. The implementing legislation amended the anti-money laundering law to criminalize the financing of terrorism. In November 2004, MOKAS designated two employees to be responsible for terrorist finance issues. MOKAS routinely asks banks to check their records for any transactions by any person or organization designated by foreign FIUs as a terrorist or a terrorist organization. If a person or entity is so designated by the UN 1267 Sanctions Committee or the EU Clearinghouse, the Central Bank automatically issues a "search and freeze" order to all banks, both domestic and IBUs. As of mid-December 2005, no bank had reported holding a matching account. The lawyers' and accountants' associations cooperate closely with the Central Bank. The GOC cooperates with the United States to investigate terrorist financing.

There is no evidence that alternative remittance systems such as hawala or black market exchanges are operating in Cyprus. The GOC believes that its existing legal structure is adequate to address money laundering through such alternative systems. The GOC licenses charitable organizations, which must file with the GOC copies of their organizing documents and annual statements of account. Reportedly, the majority of all charities registered in Cyprus are domestic organizations.

Cyprus is a party to the 1988 UN Drug Convention and the UN Convention against Transnational Organized Crime. Cyprus is a member of the Council of Europe's MONEYVAL, and the Offshore Group of Banking Supervisors. MOKAS is a member of the Egmont Group and has signed memoranda of understanding (MOUs) with the FIUs of the United States, Belgium, France, the Czech Republic, Slovenia, Malta, Ireland, Australia, Ukraine, Poland, Canada, Russia, Bulgaria, South Africa, and Israel. Although Cypriot law specifically allows MOKAS to share information with other FIUs without benefit of an MOU, Cyprus is negotiating MOUs with Venezuela, Italy, and Romania. A Mutual Legal Assistance Treaty between Cyprus and the United States entered into force September 18, 2002. In 1997, the GOC entered into a bilateral agreement with Belgium for the exchange of information on money laundering. Cyprus underwent a MONEYVAL mutual evaluation in April 2005, the results of which will be published in a report to be adopted at the MONEYVAL Plenary meeting in January 2006.

The Government of the Republic of Cyprus has put in place a comprehensive anti-money laundering regime. It should continue to take steps to tighten implementation of its laws. In particular, it should ensure that regulation of charitable and nonprofit entities is adequate. Cyprus should enact provisions that allow for civil forfeiture of assets.

Area Administered by Turkish Cypriots. The Turkish Cypriot community continues to lack the legal and institutional framework needed to provide effective protection against the risks of money laundering. Turkish Cypriot authorities have, however, developed a greater appreciation of the dangers of unchecked money laundering and have begun taking limited steps to address these risks. It is

believed that the 23 essentially unregulated, and primarily Turkish-mainland owned, casinos are the primary vehicles through which money laundering occurs. Casino licenses are fairly easy to obtain, and background checks done on applicants are minimal. A significant part of the funds generated by these casinos are reportedly transported directly to Turkey without entering the Turkish Cypriot banking system, and there are few safeguards to prevent the large-scale transfer of cash to Turkey. Another area of concern is the 500 "finance institutions" operating in the area administered by Turkish Cypriots that extend credit and give loans. Although they must register with the "Office of the Registrar of Companies" they are unregulated. Some are owned by banks and others by auto dealers. In 2005, there was a huge increase in the number of sport betting halls, which are licensed by the "Ministry of Sports and Youth." There are currently six companies operating in this sector, each of which has between 15 and 20 branches; licenses for two additional companies are pending. The fact that the "TRNC" is recognized only by Turkey limits the ability of Turkish Cypriot officials to receive training or funding from international organizations with experience in combating money laundering.

The offshore banking sector also remains a concern. In August 2004, the U.S. Department of the Treasury's FinCEN issued a notice of proposed rulemaking to impose a special measure against First Merchant Bank OSH Ltd in the area administered by Turkish Cypriots as a financial institution of primary money laundering concern. Pursuant to Section 311 of the USA PATRIOT Act, FinCEN found First Merchant Bank to be of primary money laundering concern based on a number of factors, including: (1) It is licensed as an offshore bank in the "TRNC", a jurisdiction with inadequate anti-money laundering controls, particularly those applicable to its offshore sector; (2) it is involved in the marketing and sale of fraudulent financial products and services; (3) it has been used as a conduit for the laundering of fraudulently obtained funds; and (4) the individuals who own, control, and operate First Merchant Bank have links with organized crime and apparently have used First Merchant Bank to launder criminal proceeds. As a result of the finding and in consultation with federal regulators and the Departments of Justice and State, FinCEN proposed imposition of the special measure that would prohibit the opening or maintaining of correspondent or payable-through accounts by any domestic financial institution or domestic financial agency for, or on behalf of First Merchant Bank OSH Ltd. First Merchant Bank's license has not been revoked or suspended, and it continues to operate.

