UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-against-

BANK OF CYPRUS
PUBLIC COMPANY LIMITED,

Defendant.

Index No.:  07 CIV 9234 (CSH)

**EXPERT OPINION OF
WILLIAM BLAIR QC**

London, England

William Blair QC, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I provide this expert report at the request of Hughes, Hubbard & Reed LLP, attorneys for the defendant Bank of Cyprus Public Company Limited, which is a bank incorporated in the Republic of Cyprus, with an operation in the United Kingdom called Bank of Cyprus (London) Ltd.  The opinion is to be submitted in respect of money laundering charges against Bank of Cyprus filed on 15 October 2007 by the United States Attorney for the Southern District of New York in connection with the AremisSoft securities fraud.

2.    I was called to the Bar of England and Wales in 1972, and appointed a Queen's Counsel in 1994.  I carry on practice from Chambers in Gray's Inn, London, and specialise in the law of domestic and international banking and finance.  My practice includes advisory work, litigation and arbitration in the area of international banking, both in England and in other countries.  I have been a visiting Professor of Law at the London School of Economics since 1994, and a visiting Professor at the Centre for Commercial Law Studies (which is part of Queen Mary College, University of London) since 1999.  In the course of my academic work, I have published numerous articles on banking law and practice, and have spoken extensively on subjects related to financial law internationally.  I am familiar with

1

the principles of law as regards money laundering as they apply in the United Kingdom. My book on "*Banks and Financial Crime, The Law of Tainted Money*" co-authored with specialist academics and practitioners will be published by the Oxford University Press in Spring 2008. As is the case of some other senior members of the legal profession in England, I have certain part time judicial duties, sitting as a Recorder (judge) in the Crown Court, as one of the legal Chairman of the Financial Services and Markets Tribunal, and as a Deputy High Court Judge sitting in the Queens Bench Division and Chancery Division. A copy of my curriculum vitae is annexed to this Opinion.

3.    I am asked to give my opinion (1) describing the UK regulatory framework as regards money laundering, and (2) on the impact of the criminal offence of "tipping off" under English law on a U.K. bank's obligations to report suspicious transactions to U.K. money laundering authorities at the time of two letters from Bank of Cyprus (London) Ltd dated 10 October 2001 and 2 July 2002 respectively to the NCIS (National Criminal Intelligence Service) Economic Crime Unit in London.

4.    In preparing this opinion, I have seen the following documents[1]:

(1)    A memorandum of law dated 30 November 2006 submitted by Bank of Cyprus in support of the Motion.

(2)    The Opinion of Hon. Charles S. Haight Jr, Senior United States District Judge, Southern District of New York, dated 15 August 2007 dismissing (upon certain conditions) the Amended Complaint on the ground of *forum non conveniens*. For the factual basis of this report, I have respectfully proceeded on the basis of Judge Haight's analysis, taking into account additionally the letters mentioned in sub-para (5).

---

[1] To assist me with the form in which the report should be submitted to the Court, I was also provided with a Declaration of Mr Demetrios Stylianides, former President of the Cyprus Supreme Court, executed on 22 November 2006 in support of the Motion of the Bank of Cyprus to dismiss the Amended Complaint in *LaSala et al v. Bank of Cyprus Public Company Limited* (06 Civ 6673)

(3)    A Complaint against Bank of Cyprus filed on 15 October 2007 by the United States Attorney for the Southern District of New York in *The United States of America v. Bank of Cyprus Public Company Limited* (07 Civ 9234).

(4)    Letters from Bank of Cyprus (London) Ltd dated 10 October 2001 and 2 July 2002 to NCIS Economic Crime Unit in London reporting suspicious transactions involving a customer, Mr Lycourgos Kyprianou.

The UK regulatory framework as regards money laundering

5.    UK banks, and UK branches of non-UK banks, are subject to a relatively onerous regime as regards anti-money laundering (AML) and counter-terrorist financing (CTF). Though there has been considerable change over the last few years, and a substantial increase in reporting since 9/11, the core obligations are familiar internationally. The law imposes a "know your customer" (KYC) requirement. Once the relationship is operational, the law imposes requirements as to the recognition and reporting of suspicious transactions. Banks must report such transactions to the authorities, who then have to decide what action to take. There are also obligations as regards systems and controls, record keeping, staff training, etc.

6.    Until 2006, reports in the UK were made to NCIS, the recipient of the letters of 10 October 2001 and 2 July 2002, and thereafter to its successor, the Serious Organised Crime Agency. Though there are standard forms for disclosure, their use is not mandatory, and I do not believe that it is unusual for financial institutions to write to NCIS as happened in this case.

7.    Leaving CTF aside, broadly speaking, there are five main sources of law as regards AML. First, money laundering gives rise to a number of criminal offences under primary legislation. Until 2003, offences relating to narcotics were contained within the Drug Trafficking Act 1994. Offences relating to the laundering of the

proceeds of other crimes were mostly found in the Criminal Justice Act 1988 (as amended). With effect from 24 February 2003, these provisions were consolidated in Part 7 of the Proceeds of Crime Act 2002, though not retrospectively. Under the pre-2003 law, failure to report knowledge or suspicion of drug money laundering to the police was a criminal offence (the 2002 Act extended this provision so far as banks are concerned to the proceeds of crime generally).

