HUGHES HUBBARD & REED LLP
John Fellas
Marc A. Weinstein
Sarah L. Cave
Hagit Elul
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)

*Attorneys for Defendant Bank of Cyprus Public Company Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| -against- | Index No.: 07 CIV 9234 (CSH) |
| BANK OF CYPRUS PUBLIC COMPANY LIMITED, | |
| Defendant. | |

**DEFENDANT BANK OF CYPRUS PUBLIC COMPANY LIMITED'S**
**<u>MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS</u>**

TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................ 1

The Government's Allegations ................................................................................... 4

Argument .................................................................................................................... 8

I.    THE GOVERNMENT'S CLAIMS EXCEED THE LIMITED GRANT OF
      EXTRATERRITORIAL JURISDICTION UNDER THE MONEY
      LAUNDERING CONTROL ACT ..................................................................... 8

      A.    The Alleged Conduct Of The Bank Does Not Fall Within The Limited
            Extraterritorial Jurisdiction Permitted Under Section 1956 Of The MLCA ........... 9

      B.    The Alleged Conduct Of The Bank Does Not Fall Within The Limited
            Extraterritorial Jurisdiction Permitted Under Section 1957 Of The MLCA ......... 14

      C.    The Exercise of Extraterritorial Jurisdiction Here Would Be Unreasonable ........ 15

II.   THE EXERCISE OF PERSONAL JURISDICTION OVER THE BANK
      WOULD NOT BE REASONABLE ................................................................. 17

      A.    The Bank Will Bear An Enormous Burden If Required To Litigate Here ........... 18

      B.    Cyprus And The United Kingdom Possess A Stronger Local Interest In
            Adjudicating Claims Based On The Bank's Conduct In Those Countries ........... 20

      C.    The Government's Interest In Obtaining Convenient and Effective Relief ......... 20

      D.    Judicial System's Interest In Most Efficient Resolution Of The
            Controversy ................................................................................................... 21

III.  THE GOVERNMENT'S CLAIMS FOR THE 99 TRANSACTIONS BEFORE
      SEPTEMBER 7, 2002 ARE BARRED BY THE STATUTE OF LIMITATIONS ......... 22

IV.   THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE
      2003 TRANSACTIONS .................................................................................. 24

      A.    The Complaint Fails To State A Claim For Money Laundering With
            Respect To The 2003 Transactions .................................................................. 25

            1.    None of The 2003 Transactions Involved The Proceeds Of
                  Specified Unlawful Activity ..................................................................... 27

            2.    The Bank Did Not Have The Requisite Knowledge ................................. 27

            3.    None Of The 2003 Transactions Was Conducted For The Purpose
                  Of Concealment ...................................................................................... 28

TABLE OF CONTENTS
(continued)

Page

4.   None Of The 2003 Transactions Was Intended To Promote Specified Unlawful Activity .................................................................. 29

5.   None Of The Alleged Transactions Involved Transfers To Or From The United States ................................................................. 30

B.   The Complaint Fails To Allege That Any Conspiracy Took Place After The Limitations Date ...................................................... 31

Conclusion ...................................................................................................... 36

## TABLE OF AUTHORITIES

Page

### CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................................25, 28

*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328 (2d Cir. 2006).........................25, 31

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001).................................................33

*Asahi Metal Indus. Co. Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102 (1987)..................18

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988)........................................................23

*Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189 (N.Y. 1991)..............................................12

*Bell Atlantic Corp. v. Twombly*, --U.S.--, 127 S. Ct. 1955 (2007)..........................................25, 34

*Bingham v. Zolt*, 66 F.3d 553, 559-60 (2d Cir. 1995) ...................................................................23

*Blusal Meats, Inc. v. United States*, 638 F. Supp. 824 (S.D.N.Y. 1986) ......................................23

*Calgarth Inv., Ltd. v. Bank Saderat Iran*, 1996 WL 204470 (S.D.N.Y. Apr. 26, 1996) ...............12

*Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018 (2d Cir. 1997) .............................................18, 20, 21

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002).........................................................6

*Citibank, N.A. v. Wells Fargo Asia Ltd.*, 495 U.S. 660 (1990)......................................................11

*Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394 (S.D.N.Y. 2000) ...........................8

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) .....................................................................9

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)..............................................25, 33, 34

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir.1995) ................................25, 27, 29, 32

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ......................................................17

*International Hous., Ltd. v. Rafidain Bank Iraq*, 712 F. Supp. 1112 (S.D.N.Y.),
    *aff'd*, 893 F.2d 8 (2d Cir. 1989)........................................................................11, 13, 14

*Jones v. Coughlin*, 665 F. Supp. 1040 (S.D.N.Y. 1987)..........................................................24, 25

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007) ................. *passim*

# TABLE OF AUTHORITIES
(continued)

*Lan Assocs. XVIII, Ltd. v. Bank of Nova Scotia*, 1997 WL 458753
(S.D.N.Y. Aug. 11, 1997) ...................................................................13

*Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533 (S.D.N.Y 1983)....................................13, 14

*In re Maxwell Commc'n Corp.*, 93 F.3d 1036 (2d Cir. 1996) ......................................17

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)............17, 18, 21

*National Group For Commc'ns & Computers v. Lucent Techs., Inc.,* 420 F. Supp. 2d 253
(S.D.N.Y. 2006) ...................................................................................31

*Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980) ......................................23

*Smith v. United States*, 507 U.S. 197 (1993) .................................................................9

*Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236 (S.D.N.Y. 2003) ..........................23

*Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992) ...................................13

*United States v. Approximately $25,829,681.80 in Funds*, 1999 WL 1080370
(S.D.N.Y. Nov. 30, 1999) ...................................................................10

*United States v. Cabrales*, 524 U.S. 1 (1998) .................................................11

*United States v. Javino*, 960 F.2d 1137 (2d Cir. 1992)..........................................9, 13, 15

*United States v. Esterman*, 324 F.3d 565 (7th Cir. 2003)........................................29

*United States v. Ness*, 466 F.3d 79 (2d Cir. 2006)...............................................29

*United States v. Gotti*, 457 F. Supp. 2d 411 (S.D.N.Y. 2006)......................................28

*United States v. Johnson*, 440 F.3d 1286 (11th Cir. 2006)........................................29

*United States v. Napoli*, 179 F.3d 1 (2d Cir. 1999) .............................................28

*United States v. Stein*, 1994 WL 285020 (E.D. La. June 23, 1994)................................10

*United States v. Stephenson*, 183 F.3d 110 (2d Cir. 1999).......................................28, 29

*United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003).............................................30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)..............................25

## STATUTES

18 U.S.C. § 1956................................................................................... passim

## TABLE OF AUTHORITIES
(continued)

Page

18 U.S.C. § 1957................................................................................................... passim

28 U.S.C. § 2462...................................................................................................22

Restatement (Third) of Foreign Relations Law § 403(2)..........................................15

S. Rep. No. 99-433 (1986)....................................................................................9, 30

## MISCELLANEOUS

Justice Criminal Resource Manual for U.S. Attorneys, § 2101 (Money Laundering Overview) (Oct. 1997)..................................................................................14

3 Sand, Modern Federal Jury Instructions – Criminal ¶¶ 50A-2, 50A-16, 50A-25......................27

Defendant Bank of Cyprus Public Company Limited (the "Bank") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint.

## Preliminary Statement

Through its complaint, the Government seeks to bring stale claims against a foreign bank predicated on exclusively foreign conduct. While seeking to recover approximately $162 million based upon 107 alleged money laundering transactions involving accounts at the Bank, the face of the complaint makes plain that: (i) none of the 107 transactions involved transfers to or from the United States; (ii) the Bank did not otherwise act in the United States; (iii) 99 of the 107 transactions (over $160 million of the $162 million claim) occurred more than five years before the filing of this action. These obvious pleading defects pose four insurmountable legal hurdles to the Government's claims: the Court lacks both subject matter and personal jurisdiction, the large majority of the alleged laundering transactions are time-barred, and for those not time-barred the Government has failed to state a claim.

That the Government chose to file such a meritless action at this late date can be explained only by its concerted, and equally unsuccessful, efforts with the AremisSoft Trustees, with whom it has agreed through a court-approved Coordination Agreement to "coordinate[e] tactics and strategy,"[1] to employ the United States courts against this foreign bank for conduct wholly outside of this country. Although it began to investigate the AremisSoft fraud over six years ago,[2] the Government waited to assert that it had any claim against the Bank until after this Court dismissed the action against the Bank brought by the AremisSoft Trustees. This Court

---

[1]    Coordination Agreement, September 14, 2004, Section 12, attached as Exhibit 2 to the Declaration of John Fellas dated January 23, 2008 ("Fellas Decl."); Order Approving Coordination Agreement, Oct. 13, 2004, ¶ 20, *In re AremisSoft Corp.*, 02-cv-01336 (D.N.J.) (the "Order") (Fellas Decl Ex. 3).