In 1999, a money laundering law for the area administered by Turkish Cypriots went into effect with the stated aim of reducing the number of cash transactions in the "TRNC" as well as improving the tracking of any transactions above $10,000. Banks are required to report to the "Central Bank" any electronic transfers of funds in excess of $100,000. Such reports must include information identifying the person transferring the money, the source of the money, and its destination. Banks, non-bank financial institutions, and foreign exchange dealers must report all currency transactions over $20,000, and suspicious transactions in any amount. Banks must follow a know-your-customer policy and require customer identification. Banks must also submit suspicious transaction reports to an "Anti-Money Laundering Committee" that is supposed to function as a quasi-FIU and have investigative powers. The five-member committee is composed of representatives of the police, customs, the "Central Bank," and the "Ministry of Finance." However, the 1999 anti-money laundering law has never been fully implemented or enforced.

In 2005, the "Anti-Money Laundering Committee," which had been largely dormant for several years, began meeting on a regular basis and encouraging banks to meet their obligations to file SARs. The committee has reportedly referred several cases of possible money laundering to law enforcement for further investigation, but no cases have been brought to court and no individuals have been charged. There have been no successful prosecutions of individuals on money laundering charges, and there are concerns that law enforcement and judicial officials lack the technical skills needed to investigate and prosecute financial crimes.

Although the 1999 money laundering law prohibits individuals entering or leaving the area administered by Turkish Cypriots from transporting more than $10,000 in currency without prior

"Central Bank" authorization, "Central Bank" officials note that this law is difficult to enforce, given the large volume of travelers to and from Turkey In 2003, Turkish Cypriot authorities relaxed restrictions that limited travel across the UN-patrolled buffer zone. There is also a relatively large British population in the area administered by Turkish Cypriots and a significant number of British tourists. As a result, an informal currency exchange market has developed.

The "Ministries of Finance and Economy and Tourism" are drafting several new anti-money laundering laws that they say will, among other things, better regulate casinos, currency exchange houses, and both onshore and offshore banks. Turkish Cypriot officials have committed to ensuring that the new legislation meets international standards. However, it is unclear if the new legislation will be adopted, and if it is, whether it will ever be fully implemented and enforced.

There are currently 26 domestic banks in the area administered by Turkish Cypriots. Internet banking is available. The offshore sector consists of 18 banks and approximately 50 IBCs. The offshore banks may not conduct business with residents of the area administered by Turkish Cypriots and may not deal in cash. The offshore entities are audited by the "Central Bank" and are required to submit a yearly report on their activities. However, the "Central Bank" has no regulatory authority over the offshore banks and can neither grant nor revoke licenses. Instead, the "Ministry of the Economy" performs this function. Although a proposed new law would have restricted the granting of new bank licenses to only those banks already having licensees in an OECD country, the law never passed.

The 1999 Turkish Cypriot anti-money laundering law does provide better banking regulations than were previously in force, but it is far from adequate. The major weakness continues to be the area administered by Turkish Cypriots many casinos, where a lack of resources and expertise leave that area, for all intents and purposes, unregulated, and therefore especially vulnerable to money laundering abuse. The largely unregulated finance institutions, currency exchange houses, and offshore banking sector are also of concern. The Turkish Cypriot authorities should move quickly to enact a new anti-money laundering law and to tighten regulation of casinos, money exchange houses, and the offshore sector.

## Czech Republic

The Czech Republic's central location in Europe and its relatively new status as a functional market economy have left it vulnerable to money laundering. While various forms of organized crime (narcotics trafficking, trafficking in persons, fraud, embezzlement, and smuggling) remain the primary source of laundered assets in the country, Czech officials and media outlets have voiced increasing concern about the ability of extremist groups and terrorists to launder or remit money within the country. Although steadily improving, Czech enforcement and prosecution of money laundering offenses remains relatively weak, with the few convicted offenders receiving only light sentences. Domestic and foreign organized crime groups target Czech financial institutions for laundering activity. Banks, currency exchanges, casinos and other gaming establishments, investment companies, and real estate agencies have all been used to launder criminal proceeds.

The Czech Republic first criminalized money laundering in September 1995 through additions to its Criminal Code. Although the Criminal Code does not explicitly mention money laundering, its provisions apply to financial transactions involving the proceeds of all serious crimes. A July 2002, amendment to the Criminal Code introduces a new, independent offense called "Legalization of Proceeds from Crime." This offense has a wider scope than previous provisions in that it enables prosecution for laundering one's own illegal proceeds (as opposed to those of other parties). The 2002 amendment also stipulated punishments of five to eight years imprisonment for the legalization of proceeds from all serious criminal activity and also called for the forfeiture of assets associated with money laundering.