8.   Second, European Union legislation provides a degree of uniform standards across the (currently twenty seven) member states, though states can, and in the case of the UK have, gone beyond these standards. At the material times, the relevant Directives were the first AML Directive which was adopted in 1991 (91/308/EEC), and the second AML Directive (2001/97/EC) which was adopted in 2001 and came into effect in June 2003. (This, amongst other things, extended the scope of the first directive beyond banks and financial institutions). The Third AML Directive (2005/60/EC) contains further significant extensions, but so far as the UK is concerned, only came into effect in December 2007.

9.   Third, these directives require implementation at the national level. In the UK, implementation is by regulations consisting of secondary legislation in the form of statutory instruments. These are important sources of banks' AML obligations. There have been a number of such regulations promulgated, including the Money Laundering Regulations 1993 (SI 1993 No 1933), 2001 (SI 2001 No 3641), 2003 (SI 2003 No. 3075), and 2007 (SI 2007 No. 2157). It is these regulations that impose the KYC and other requirements mentioned above.

10.  The fourth source is regulatory. Since 1998, banks in the UK have been regulated by the Financial Services Authority (FSA). By statute, one of the FSA's regulatory objectives is the reduction in financial crime, and the prevention of money laundering is one of its responsibilities. Between 2001 and 2006, the AML rules were contained in the FSA's money laundering sourcebook, which contained a mix of regulatory rules and guidance (it was deleted because there was an unnecessary

overlap with the industry guidance notes mentioned in the next paragraph). The FSA has imposed substantial fines on financial institutions for breach of money laundering rules. It also has power to prosecute certain offences relating to money laundering.

11. The fifth source consists of the *Guidance for the UK Financial Sector* issued by the Joint Money Laundering Steering Group (JMLSG) which is made up of the leading UK trade associations in the financial services industry. Its aim is to promulgate good practice in countering money laundering and to give practical assistance in interpreting the UK Money Laundering Regulations. The Guidance is periodically updated. Whilst its application is not in a formal sense mandatory, in determining whether the Money Laundering Regulations have been complied with, a Court may take account of the Guidance (eg regulation 42(3) of the 2007 Regulations).

12. Where a financial institution makes a report to NCIS, there are a number of enforcement measures available to the authorities should they decide to intervene. These have been expanded under the provisions of the Proceeds of Crime Act 2002. Looking at the position as it was at the time, had the letters of 10 October 2001 and 2 July 2002 given rise to a criminal investigation, either against Mr Lycourgos Kyprianou, or against the bank itself, a Court could have ordered the bank to give information about the account relationship under the Police and Criminal Evidence Act 1984 (for the relevant provisions see eg *Barclays Bank plc v Taylor* [1989] 1 WLR 1066, CA). Had this resulted in an intention to bring charges, the Court could have granted a "restraint order" freezing the bank accounts concerned. Had charges resulted in conviction, the funds in question would have been subject to the provisions as to confiscation.

The Offence of "Tipping Off"

13. In addition to describing the U.K. regulatory framework as regards money laundering, I should mention the provisions as regards the offence of "tipping off"

which were in force at the time of the letters of 10 October 2001 and 2 July 2002. Section 93D Criminal Justice Act 1988 provided that:

> (1) A person is guilty of an offence if-(a) he knows or suspects that a constable is acting, or is proposing to act, in connection with an investigation which is being, or is about to be, conducted into money laundering; and (b) he discloses to any other person information or any other matter which is likely to prejudice that investigation, or proposed investigation.

> (2) A person is guilty of an offence if-(a) he knows or suspects that a disclosure ("the disclosure"[2]) has been made to a constable under section 93A or 93B above; and (b) he discloses to any other person information or any other matter which is likely to prejudice any investigation which might be conducted following the disclosure.

> (3) A person is guilty of an offence if-(a) he knows or suspects that a disclosure of a kind mentioned in section 93A(5) or 93B(8) above ("the disclosure") has been made; and (b) he discloses to any person information or any other matter which is likely to prejudice any investigation which might be conducted following the disclosure.

14. This provision was intended to criminalise the disclosing of information which amounts to the "tipping off" by a bank or anybody else of a criminal who is seeking to launder the proceeds of criminal conduct, thereby thwarting a money laundering investigation by the authorities. Similar provisions appear in the Proceeds of Crime Act 2002. The "tipping off" provisions have been interpreted by banks as preventing them from alerting a customer that a report to the authorities has been made in respect of the customer's account. There is some uncertainty as to what amounts to "alerting the customer" for these purposes.

15. According to a leading textbook, "This 'tipping off' offence has caused considerable difficulties to banks when faced with customers whom they suspect or

---

[2] For example, a suspicious activity report made by a bank to NCIS. Somewhat confusingly, the provisions describe this as a "*disclosure*", and go on to describe tipping off in terms of "*disclosing* information which is likely to prejudice any investigation". The "disclosures" in each case are of course completely different.

know have criminal property in their accounts, as any freezing of the account after reporting suspicions to NCIS may 'tip off' the customer that this has occurred" (Ellinger's Modern Banking Law, 4[th] edn (2006) at p.107). The implication is that a bank may feel constrained to allow a transaction to proceed for fear of running foul of the law.    Another textbook analyses the tipping off offence as follows: "Disclosure [i.e. to the customer] probably means no more than to 'advert to', 'state', 'communicate' or 'advise'   Disclosure can be direct (e.g. informing the affected client of the [report] over the telephone) or constructive (e.g. the rejection of a client's instructions or retainer in such a way that the only inference that could be drawn is that a [report] has been made" (Butterworths Money Laundering Law para 3[1281]).


I declare under penalty of perjury that the foregoing is true and correct.


*William Blair*


Executed on this 23rd day of January 2008
in London, England