[2]    The Government began to investigate the AremisSoft fraud at least as early as late 2001, indicting Roys Poyiadjis on December 19, 2001, commencing a civil forfeiture action in March 2002, and indicting Lycourgis Kyprianou in June 2002, including for money laundering. (Compl. ¶¶ 23, 24 (Fellas Decl. Ex. 1).)

dismissed that action on August 15, 2007, on grounds of *forum non conveniens*, finding that Cyprus was the appropriate forum for the Trustees' claims. *LaSala v. Bank of Cyprus Pub. Co Ltd.*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007).

Just days after that dismissal, the Government suddenly indicated it would be bring a claim against the Bank for money laundering. On August 28, 2007, the Government wrote to this Court stating that it intended to file complaints against the Bank and Lloyds TSB Bank plc that "arise out of the same facts as the two cases pending before Your Honor, which were recently dismissed on the grounds of <u>forum</u> <u>non</u> <u>conveniens</u>."[3] The substantial similarity between the Government's action and the Trustees' now-dismissed action is readily apparent:[4]

- In many instances, the Government complaint is copied verbatim from the Trustees' now-dismissed complaint. (*Compare* Trustees' Compl. ¶¶ 9, 11-12, 20-22, 24, 36-37, 39, 51, 65, 77-78, 80, 84, 86-88, 91-91 (Fellas Decl. Ex. 5) *with* Compl. ¶¶ 21, 18-19, 6-8, 11, 13, 32, 46, 47, 52-53, 73, 83-85, 87-88, 90-91, 94-96.)

- As with the Trustees' case, the events center on Cyprus, and to a lesser extent England, involving accounts opened and administered in Cyprus and England, and the transfers of funds among European banks, but none in the United States. (Trustees' Compl. ¶¶ 63, 67-68, 82-83, 85, 90; Compl. ¶ 41.)

- The Government charges the Bank with money-laundering and with being a party to a conspiracy with Kyprianou. Thus, as with the Trustees' action, at the heart of the Government's case is what the Bank's representatives knew and what they did when they knew those things, with the result that the vast majority of the witnesses and other evidence relating to this case is located in Cyprus. *LaSala*, 510 F. Supp. 2d at 262.

- As with the Trustees' case — where the Court held that Cyprus law governed the Trustees' claims — here the Government acknowledges that the Bank and the Bank of Cyprus (UK) are regulated by a rigorous scheme of Cypriot and English money-laundering law. *LaSala,* 510 F. Supp. 2d at 263-266. (Compl. ¶¶ 34-39.)

- Like the Trustees' complaint, the Government complaint has been prepared with the benefit of the discovery obtained by the Trustees from Bank of Cyprus (UK),

---

[3]    Letter from Rua M. Kelly to Honorable Charles S. Haight, Jr., dated Aug. 28, 2007. (Fellas Decl. Ex. 4.)

[4]    The Trustees have filed a motion for reconsideration of this Court's dismissal of their action based on the Government's August 28, 2007 letter.

and the complaint quotes from and cites to documents obtained in discovery. (Compl. ¶¶ 84-88, 92, 94; Declaration of Stephen George Byrne, dated January 22, 2008 ("Byrne Decl."), at ¶¶ 11-14.)

- Finally, as with the Trustees' action, under the terms of the Coordination Agreement and the court's order approving the agreement, if the Government secures any recovery, the proceeds will go to the AremisSoft Liquidating Trust for the benefit of the Trust beneficiaries. (Coordination Agreement, Section 5.1-5.3 ¶¶ 17-18 (Fellas Decl. Ex. 2); Order (Fellas Decl. Ex. 3).)

In light of the substantial similarity between the Trustees' and the Government's actions, as well as the timing of the latter, it appears that the Government action is an attempt to circumvent this Court's decision dismissing the Trustees' action in favor of Cyprus. But the same factors that compelled the dismissal of the Trustees' action — the fact that the dispute is centered on events in Cyprus, that the majority of the evidence is located there and that other countries have a greater interest than the United States regarding the activities of banks operating in their countries — warrant dismissal here, albeit on analogous but different legal grounds.

First, this action should be dismissed because it constitutes an unprecedented attempt to apply the United States money laundering statute beyond its explicit, but limited, statutory extraterritorial reach to conduct that took place outside of the United States. (Point I.) Second, this case should be dismissed because the exercise of personal jurisdiction over the Bank based on its activities in other countries offends the traditional notions of "fair play and substantial justice." (Point II.)

Third, those claims seeking recovery based on transactions pre-dating September 7, 2002 should be dismissed as time-barred. Even though it has investigated the AremisSoft fraud since 2001, the Government delayed bringing any claims against the Bank for six more years. It did not file a complaint until October 15, 2007, shortly after it entered into an agreement with the Bank tolling the statute of limitations as of September 7, 2007. Yet the Government charges the Bank with money laundering with respect to transactions that took place

over eight years before that date, well beyond the applicable five-year statute of limitations. Indeed, the overwhelming majority of the transactions that are the subject of the complaint — 99 out of 107 — took place before September 7, 2002 (the "Limitations Date"), which is five years before the date on which the parties agreed to toll the statute of limitations. These stale transactions are the basis of over $160 million of the $162 million sought by the Government, and are barred by the statute of limitations. (Point III.)

Fourth, those claims seeking recovery for any post-September 7, 2002 transactions should be dismissed for failure to state a claim. The Government claims that eight alleged money laundering transactions took place after the Limitations Date — constituting about $900,000 of the $162 million it seeks. But its complaint is devoid of any facts to support its allegation that those transactions (all of which occurred in 2003 and more than one year after the AremisSoft fraud ended) satisfy the elements of a claim for money laundering, or that the Bank participated in a conspiracy to launder funds during that period. (Point IV.)

## The Government's Allegations

The Government alleges that in 1988, over a decade before any alleged fraudulent activity in connection with AremisSoft, Lycourgos Kyprianou established a banking relationship with the Bank in Cyprus. (Compl. ¶¶ 21, 32.) Kyprianou, as the Government acknowledges, "is part of a wealthy and influential family of Cypriots." (Compl. ¶ 32 n. 2.) His wife, Hermione, is the daughter of Solon Zevlaris who, along with Kyprianou, is "reputed to be among the wealthiest Cypriots" in the country. (*Id.*) According to the complaint, Kyprianou's stature in Cyprus was the product not only of legitimate family wealth, but also of high-level political ties: Kyprianou is the nephew of the founder of the Democratic Party of Cyprus and former President

of the Republic, and is related to the former Minister of Finance who now serves as the European Commissioner for Health and Consumer Protection. (*Id*.)

The Government refers to "the core principles of both the Cyprus and UK laws … to 'know your customer.'" (Compl. ¶ 37.) It is clear that, on the roster of customers any bank might have, Kyprianou, in light of the background described by the Government, was hardly one who stood out as a potential money launderer.

AremisSoft was incorporated in 1998. On April 26, 1999, Kyprianou, as a result of a resolution unanimously passed by AremisSoft's Board of Directors, opened an AremisSoft account at the Bank in Cyprus. The AremisSoft account was funded out of the millions of dollars raised in AremisSoft's April 1999 initial public offering. The Government has raised no question about the legitimacy of the funds used initially to open the AremisSoft account. (Compl. ¶¶ 21, 32, 43, 44.) According to the Government, at some unspecified point after opening the AremisSoft account Kyprianou began to engage in a massive securities fraud scheme involving AremisSoft, and — just a month after opening the account — laundered the proceeds of that fraud through the Bank and the Bank of Cyprus (UK) (the "Bank UK"). (Compl. ¶ 41.)

The Government does not allege that the Bank, the Bank UK, or any of their employees, played any role in the AremisSoft fraud. The Government does, however, claim that "worldwide attention began to focus on AremisSoft for reporting fraudulently inflated income" in May 2001, "[s]pecifically" because of a May 17, 2001 article in the New York Times. (Compl. ¶ 11; *see also id.* ¶ 79.) While the New York Times article is not attached to the

complaint — and there is no allegation that anyone at the Bank even saw it[5] — as even a cursory review of it makes clear, no plausible inference could be drawn from it that Kyprianou was suddenly about to embark on a money laundering scheme, still less that he had been engaged in one for the last two years[6]

Moreover, despite the pivotal significance the Government attaches to the article, as the Government acknowledges, NASDAQ continued to allow AremisSoft to trade for over two months after its publication, Kyprianou did not resign from AremisSoft until over two months after its publication, and NASDAQ continued to list AremisSoft for over three months after its publication.  (Compl. ¶ 13.)  In fact, it was not until June 2002, over a year after the publication of the article, that the Government indicted Kyprianou.  (*Id*. ¶ 14.)

The Government alleges that Kyprianou used various AremisSoft accounts at the Bank, and various other accounts in the name of companies allegedly controlled by him — Denon International, Semark Consultancy Services, Southwood Management, Ltd., Still and Life GMBH — "to convert AremisSoft assets and launder the fraud proceeds of his alleged insider trading."  (Compl. ¶ 50; *see also id.* ¶¶ 46-49, 51.)  Yet, it is critical to note that, by the Government's own allegations, all transactions by the Bank involving any of these accounts ceased *before* trading in AremisSoft was halted by NASDAQ, *before* Kyprianou resigned from the company, and *before* AremisSoft was delisted from NASDAQ.  (Compl. ¶ 41 (listing no such transactions after July 27, 2001).)

---

[5]    Much as we New Yorkers may venerate the New York Times*,* it displays a parochial view of the world to suggest that because something was reported there that employees at a bank in a small island in the Mediterranean several time zones and thousands of miles away should somehow be tagged with knowledge of what was in it.  This is not an incidental point, but one that highlights a central defect in the Government's case — the attempt to view through a U.S. lens and improperly to extend the application of U.S. law to banking transactions that took place exclusively in, and were regulated by the law of, other countries.

[6]    The New York Times article referenced in the complaint is attached as Exhibit 6 to the Fellas Declaration.  The Court may consider the contents of any documents attached to, incorporated by reference in, or relied on in drafting, the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

None of the fourteen transactions that allegedly took place after July 27, 2001 — and, more significantly, none of the eight transactions that allegedly took place after the Limitations Date of September 7, 2002 — involved transfers between purported business entities intended to legitimize unlawful proceeds in the cloak of real business dealings. Rather, each of those eight transactions involved an account at the then-separate legal entity, the Bank UK, in the name of Lycourgos Kyprianou.[7] (Compl. ¶ 41 at Exs. 100-107.) Given the Government's acknowledgement that Kyprianou had considerable wealth, the legitimacy of which it does not question, it is noteworthy that — despite having six years to investigate this case and the benefit of discovery from the Bank UK[8] — the Government does not allege any facts to support a claim that a single one of the eight transactions after the Limitations Date involved the proceeds of any unlawful activity. Nor does it offer any fact to support an allegation that these transactions were designed to conceal or promote any fraud.

To the contrary, the Government's specific factual allegations undercut its conclusory assertion that the eight transactions after the Limitations Date constituted money laundering. The Government acknowledges that, *before* undertaking any of those eight transactions, the Bank made two reports of a suspicion regarding Kyprianou to the appropriate law enforcement agency then responsible for combating money laundering in the U.K. — the National Criminal Intelligence Service ("NCIS") — on October 11, 2001, and again on July 2, 2002. (Compl. ¶¶ 82, 85, 90.)

Because the reports to NCIS contradict the claims against the Bank, the Government attempts to save its case by making the far-fetched allegation that the Bank reported

---

[7]    The Bank of Cyprus and the Bank of Cyprus (UK) were separate legal entities until November 2004. (Byrne Decl. ¶¶ 4-5.)

[8]    Byrne Decl. ¶¶ 11-14.

to NCIS as a way of supposedly masking its purported money laundering activities. (Compl. ¶ 93.) It is simply implausible — to put it mildly — that the Bank would try to *conceal* its supposed money laundering and conspiratorial activities by reporting its purported co-conspirator to NCIS, a U.K. government agency with broad investigative and enforcement powers.[9]

Moreover, the Government's suggestion that a report could be made to the U.K. money laundering authorities as a "guise" displays, yet again, an insular view of the world. It rests, regrettably, on the narrow view that the U.K. authorities — who were on the ground at the time of the events in question and were responsible for combating money laundering through banks in the U.K. — could not be relied upon to take appropriate action in response to the Bank's contemporaneous reports of its suspicions regarding Kyprianou.[10] Rather, according to the Government, the only solution is for it to step in some six years after the fact and to charge the Bank with money laundering in a court thousands of miles away from where the transactions took place, not under the law of the country where the Bank was operating, but under U.S. law.

### Argument

**I.    THE GOVERNMENT'S CLAIMS EXCEED THE LIMITED GRANT OF EXTRATERRITORIAL JURISDICTION UNDER THE MONEY LAUNDERING CONTROL ACT.**

The Government targets conduct by the Bank that took place entirely outside the United States. It is, however, a "long-standing principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial

---

[9]    Declaration of William Blair QC, dated January 23, 2008 ("Blair Decl.") ¶ 12; United States Department of State INCS Report on "Money Laundering and Financial Crimes" dated March 2003 ("2003 State Dep't Report") (describing powers of NCIS) (Fellas Decl. Ex. 7.)

[10]   *Cf. Dow Jones & Co., Inc. v. Harrods Ltd.*, 237 F. Supp. 2d 394, 428-29 (S.D.N.Y. 2000) ("[t]here can be no room for arrogance or presumption, or for extravagant rules or practices that may encourage insularity or chauvinism rather than respect for comity.") (citations omitted)), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

jurisdiction of the United States.'"  *United States v. Javino*, 960 F.2d 1137, 1142 (2d Cir. 1992)

(quoting *EEOC v. Arabian Amer. Oil Co.*, 499 U.S. 244, 248 (1991)) (internal citation and

quotation omitted).  "[T]he presumption against extraterritorial application of United States

statutes requires that any lingering doubt regarding the reach of the [statute] be resolved against

[extraterritorial application]."  *Smith v. United States*, 507 U.S. 197, 203-04 (1993).  Even where

Congress intends for a statute to apply to conduct abroad, legislating extraterritorially is

nonetheless impermissible "when the exercise of jurisdiction is unreasonable."  *Javino*, 960 F. 2d

at 1142-43 (internal quotation omitted).

   The complaint should be dismissed because the provisions of the Money

Laundering Control Act of 1986 ("MLCA") on which the Government relies are not intended to

apply to conduct by foreign citizens occurring wholly outside the U.S., such as that alleged here.

(Points A and B.)  Moreover, construing the statute to extend its territorial jurisdiction beyond its

plain terms would violate not only the presumption against extraterritoriality, *Smith*, 507 U.S. at

203-04, but also would be unreasonable.  (Point C.)

  A. The Alleged Conduct Of The Bank Does Not Fall Within The Limited
    <u>Extraterritorial Jurisdiction Permitted Under Section 1956 Of The MLCA.</u>

   Section 1956, on which the Government predicates each of its claims, may apply

to conduct occurring outside the United States only if "the conduct is by a United States citizen

<u>or, in the case of a non-United States citizen, the conduct occurs in part in the United States.</u>" 18

U.S.C. § 1956(f) (emphasis added).  The legislative history to section 1956(f) of the MLCA

confirms that Congress intended this grant of extraterritorial jurisdiction to be limited:  "<u>It is not</u>

<u>the Committee's intention to impose a duty on foreign citizens operating wholly outside of the</u>

<u>United States to become aware of U.S. laws.</u>"  S. Rep. No. 99-433, at 14 (1986) (emphasis

added).

The Government makes no allegation, nor could it,[11] that the Bank meets any definition of the term "United States citizen," and thus there is no question that, of the two possible grounds under section 1956(f)(1), extraterritorial jurisdiction does not lie here unless "the conduct occur[red] in part in the United States."  18 U.S.C. § 1956(f)(1).  Congress defined the term "conducts" in section 1956 to mean "initiating, concluding, or participating in initiating, or concluding a transaction."  18 U.S.C. § 1956(c)(2).  Thus, one conducts a transaction by withdrawing funds from one account (*i.e.*, "initiating" a transaction) and transferring or otherwise depositing those funds into a separate account (*i.e.*, "concluding" a transaction).  Based on this definition, the prohibited "conduct" under Section 1956(f) is the initiation or conclusion of a proscribed transaction.

Consistent with the plain language of section 1956, courts have found that the MLCA applies to foreign citizens where a transaction was either initiated or concluded at bank accounts located in the United States.  *See, e.g.*, *United States v. Approximately $25,829,681.80 in Funds*, 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) (MLCA applied to wire transfer initiated by foreign citizen in Holland and concluded at account in New York); *United States v. Stein*, 1994 WL 285020, at * 1 (E.D. La. June 23, 1994) (MLCA applied to foreign citizen who initiated a transfer of funds from account in New Orleans to London while he was in the United Kingdom).

In this case, however, none of the conduct at issue occurred in the United States, either in whole or in part.  There is not a single allegation that the Bank initiated or concluded a transaction at an account anywhere in the United States.  Rather, the Government affirmatively alleges that each transaction, without exception, was initiated or concluded by Kyprianou or his

---

[11]    Declaration of Louis Pochanis, dated January 22, 2008 ("Pochanis Decl.") ¶¶ 1, 5.

associates using European accounts at European banks.  (*See, e.g.*, Compl. ¶¶ 33, 40, 41, 50, 52, 78.)  Nor is there any allegation that any acts in furtherance of the purported conspiracy to launder money occurred in the United States.

That the underlying AremisSoft fraud occurred in part in the United States does not impart extraterritorial jurisdiction over the separate money laundering claims brought under the MLCA.  *Cf. United States v. Cabrales*, 524 U.S. 1, 6-7 (1998) (rejecting venue under the MLCA based on location of underlying fraud because money laundering violations set forth in Sections 1956 and 1957 "interdict only the financial transactions … not the anterior conduct that yielded the funds allegedly laundered").

The Government's allegation that some transfers passed through correspondent bank accounts in the United States (*see, e.g.*, Compl. ¶¶ 49, 59, 66, 70), is also not a basis for extraterritorial jurisdiction under the plain language of section 1956(f).[12]  Nor has any court ever held that the passive flow of funds through U.S. correspondent bank accounts can form the basis of extraterritorial jurisdiction under the MLCA over otherwise wholly foreign transactions.

Many international banks maintain correspondent bank accounts in non-domiciliary countries to facilitate their customers' international banking transactions in jurisdictions where the banks have no physical presence, and to facilitate transactions involving foreign currency.  Given the international importance of U.S. currency, in order to process foreign transactions involving U.S. dollars many foreign banks have correspondent bank accounts in New York, with whom they maintain accounts denominated in U.S. dollars. *See Citibank, N.A. v. Wells Fargo Asia Ltd.,* 495 U.S. 660, 663 (1990); *International Housing, Ltd. v. Rafidain Bank Iraq*, 712 F. Supp. 1112, 1118 (S.D.N.Y.), *rev'd on other grounds*, 893 F.2d 8 (2d

---

[12]    Moreover, seven of the eight transactions that took place after the Limitations Date were not in U.S. dollars and, thus, could not have had even this incidental contact with the United States.  (Compl. ¶ 41 at Exs. 100-106.)

Cir. 1989). Foreign transactions passing through U.S. correspondent bank accounts are "generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the CHIPS." *Banque Worms v. Bank America Int'l*, 570 N.E.2d 189, 194 (1991). CHIPS alone processed over 87 million transactions (more than $485 trillion) in 2007. *See* CHIPS Annual Statistics, 1970 to 2007, http://www.chips.org/docs/000652.XLS (last visited January 24, 2008).

In the analogous context of *forum non conveniens*, the court in *Calgarth Investments, Ltd. v. Bank Saderat Iran*, described the incidental contact of a correspondent banking relationship as follows:

> The only link to this country arises because the relatively stable United States dollar is a desirable currency for the denomination of international debts, even in transactions involving no Americans. Because [defendant] had to reimburse [foreign bank] for its payment on the [letters of credit] in United States dollars, [defendant] drew on its dollar denominated accounts, which happened to be maintained at its New York branch. But debits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign.

1996 WL 204470, at * 6 (S.D.N.Y. Apr. 26, 1996).

The practical necessity for virtually all foreign bank transactions involving U.S. dollars to pass through correspondent banks in the U.S., and the enormous volume of such transactions, demonstrates why such a connection must be insufficient upon which to base subject matter jurisdiction. Asserting jurisdiction on such a basis would subject millions of wholly foreign transactions to the jurisdiction of the U.S. merely because of the incidental structure of the global banking system. Indeed, if correspondent bank accounts were "to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive

link to New York." *Lan Assocs. XVIII L.P. v. Bank of Nova Scotia*, 1997 WL 458753, at *6

(S.D.N.Y. Aug. 11, 1997) (dismissing action on *forum non conveniens* grounds); *see also*

*Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992) (finding that foreign bank's

use of New York branch to "route loan proceeds" internationally "cannot be regarded, in the

overall scheme of things, as other than peripheral").

It is not surprising, therefore, that no court has ever applied the MLCA to a

foreign citizen simply because fund transfers from one foreign bank account to another foreign

bank account were executed in U.S. dollars, and thus, as an incidence of the global banking

system, passively flowed through correspondent accounts in the United States.  In *International*

*Housing, Ltd. v. Rafidain Bank Iraq*, the Second Circuit held that the transfer of funds to a

correspondent bank account in New York <u>does not</u> create a sufficient nexus to the United States

for the purposes of subject matter jurisdiction under the Federal Sovereign Immunities Act, on

the ground that the site of the financial benefit was abroad and not the United States, and that the

correspondent bank account's role "<u>was that of a passive conduit indifferent to the nature of</u>

<u>terms of the underlying transaction</u>."  893 F.2d 8, 12 (2d Cir. 1989) (emphasis added).  Similarly,

in the analogous context of venue, the court in *Leema Enterprises, Inc. v. Willi*, found the passive

receipt of payments at a correspondent bank account to be too tenuous a connection to New York

to establish venue in an attachment action against a foreign bank because the bank's "conduct" in

New York was "unrelated to the fraud alleged" and "[t]he payment could have been made

anywhere and it would not have changed the nature of plaintiffs' allegations."  575 F. Supp.

1533, 1537 (S.D.N.Y 1983); *cf. Javino*, 960 F.2d at 1143 (fact that a foreign-made device

entered the United States was not a basis for inferring that Congress intended statute to apply to

the manufacture of that device outside the United States).

13

Here, as in *International Housing* and *Leema*, the fact that certain international transactions were incidentally processed through correspondent bank accounts in the United States is immaterial to the money laundering allegations.  In fact, the connection to the United States is more tenuous here than in *International Housing* and *Leema*, as the disputed payment in those cases was sent directly to the foreign bank's correspondent account.  By contrast, the transfers here were all directed to and from European accounts.  Nor is the any allegation in the complaint that the Bank or even Kyprianou affirmatively selected any place in the United States as the location to receive and make payments or that processing the transactions through United States correspondent accounts, as opposed to correspondent accounts in any other jurisdiction, facilitated the alleged money laundering transactions.

Thus, the incidental use of correspondent bank accounts cannot confer extraterritorial jurisdiction under section 1956 over these wholly foreign transactions.

B.     The Alleged Conduct Of The Bank Does Not Fall Within The Limited Extraterritorial Jurisdiction Permitted Under Section 1957 Of The MLCA.

The extraterritorial reach of the MLCA is even more limited under Section 1957, which makes clear that it applies only where "the offense … takes place in the United States" (or its territorial jurisdiction) or a United States person commits "the offense…outside the United States."  18 U.S.C. § 1957(d).  By its plain language, then, the extraterritorial reach of Section 1957 extends only to United States persons' acts outside the United States, a narrow application the Government itself has recognized.  *See* U.S. Dep't of Justice Criminal Resource Manual for U.S. Attorneys, § 2101 (Money Laundering Overview) (Oct. 1997) ("DOJ Manual") ("There is extraterritorial jurisdiction for violations of § 1957 if the defendant is a United States person.").[13]  The complaint does not, and cannot, demonstrate that the Bank is a "United States

---

[13]     Found at http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm02101.htm (last visited on Jan. 24, 2008).

person" over whom extraterritorial jurisdiction may lie under 18 U.S.C. § 1957(d)(2)(ii).  *See* 18

U.S.C. § 3077.  Thus, section 1957 cannot apply to the alleged conduct of the Bank — a foreign

entity.  Moreover, from the fact that the complaint does not allege that a money laundering

offense occurred in the United States (Compl. ¶ 41), it follows that the Bank has not committed

any "offense" in the United States under section 1957.  The Government's claim under

section 1957, therefore, also exceeds Congress's limited grant of extraterritorial jurisdiction.

   C.  <u>The Exercise of Extraterritorial Jurisdiction Here Would Be Unreasonable.</u>

     Not only does the MLCA by its plain terms not extend its jurisdictional reach to

the Bank's conduct abroad, but also it would, in any case, be unreasonable so to construe it.  To

determine the reasonableness of the extraterritorial application of a federal statute, the Second

Circuit has looked to the Restatement (Third) of Foreign Relations Law § 403(2) (hereinafter

"Restatement"), which sets forth several factors, including: "(a) the link of the activity to the

territory of the regulating state, *i.e.*, the extent to which the activity takes place within the

territory, or has substantial, direct, and foreseeable effect upon or in the territory; [and] (g) the

extent to which another state may have an interest in regulating the activity."  *See Javino*, 960

F.2d at 1143 (construing the National Firearms Act and noting "[i]n light of the substantial

interests that other countries have in regulating the manufacture of firearms within their own

borders, and the attenuated impact that a foreign-made firearm is likely to have within this

country," application of the relevant statute "would likely be ruled unreasonable").[14]

---

[14] Though the Restatement lists eight factors, the Second Circuit in *Javino* highlighted these two factors as particularly pertinent to the extraterritorial jurisdiction analysis.  The Restatement explains that "[n]ot all considerations have the same importance in all situations; the weight to be given to any particular factor or group of factors depends on the circumstances."  Restatement § 403, cmt. b.  In any case, the other six factors also relate to (i) the connection between the conduct and the regulating state and (ii) the relative interests of the regulating state and other nations and the person subject to the regulation, and thus also weigh against the exercise of jurisdiction here.

The complaint does not allege any conduct by the Bank establishing a link to the United States.  The alleged money laundering transactions are entirely foreign, involving transfers of funds to and from European banks in Europe, through foreign bank accounts administered in Cyprus and England.  There is no allegation that the Bank participated in money laundering via a transfer of funds to or from an account anywhere in the United States.

Moreover, in dismissing the Trustees' action, this Court weighed the very same United States interest with respect to money-laundering against the interest of Cyprus, and concluded that Cyprus had a far stronger interest in regulating the largest bank within its borders.[15]  The Court noted that while the United States "may have an interest in ensuring that American currency not be laundered and American investors not be defrauded by those who attempt to use foreign banks to further a criminal scheme . . . this interest pales in comparison with that of Cyprus," in light of the localized nature of the alleged money-laundering transactions and Cyprus.  *LaSala*, 510 F. Supp. 2d at 262-63 (emphasis added).  As the Court found:

> Cyprus's interest in regulating the conduct of banks within its borders, particularly where the bank is the leading financial services provider in the country, is great. The reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks, and it has a stronger interest in policing its financial systems than does the United States in ensuring that United States dollars are not laundered abroad to the detriment of United States shareholders and a United States company.

*Id.* at 265.

These findings are equally applicable to the Government's action which, as the Government acknowledged in its August 28, 2007 letter to this Court, "arise[s] out of the same

---

[15]    The Bank is the leading financial services organization in Cyprus with a market share of over 25 percent in deposits and loans.  (Pochanis Decl. ¶ 5.)

facts" as the Trustees' action.  (Fellas Decl. Ex. 4.)  The localized nature of the alleged conduct

at issue highlights the strong interest of Cyprus (and, for the English transactions, England) in

regulating the activities of a bank operating within its borders.  *See In re Maxwell Commc'n*

*Corp.,* 93 F.3d 1036, 1052 (2d Cir. 1996) (England had greater interest in applying its

bankruptcy laws to transactions which occurred in England).  The Bank is actively regulated by

the government of Cyprus with respect to its operations in Cyprus[16] and by that of the United

Kingdom with respect to its operations in the United Kingdom.[17]  Indeed, the complaint serves

only to confirm the interest of Cyprus and England in this case, alleging, as it does, that the

Bank supposedly violated the money laundering regulations of these two nations where the

Bank was operating. (Compl. ¶¶ 36-40.)  And, the Cyprus courts have already weighed in on the

issues underlying this case in the related Cyprus actions brought by the Trustees.  In light of the

substantial interest that Cyprus and England have in regulating the conduct of the banks

operating in their countries, and the fact that the Bank engaged in no conduct in the United

States, the extension of extraterritorial jurisdiction under the MLCA would be unreasonable.

## II.    THE EXERCISE OF PERSONAL JURISDICTION OVER THE BANK WOULD NOT BE REASONABLE.

This case should also be dismissed because the exercise of personal jurisdiction

over the Bank in the circumstances of this case would not be reasonable and therefore would

violate the Due Process Clause of the Fifth Amendment.  *See Int'l Shoe Co. v. Washington*, 326

U.S. 310, 316 (1945); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d

Cir. 1996).  The Supreme Court has cautioned that "[g]reat care and reserve should be exercised

---

[16]    United States Department of State  INCS Report on "Money Laundering and Financial Crimes," dated March 2006 (Fellas Decl. Ex. 8) (identifying Cyprus laws regulating Cyprus Banks.)

[17]    Blair Decl. ¶¶ 5-12; 2003 State Dep't Report (Fellas Decl. Ex. 7) (identifying U.K. law applicable to U.K. banks).

when extending … personal jurisdiction into the international field." *Asahi Metal Indus. Co.  v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987).  Whether it is reasonable to exercise jurisdiction over a non-resident defendant depends on: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiffs' interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states [or nations] in furthering substantive social policies." *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1028 (2d Cir. 1997); *Metropolitan Life Ins.*, 84 F.3d at 568.

A.    <u>The Bank Will Bear An Enormous Burden If Required To Litigate Here.</u>

As this Court noted in dismissing the Trustees' action, "the vast majority of the evidence appears to be in Cyprus, where the bank accounts were opened and administered," *LaSala*, 510 F. Supp. 2d at 259:

> There is no question that this dispute centers around events occurring [in Cyprus].  The Bank of Cyprus accounts were opened in Cyprus, and the transfers alleged to have been improperly permitted by the Bank were authorized by personnel in Cyprus. This is at its heart a dispute involving what Cyprus banking representative did and what they knew when they did these things. <u>The [Bank's alleged] knowledge…concerning the Bank's legal obligations and concerning the fraudulent nature of Kyprianou's transfers resides in the minds of Bank representatives in Cyprus</u>.

*Id.* at 262 (emphasis added).

"The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114.  In dismissing the Trustees' action, this Court recognized the burdens faced by the Bank in litigating this dispute in New York.

First, none of the potential witnesses necessary to defend against this action is in New York. *LaSala*, 510 F. Supp. 2d at 259. Nineteen potential witnesses including at least five current and former employees who were involved in the administration of the accounts at issue, and other non-party witnesses all reside in Cyprus. (Pochanis Decl. ¶¶ 9,11, Exs. A & B.) In addition, at least 4 witnesses necessary to rebut the Government's claims with respect to the eight transactions after the Limitations Date and to describe the Bank UK's reports to NCIS are in London. (Byrne. Decl. ¶ 7.) The cost and inconvenience for the Bank to transport these witnesses from both England and Cyprus to New York in order to defend against the Government's claims would be enormous.

Second, the Bank would face the added burden associated with the translation of testimony and documents (which are located in England and Cyprus, and not New York). Moreover, while many of the Cyprus-based Bank employees can speak English, it is not their native language, and most would likely testify in Greek through an interpreter. (Pochanis Decl. ¶¶ 10, 12.) Central to the Government's case — which rests on what the Bank knew and intended — is a determination of the credibility of the current and former Bank employees responsible for the various accounts at issue in the case. As this Court noted with respect to the giving of testimony through an interpreter, "[e]ven putting aside the question of cost, the difficulties presented to a court's assessment of witness credibility are considerable." *LaSala*, 510 F. Supp. 2d at 261.

Third, there are at least 17 witnesses with unique firsthand knowledge of the alleged actions in this case that are beyond the control of the Bank and the subpoena power of this Court: Kyprianou — the Bank's alleged co-conspirator, his wife, and three former Bank employees, and representatives of the Central Bank of Cyprus. (Pochanis Decl. ¶¶ 9, 11, Exs. A

& B.)  The only way the Bank could compel any (non-live) testimony from these witnesses would be through letters rogatory by way of the Hague Convention on Taking Evidence.  As this Court already found, however, "evidence obtained [from Cyprus] by means of the Hague Convention, which delivers testimony in the form of a judge's summary of a deposition, is a poor substitute for live trial testimony."  *LaSala*, 510 F. Supp. 2d at 260 (internal citation omitted).[18] It is hard to imagine how a fact finder could even begin to assess a witness's credibility based on a summary of a deposition prepared by a judge.

These burdens will severely compromise the Bank's ability to mount an effective defense against the very serious charges made by the Government, and underscore the unreasonableness of subjecting the Bank to personal jurisdiction in this forum.

B.     Cyprus And The United Kingdom Possess A Stronger Local Interest In Adjudicating Claims Based On The Bank's Conduct In Those Countries.

The second and fifth reasonableness factors require the Court to consider the "interests of the forum state in adjudicating the case," and "the shared interest of the states [or nations] in furthering substantive social policies."  *Chaiken*, 119 F.3d at 1028.  As noted (Point I.C. *supra*), any interest of the United States with respect to money laundering is outweighed by the interest of Cyprus in regulating the conduct of the largest bank within its borders, as this Court has already found and by the same interest of the United Kingdom with respect to banks operating there.

C.     The Government's Interest In Obtaining Convenient and Effective Relief.

The fact that, as a result of the Coordination Agreement, any recovery by the Government in this case will likewise ultimately reach the Trust beneficiaries diminishes any purported interest of the Government in bringing this action.  (Coordination Agreement §§ 5.1-

---

[18]    *See also* Declaration of Demetrios Stylianides ("Stylianides Decl."), dated Nov. 22, 2006, ¶¶ 34-36 (Fellas Decl. Ex. 9).

5.3, ¶¶ 17-18 (Fellas Decl. Ex. 2).)  The Trustees can vindicate that interest by proceeding with a lawsuit against the Bank in Cyprus, which this Court found to be an adequate forum for the Trustees claims against the Bank.  *LaSala*, 510 F. Supp. 2d at 255-56.

        D.      <u>Judicial System's Interest In Most Efficient Resolution Of The Controversy.</u>

        The Trustees have already brought an action in Cyprus against the twelve principal players in the AremisSoft fraud, which is pending in the court there.  *See LaSala*, 510 F. Supp. 2d at 253; Stylianides Decl. ¶¶ 13-17 (Fellas Decl. Ex. 9).  It would be inefficient for this Court to entertain a duplicative action here against an alleged secondary participant in the fraud for conduct that took place abroad.  As this Court recognized in dismissing the Trustees' action, there is "little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner."  *LaSala*, 510 F. Supp. 2d at 261 (internal quotation omitted).  *See also Chaiken*, 119 F.3d at 1029 ("[B]ecause the parties, witnesses, and evidence are located in Israel, proceedings in Massachusetts will not advance the interest in obtaining the most efficient resolution of controversies.") (internal quotation omitted); *Metropolitan Life*, 84 F.3d at 574 (exercise of personal jurisdiction over out-of state company unreasonable where no witness and evidence located in Vermont and locus of alleged tort occurred in Florida).

*     *     *

        In sum, the burdens faced by the Bank in adjudicating this wholly foreign action in the United States, the greater interest of Cyprus and England in the conduct of banks operating within their borders, and the inefficiencies associated with litigating here all demonstrate that the exercise of jurisdiction over the Bank would violate the Due Process Clause of the Constitution.

III.    **THE GOVERNMENT'S CLAIMS FOR THE 99 TRANSACTIONS**
        **BEFORE SEPTEMBER 7, 2002 ARE BARRED BY THE STATUTE OF**
        **LIMITATIONS.**

        The Government cannot recover civil penalties for any of the 99 transactions that

pre-date September 7, 2002 because they are time-barred.  The civil penalty provision of the

MLCA does not include a statute of limitations, and, thus, it is subject to the federal catch-all

five-year statute of limitations.  *See* 28 U.S.C. § 2462.  Because the tolling agreement between

the parties tolled the statute of limitations as of September 7, 2007, the relevant date for statute

of limitations purposes — the Limitations Date — is September 7, 2002.  (Fellas Decl. Ex. 10.)

The AremisSoft fraud ended before the Limitations Date.  This remains true whether it ended as

early as July 2001 (with Kyprianou's resignation from AremisSoft and NASDAQ's decision to

halt trading in the AremisSoft securities and shortly thereafter delist AremisSoft) or as late as

December 2001 or even July 2002 (when the Government indicted Poyiadjis and Kyprianou,

respectively).

        The Government nonetheless seeks to recover over $162 million based upon the

99 transactions that occurred before the Limitations Date.  (Compl. ¶ 41 at Exs. 1-99.)  Thus,

while the substantive money laundering claims of the complaint (Counts One through Four)

target 107 individual transactions which the Government alleges constitute money laundering, 99

of these transactions are time-barred.  Accordingly, to the extent the complaint seeks a civil

penalty for alleged money laundering transactions that took place prior to September 7, 2002,

those Counts should be dismissed on statute of limitations grounds.

        Similarly, the conspiracy claim (Count Five) seeks a civil penalty in excess of

$162 million dollars based on the same 99 transactions that were executed before the Limitations

Date.  In an attempt to avoid the fatal consequences of the statute of limitations, the Government

has stretched the conspiracy into 2003 to incorporate eight transactions after the Limitations

Date.  Not only do these transactions have nothing to do with money laundering (Point IV, *infra*)

but, in any case, "[t]he principle is well-settled in this circuit that the occurrence of an act within

the limitations period does not render every related but otherwise time-barred conspiratorial act

actionable." *Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 829-30 (S.D.N.Y. 1986)

(dismissing as time-barred government's conspiracy action brought under False Claims Act).

The Supreme Court has explained: "[i]n the context of a continuing conspiracy …

each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to

recover the damages caused by that act and that, as to those damages, the statute of limitations

runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Res., Inc*., 401 U.S. 321,

338 (1971) (discussing damages in antitrust conspiracy).  Following the Supreme Court's lead,

courts in this Circuit have consistently held that "in a longstanding conspiracy … a civil plaintiff

will recover only those damages 'caused by' overt acts of the conspiracy that occurred within the

period of the statute of limitations." *Jones v. Coughlin*, 665 F. Supp. 1040, 1044 (S.D.N.Y.

1987) (civil rights conspiracy) (internal quotations omitted); *see also Stolow v. Greg Manning

Auctions Inc.*, 258 F. Supp. 2d 236, 251 (S.D.N.Y. 2003) (same, in antitrust conspiracy); *cf.

Bingham v. Zolt,* 66 F.3d 553, 559-60 (2d Cir. 1995) (recognizing separate accrual rule as

applicable to RICO claims, and holding that plaintiff could only recover for injuries accrued

within statute of limitations); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988)

(same).

In *Singleton v. City of New York*, the Second Circuit rejected a plaintiff's attempt

to circumvent the statute of limitations by alleging that otherwise time-barred acts were part of a

conspiracy:

23

> Characterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as 'a single series of interlocking events' does not postpone the accrual of claims based on individual wrongful acts.… To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

632 F.2d 185, 192 (2d Cir. 1980); *see also Jones*, 665 F. Supp. at 1044 ("violations committed outside the statute of limitations cannot be brought inside by an allegation of the existence of a conspiracy").

This court should likewise reject the Government's attempt to resuscitate its time-barred claims through its allegations of conspiracy. Thus, to the extent the Government seeks through its conspiracy claim to recover civil penalties based on transactions executed before the Limitations Date, Count Five should be dismissed.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE 2003 TRANSACTIONS.

Not only are the 99 transactions that preceded the Limitations Date barred by the statute of limitations (Point III, *supra*), but the complaint also fails to state a claim as to the remaining eight.

The Government alleges that from January 23, 2003 through April 14, 2003, Kyprianou made eight transfers from his Bank UK "Property Account" ending in "0706" in the approximate amount of $900,000 (the "2003 Transactions"). (Compl. ¶ 41 at Exs. 100-107, ¶¶ 94, 96.) None of the 2003 Transactions, however, bears any relation to the underlying fraud or the alleged laundering activity, and each occurred *after* the fraud was exposed and terminated. The eight 2003 Transactions — which account for less than one percent of the $162 million the Government seeks — cannot support the money laundering claims because the Government has failed to allege sufficiently the elements of money laundering with respect to these transactions.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, --U.S.--, 127 S. Ct. 1955, 1972 (2007)). The allegations of the complaint, thus, "require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1974). Moreover, a complaint will not survive dismissal where it does no more than allege facts that are as equally consistent with liability as with "an obvious alternative explanation" for which there is no liability. *Twombly*, 127 S. Ct. at 1972.

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006). Nor will general conclusory allegations be credited "when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995).

A.    The Complaint Fails To State A Claim For Money Laundering With Respect To The 2003 Transactions.

Despite having had six years to bring this action and the benefit of discovery from the Bank UK (*see* Byrne Decl. ¶¶ 11-14), the Government does not state a claim for money laundering with respect to the 2003 Transactions, and thus Counts One through Four should be dismissed as to those transactions.[19] The thrust of the Government's case is that the Bank allowed Kyprianou "to conduct approximately 100 large transactions in rapid succession,

---

[19]    While the Bank is not conceding that the Government has stated a claim for money laundering with respect to any of the 99 transactions that took place prior to the Limitations Date, it is not necessary for this Court to address that issue since they are time-barred.

transferring monies from AremisSoft accounts to accounts of third-parties controlled by Kyprianou" such as Southwood, Semark, Denon and others.  (Compl. ¶ 33; *see also id.* ¶¶ 46-50.)  But, as the complaint makes plain, no large transactions involving rapid successive transfers between purported business entities took place after July 27, 2001.  That was over a year before the Limitations Date, about a year before Kyprianou was indicted by the Government, a month before NASDAQ delisted AremisSoft, and even before NASDAQ halted trading in AremisSoft.  (Compl. ¶¶ 13, 14, 41.)

By contrast to the pre-July 2001 transactions, all of the 2003 Transactions were withdrawals from Kyprianou's Property Account at the Bank UK in London.  Seven of the eight 2003 Transactions involved straightforward transfers of English pounds to E-Cash Direct, which the complaint describes as an "online gaming entity." (Compl. ¶ 41 at Ex.100-106, ¶ 94.)  Only one is alleged to have been in U.S. dollars — a transfer of funds to Highland West, a bank account at Kredietbank, which according to the complaint, was used to disburse maintenance payments for Kyprianou's yacht.  (Compl. ¶ 41 at Ex. 107, ¶¶ 94, 97.)

The Government has failed to offer any facts supporting its allegation that a single one of the 2003 Transactions satisfies the required elements of a claim of money-laundering: (i) that the funds transferred were the proceeds of specified unlawful activity; (ii) that the Bank had knowledge that the funds derived from illegal activity; (iii) that, by executing the transactions, the Bank intended to disguise the source of the funds; and (iv) that, by executing the transactions, the Bank intended further to promote the AremisSoft fraud.  18 U.S.C. §§ 1956, 1957.  The Government also fails to allege that there were any transfers to or from the United States as required for its claim under 18 U.S.C. § 1956(a)(2).

1.    None of The 2003 Transactions Involved The Proceeds Of
      Specified Unlawful Activity.

To support a claim under the MLCA, the Government must properly allege that

each of the 2003 Transactions involved proceeds of specified unlawful activity.  3 Sand, Modern

Federal Jury Instructions — Criminal ¶¶ 50A-2; 50A-16, 50A-25 (2007).   The complaint does

not satisfy this threshold requirement, since it is devoid of any facts supporting the allegation that

the source of the funds in the Property Account was from unlawful activity.  This is a fatal

omission given the Government's acknowledgement that Kyprianou and his wife had substantial

family wealth of unquestioned legitimacy.  (Compl. ¶ 32 n.2.)  Indeed, the only specific factual

allegation on this issue gives rise to the opposite inference:  the complaint quotes from an email

of July 2, 2002, stating that the Bank investigated the source of funds with respect to a July 2002

transfer into the Property Account and concluded that the proceeds were legitimate:

> We spoke about the transfer of £125,000 to Switzerland.  We
> agreed that the source of these funds was the known sale of a
> property in the name of the wife.  The proceeds pass via her
> account to the Kyprianou property account.  There are no grounds
> to believe that these funds belong to a third party, and no reason to
> link this to proceedings in US against the customer.  The
> transaction may therefore proceed.  You should be aware that we
> have reported Mr. Kyprianou to NCIS under normal money
> laundering procedures last October.  They have not indicated that
> we should not deal with him.  I will also report this transaction.

(Compl. ¶ 90 (emphasis added).)  *See Hirsch*, 72 F.3d at 1092 (specific allegations must be

credited over conclusory allegations).

2.    The Bank Did Not Have The Requisite Knowledge.

Even assuming the complaint cleared the first hurdle, which it has not, the

Government must also sufficiently allege that the Bank had knowledge that the funds derived

from unlawful activity.  3 Sand, Modern Federal Jury Instructions — Criminal ¶¶ 50A-2; 50A-

16, 50A-25.  The complaint fails here as well.  It alleges no facts to support its allegation that

27

the Bank knew that funds involved in the 2003 Transactions were derived from unlawful

activity, and, as noted, it makes a specific allegation suggesting the opposite — that the Bank

investigated the source of the July 2002 funds and found them to be legitimate.

        3.      None Of The 2003 Transactions Was Conducted For The
Purpose Of Concealment.

        Counts Two and Three of the complaint purport to assert claims for concealment

money laundering in violation of 18 U.S.C. § 1956(a)(1)(B) and 18 U.S.C. § 1956(a)(2)(B)

respectively, which illegalize transactions designed to "<u>conceal or disguise</u> the nature, the

location, the source, the ownership, or the control of the proceeds of unlawful specified activity."

(Emphasis added.)  The Second Circuit has made clear that "the money laundering statute does

not criminalize the mere spending of proceeds of specified unlawful activity… [a]bsent proof of

intent to conceal, an ordinary purchase made with ill-gotten gains does not violate the money

laundering statute."  *United States v. Stephenson*, 183 F.3d 110 (2d Cir. 1999) (internal citations

and quotations omitted).  Thus, there is no violation of the MLCA where the transactions were

not intended "to create the appearance of legitimate wealth or for any purpose other than present

personal benefit."  *Id*. at 121 (quotation omitted); *see also United States v. Gotti*, 457 F. Supp. 2d

411 (S.D.N.Y. 2006) (noting these sections of the MLCA criminalize transactions "designed to

vest illegal proceeds with 'the appearance of legitimacy'") (quoting *United States v. Napoli*, 179

F.3d 1, 8 (2d Cir. 1999)).

Missing from the complaint are any factual allegations plausibly suggesting that the 2003 Transactions were designed for obfuscatory purposes,[20] giving rise to an independent grounds for dismissal of these Counts. To the contrary, the allegations in the complaint merely indicate that these transfers — which were done openly from an account in Kyprianou's own name, for his personal benefit, involving gambling and yacht maintenance payments — are exactly the type of "simple and straightforward banking transactions, easily discovered through a cursory review of [defendant's] bank accounts" which courts — including the Second Circuit — have routinely held <u>cannot</u> be considered money laundering. *United States v. Johnson*, 440 F.3d 1286, 1292-93 (11th Cir. 2006) (no intent to conceal where defendant made transfers from U.S. bank account to foreign bank account); *accord Stephenson*, 183 F.3d at 121 ("open and notorious" purchase of car for "personal benefit" was not concealment). Yet again, rather than making any allegations suggesting concealment with respect to the 2003 Transactions, the complaint does the exact opposite, making the specific allegation that the Bank UK took affirmative steps to report a general suspicion regarding Kyprianou to law enforcement through two separate NCIS reports. (Compl. ¶¶ 85, 91.) *See Hirsch*, 72 F.3d at 1092.

4.    None Of The 2003 Transactions Was Intended To Promote
       Specified Unlawful Activity.

Counts One and Three of the complaint further fail to state a claim for promotion money laundering because the complaint does not allege any facts suggesting that the 2003 Transactions — which took place at least a year after the AremisSoft fraud was exposed — were

---

[20]    Indicia of concealment include irregular financial transactions, unusual secrecy, careful structuring of transactions to avoid attention, folding or otherwise depositing illegal profits into the bank account of a legitimate business, use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction. *See United States. v. Esterman*, 324 F.3d 565, 573 (7th Cir. 2003) (citing examples of indicia of concealment); *accord United States v. Ness*, 466 F.3d 79 (2d Cir. 2006) (finding concealment where defendant engaged in secrecy concerning financial transactions including clandestine meetings to transfer large sums of concealed cash, use of coded language, scrupulous avoidance of paper trail).

designed "to promote the carrying on of specified unlawful activity."  18 U.S.C. §§ 1956(a)(1)(A) & (a)(2)(A).  Promotion money laundering requires that "that the receipt and deposit of laundered funds was made with the intent to promote the specified underlying unlawful activity, be it, for example, <u>by promoting continued illegal activity or by being essential to the completion of the scheme</u>."  *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003) (upholding conviction where money was used to continue the criminal enterprise).  As with concealment money laundering, promotion money laundering requires more than a mere transaction with "tainted" money.  *Id.*

As pled in the complaint, the AremisSoft fraud spanned a two-year period from 1999 through 2001.  (Compl. ¶¶ 6, 11-12.)  By the time of the 2003 Transactions, there was simply no continuing unlawful activity to promote, further or carry-on.  Moreover, on their face, these transactions — which include purely personal expenditures for gambling and Kyprianou's yacht — can in no way be plausibly construed as having furthered or promoted the "carrying on" of continuing unlawful activity.  *See Thorn*, 317 F.3d at 133.

5.    None Of The Alleged Transactions Involved Transfers To Or From The United States.

Count Three of the complaint further fails to state a claim because the Government does not allege any facts supporting a plausible inference that the 2003 Transactions —— which involved only intra-Europe transfers — involved the transfer of funds "<u>from a place in the United States</u> to or through a place outside of the United States, <u>or to a place in the United States</u> from or through a place outside of the United States," as required for a violation of 18 U.S.C. § 1956(a)(2).  *See also* S. Rep. No. 99-433 (1986) (Section 1956(a)(2) is "designed to illegalize international money laundering transactions," and "covers situations in which money is

being laundered by transferring it into the United States as well as those in which money is being laundered by transferring it out of the United States.")

B.     The Complaint Fails To Allege That Any Conspiracy Took Place After The Limitations Date.

Because the substantive counts fail to state a claim with respect to the 2003 Transactions, the conspiracy claim fails for the same reason. *See Nat'l Group For Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 273 (S.D.N.Y. 2006) (dismissing RICO conspiracy claim where substantive RICO claims failed to state claim).  While the Government makes the conclusory allegation that a conspiracy continued until 2003 (Compl. ¶ 121), this is not sufficient to state a claim.  *See Achtman*, 464 F.3d at 337.

The complaint fails to allege any facts plausibly suggesting that the Bank was engaged in any conspiracy after the Limitations Date,[21] with the result that Count Five should be dismissed in so far as it alleges a conspiracy based on the 2003 Transactions.  The Government alleges that the Bank and Kyprianou entered a conspiracy to violate Section 1956, the purported objective of which was to engage in financial transactions involving unlawful proceeds with the intent to promote criminal activity and conceal the unlawful proceeds.  (Compl. ¶¶ 120-126.) However, as noted above, the only alleged transactions that fall within the limitations period — the 2003 Transactions — have no relationship to the purported conspiratorial objectives, as these transactions are not alleged to have involved unlawful proceeds, to have promoted unlawful activity, or to have concealed the source or ownership of funds.

---

[21]     The Bank does not concede that the Government has stated a claim for conspiracy with respect to the transactions that took place prior to the Limitations Date.  But because recovery on such a claim is barred by the statute of limitations, it is not necessary for the Court to reach this issue.

Moreover, it is important to note that *before* any of the 2003 Transactions occurred, the Government alleges that two events took place that undermine its attempt to claim that any conspiracy to launder money continued past the Limitations Date.

First, on October 10, 2001 — just three business days after becoming aware of a Bloomberg news release reporting on allegations of fraud against Kyprianou — the Bank UK wrote to NCIS to report general suspicions about Kyprianou.  (Compl. ¶¶ 82, 84.)  In the letter sent to NCIS, the Bank UK stated:

> We have received instructions to transfer £37,000 from related accounts today, one of which was technically incomplete, but we do not believe at present we have valid reasons not to act of these instructions …  We would of course be grateful if you could make us aware of any action within the UK jurisdiction which might affect these accounts.

(Byrne Decl. Ex. 1.)

Second, on July 2, 2002, the Bank UK made a second report to NCIS, after learning that Kyprianou had been charged with money laundering in the United States.  (Compl. ¶ 92)  The Bank UK informed NCIS of Kyprianou's request to transfer £125,000, stating "[w]e have decided to process this instruction, as the source of the funds is believed to be legitimate, but report the existence of account to you as possibly suspicious in view of the US proceedings." (Byrne Decl. Ex. 2.)  Moreover, the Government quotes from a July 2, 2002 email exchange between the Bank UK employees confirming that the it had investigated the source of the July 2 transfer to Kyprianou's Property Account and concluded that it was legitimate.  (Compl. ¶ 90.)

Faced with these specific factual allegations that render implausible its conclusory allegations that the Bank was engaged in money laundering and a conspiracy, *see Hirsch*, 72 F.3d at 1092, the Government tries to rescue its case by resorting to the fanciful.  It asserts that the Bank reported its supposed co-conspirator to NCIS "[u]nder the guise of showing concern for

established money laundering protocol" — and faults the Bank for engaging in the 2003

Transactions after the second NCIS report. (Compl. ¶ 93.) But this speculative and conclusory

allegation fails to "nudge [the Government's] claims across the line from conceivable to

plausible." *Elevator Antitrust Litig.*, 502 F.3d at 50 (internal quotations omitted). [22] Indeed, it is

not obvious that the Government's claim here even qualifies as conceivable.

      The State Department has noted in a report on money laundering in the United

Kingdom regarding NCIS:

> Suspicious transaction reports are filed with the Economic Crime
> Unit of the National Criminal Intelligence Service (NCIS), which
> serves as the UK's financial intelligence unit (FIU). <u>The NCIS
> analyzes reports, develops intelligence, and passes information to
> police forces</u> and Her Majesty's Customs for investigation. The
> NCIS is an active member of the Egmont Group and has
> Memoranda of Understanding (MOU) for <u>sharing intelligence with
> foreign counterparts</u>. An arrangement is in place with the U.S.
> Financial Crimes Enforcement Network (FinCEN), and also the
> FIU's of Belgium, France, and Australia.[23]

Once a report is made, NCIS can pass that on to the police forces, initiate an investigation, share

that information with foreign counterparts, or take any number of enforcement measures such as

requesting a court order that the Bank provide information about the account relationship or

freeze the account concerned. (Blair Decl. ¶ 12.) Thus, the Government's suggestion that the

Bank's reports to NCIS were designed to further its money laundering activities, when such

---

[22] Not only do the NCIS reports made by the Bank UK thwart any conceivable claim of a conspiracy, but it is worth noting that even where a conspiracy had been properly pled, a report to law enforcement constitutes withdrawal from that conspiracy and commences the running of the statute of limitations. *See United States v. Grimmett*, 236 F.3d 452, 455-56 (8th Cir. 2001) (conspiracy charge was time-barred as to a defendant who provided partial information concerning conspiracy to investigators); *United States v. Greenfield,* 44 F.3d 1141, 1149-50 (2d Cir. 1995) (noting "the making of a clean breast to the authorities" is sufficient to establish withdrawal from a conspiracy); *United States v. LaMorte*, 950 F.2d 80 (2d Cir. 1991); *United States v. Salerno*, 868 F.2d 524, 534 n.4 (2d Cir. 1989) (withdrawal commences running of statute of limitations on conspiracy).

[23] 2003 State Dep't Report (Fellas Decl. Ex. 7 ) (emphasis added); *cf. Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 544-45 (S.D.N.Y. 2001) (relying on Department of State reports for purpose of motion to dismiss).

reports could trigger intrusive investigative and enforcement measures is simply implausible. *Elevator Antitrust Litig*., 502 F.3d at 50.

But the problems with the Government's attempt to state a claim for money laundering conspiracy in 2003 do not end there.  Under English law, a bank that blocks a transfer after reporting a suspicion to NCIS runs the risk of criminal liability for the offense of "tipping-off."  (Blair Decl. ¶¶ 13-15.)  This reflects a policy decision by the U.K. authorities combating money laundering that, because it could thwart a money laundering investigation if a customer were to know he was a target of an investigation, a Bank should not automatically freeze an account after reporting a suspicion, as this might alert the customer of the report.  (*Id.*)

Thus, while the Government speculates that the Bank UK reported its purported co-conspirator to NCIS as a way of supposedly *furthering* its supposed scheme to launder money, given (i) the Government's acknowledgement that Kyprianou has considerable wealth, the legitimacy of which is unquestioned, (ii) its acknowledgment that the Bank investigated the proceeds of a July 2002 transfer into the Property Account and determined it was legitimate, and (iii) the Government's failure to offer any facts to support the allegation that the 2003 Transactions involved the proceeds of unlawful activity, there is an "obvious alternative explanation" for why the Bank UK did not decline to act on Kyprianou's transfer instructions after its NCIS reports.  *Twombly*, 127 S. Ct. at 1972.  It had no reason to believe that the funds transferred involved the proceeds of any unlawful activity, and, in any case, after its reports to NCIS, acting otherwise would subject it to a risk of criminal liability for tipping off under English law.  *See id.* (affirming dismissal of conspiracy claim based on allegations of conduct which suggested an "obvious alternative explanation" grounded in legitimate business practice).

Moreover, all of the purported laundering activity in 2003, in contrast to the transactions executed in 2001 and earlier, occurred at the Bank UK, which was not only the entity that made the two reports to NCIS, but at the time was also a separate entity from the Bank. (Byrne Decl. ¶ 4.) The complaint, however, does not contain a single allegation that the separate United Kingdom entity knowingly participated in an alleged laundering conspiracy in any respect. In light of the Government's exclusive reliance on conduct by the United Kingdom entity to stretch the conspiracy beyond September 2002, this pleading failure alone defeats the conspiracy claim. For these reasons, the Government's attempt to save time-barred claims by pleading a conspiracy into 2003 rests not only on a faulty legal premise but is unsupported by any factual allegations in the complaint.

**Conclusion**

For the reasons stated above, the Court should, respectfully, dismiss the complaint in its entirety.

Dated: New York, New York
       January 25, 2008

HUGHES HUBBARD & REED LLP

By: _____
     John Fellas
     Marc A. Weinstein
     Sarah Cave
     Hagit Elul
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Defendant Bank of Cyprus Public Company Limited