**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                Plaintiff,

   v.

BANK OF CYPRUS PUBLIC COMPANY
LIMITED,

                Defendant.

07 Civ. 9234 (CSH)


MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
FILED BY DEFENDANT BANK OF CYPRUS PUBLIC COMPANY LIMITED

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT .........................................................................................................................11

I.    THIS COURT HAS SUBJECT MATTER JURISDICTION
      OVER THIS ACTION........................................................................................................11

      A.    The Government Has Subject Matter Jurisdiction Under 28 U.S.C. § 1345. ...........11

      B.    The Government Has Subject Matter Jurisdiction Under the MLCA,
            Where the Conduct Occurred "In Part" in the United States Analysis.....................12

      C.    Where the United States is the Plaintiff, Exercising Jurisdiction is
            Neither Unreasonable Nor Inconsistent with Principles of International Comity. ....17

II.   THIS COURT HAS PERSONAL JURISDICTION OVER LLOYDS. ................................19

      A.    Standard of Review. .................................................................................................19

      B.    Bank of Cyprus Consented to the Jurisdiction of this Court.....................................20

      C.    Section 1956(b) Confers Jurisdiction Over Foreign Persons. ...................................21

      D.    Bank of Cyprus Had a Presence in this Forum, Transacted Business in New
            York, and Purposefully Availed Itself of this Forum. ..............................................22

            1.    Personal Jurisdiction Under N.Y. C.P.L.R. § 301. ........................................23

            2.    Personal Jurisdiction Under the N.Y. Long-Arm Statute. .............................24

III.  THE GOVERNMENT'S CLAIMS ARE NOT TIME-BARRED.........................................26

      A.    Standard of Review....................................................................................................26

      B.    Section 3282 Provides the Applicable Statute of Limitations. ..................................27

      C.    Application of Section 2462 as Statute of Limitations. .............................................29

IV.   THE GOVERNMENT DOES NOT FAIL TO STATE A CLAIM
      UNDER FED. R. CIV. P. 12(b)(6) AS TO THE 2003 TRANSACTIONS ..........................32

A.    The Government Sufficiently States a
      Claim With Respect to the 2003 Transactions.............................................................32

      1.    The 2003 Transactions Involved Proceeds
            Derived from Specified Unlawful Activity..........................................................33

      2.    The Bank of Cyprus Intended to Disguise the Source of the Funds and
            had Knowledge that the Funds Derived from Specified Unlawful Activity......33

      3.    The Bank of Cyprus Further Intended to Promote the AremisSoft Fraud.........34

      4.    The Complaint Adequately Alleges Transfers in 2003 to or from
            the United States as Required Under 18 U.S.C. § 1956(a)(2). ..........................35

      5.    The Complaint Sufficiently Alleges that a
            Conspiracy Continued to Take Place in 2003.....................................................36

CONCLUSION.............................................................................................................................36

## TABLE OF AUTHORITIES

ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)............................................26

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779 (2d Cir. 1999)..................24

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007).....................................................................26, 33

Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d
Cir. 1997) ............................................................................................................................................19

Berger v. United States, 295 U.S. 78 (1935) ........................................................................................2

Blusal Meats, Inc. v. United States, 638 F. Supp. 824 (S.D.N.Y. 1986)aff'd on other grounds,
817 F.2d 1007 (2d. Cir. 1987).............................................................................................................28

Burger King v. Rudzewicz, 471 U.S. 462 (1985)................................................................................passim

Cutco Industries, Inc. v. Naughton, 806 F.2d 361 (2d Cir. 1986) ......................................................23

Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp.2d 736 (S.D.N.Y. 2004) .............................25-26

DiStefano v. Carozzi N.Am., Inc., 286 F.3d 81 (2d Cir. 2001)...........................................................19

Harris v. City of New York, 186 F.3d 243 (2d Cir. 1999)....................................................................26

Hoffman v. Blaski, 363 U.S. 335, 343 (1960) .....................................................................................20

Ford v. United States, 273 U.S. 593, 624 (1927) ................................................................................15

Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 465 U.S. 694 (1982) ...............19

Jones v. Coughlin, 665 F. Supp. 1040 (S.D.N.Y. 1987)......................................................................28

Koninklijke Philips Electronics v. Digital Works, Inc., 358 F. Supp.2d 328 (S.D.N.Y. 2005) .......19-21

LaBounty v. Adler, 933 F.2d 121 (2d Cir. 1991) ...........................................................................26, 28

LaSala v. Bank of Cyprus, 510 F. Supp. 2d 246 (S.D.N.Y, 2007) .....................................................1

Mastec Latin America v. Inepar S/A Industrias E Construcoes, No. 03 Civ. 9892, 2004 WL
1574732 (S.D.N.Y. July 13, 2004) ....................................................................................................21


M/S Bremen v. Zapata Off-shore Co., 407 U.S. 1, 15 (1972) ............................................................18

OCC v. Spitzer, 396 F. Supp.2d 383, 389 (S.D.N.Y. 2005) ...................................................11

Overseas Media, Inc. v. Skvortsov, 407 F. Supp.2d 563 (S.D.N.Y. 2006) ........................23

PDK Labs, Inc. v. Friedlander, 103 F.3d 1105 (2d Cir. 1997) .............................................23

Phillips v. Audio Active Ltd., 494 F.3d 378 (2d Cir. 2007) .................................................18

Porina v. Marward Shipping Co., No. 06-5397, 2008 WL 850301 (2d Cir. April 1, 2008)..............19

Securities and Exchange Commission v. Alexander, 2007 WL 28161195 (E.D.N.Y. Sept. 26, 2007) ............................................................................................................................................30

Securities and Exchange Commission v. Jones, No. 05 Civ. 7044(RCC), 2006 WL 1084276 (S.D.N.Y. April 25, 2006).............................................................................................................30

Securities and Exchange Commission v. Power, 525 F. Supp.2d 415 (S.D.N.Y. 2007) ..................30

Simon v. Philip Morris, Inc., 86 F. Supp.2d 95 (E.D.N.Y. 2000) ......................................24, 26

Singleton v. City of New York, 632 F.2d 185 (2d. Cir. 1980) ...........................................28

State of New York v. Henrickson Bros., Inc., 840 F.2d 1065 (2d Cir. 1988) ...................30

Stolow v. Greg Manning Auctions, Inc., 258 F. Supp.2d 236, 251 (S.D.N.Y. 2003) ......................28

United States v. Bodmer, 342 F. Supp.2d 176 (S.D.N.Y. 2004) ........................................13, 14

United States v. Brasco, 516 F.2d 816 (2d Cir. 1976).......................................................27

United States v. Collins, 503 F.3d 616 (7th Cir. 2007) ......................................................11

United States v. Dinero Express, Inc., 313 F.3d 803 (2d Cir. 2002) ..................................36

United States v. Inco Bank & Trust Corp., 845 F.2d 919 (11th Cir. 1988).........................15

United States v. LaSpina, 299 F.3d 165 (2d Cir. 2002).......................................................27

United States v. Moloney, 287 F.3d 236 (2d Cir. 2002).......................................................29

United States v. Piervinanzi, 23 F.3d 670 (2d Cir. 1994)....................................................36

United States v. Sadighi, 199 F.3d 1334 (9th Cir. 1999).....................................................16

United States v. Stein, No. 93-375, 1994 WL 285020 (E.D. La. June 23, 1994)..............................16

United States v. Tarkoff, 242 F.3d 991, 995 (11th Cir. 2001)...............................................................14

Valdez ex rel. Donely v. United States, 518 F.3d 173 (2d Cir. 2008)...................................................31

Webpro Inc. v. Petrou, 02 Civ. 3465, 2002 WL 31132889 (S.D.N.Y. Sept. 25, 2002) ...................20

Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir.2000).........................................................23

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971)...............................................28

STATE LAW

Bryant v. Finnish National Airline, 15 N.Y.2d 426 (1965) ..................................................................23

Landoil ResourcesCorp. v. Alexander & Alexander Services, Inc., 77 N.Y.2d 28, 563 N.Y.S.2d 739 (1990)..........................................................................................................................................23

Tauza v Susquehanna Coal Co., 220 N.Y. 259 (1917) .........................................................................23

FEDERAL RULES

Fed. R. Civ. P. 8(a)(2).............................................................................................................................36

Fed. R. Civ. P. 12(b)(1)..........................................................................................................................12

Fed. R. Civ. P. 12(b)(2)..........................................................................................................................19

Fed. R. Civ. P. 12(b)(6).....................................................................................................................passim

FEDERAL STATUTES

18 U.S.C. § 1956.................................................................................................................................passim

18 U.S.C. § 2462.................................................................................................................................passim

18 U.S.C. § 3282..............................................................................................................................27, 29

28 U.S.C. § 1345.............................................................................................................................11, 18

STATE STATUTES

N.Y. C.P.L.R. § 301 ...........................................................................................................................23-24

N.Y. C.P.L.R. § 302...........................................................................................................................24-25

CONGRESSIONAL REPORTS

S. Rep. 99-433 (Sept. 3, 1986)..........................................................................................................13, 15-16

## INTRODUCTION

On October 15, 2007, the Government filed the instant Complaint against Bank of Cyprus Public Company Limited ("Bank of Cyprus"), seeking a civil monetary penalty of at least $162,000,000, alleging that Bank of Cyprus conspired with the principals of AremisSoft to launder the proceeds of a massive securities fraud. This Court, of course, is extremely familiar with the facts of the AremisSoft fraud, having presided over civil actions by the SEC and by the Trustees for the AremisSoft Liquidating Trust against banks allegedly complicit in the fraud, including Bank of Cyprus. See LaSala v. Bank of Cyprus, 510 F. Supp. 2d 246 (S.D.N.Y, 2007).

In moving to dismiss the Government's Complaint, Bank of Cyprus simply ignores inconvenient facts on the face of the Complaint, entirely misstates the law regarding subject matter and personal jurisdiction, and inexplicably fails to disclose to the Court that it executed a Consent to Jurisdiction in favor of the United States that expressly waives any personal jurisdiction defense in this matter and any objection to the courts of the United States as the forum to adjudicate this claim.

First, Bank of Cyprus devotes nearly 10 pages to arguing that the Government's claims fall outside the limited grant of extraterritorial jurisdiction of the Money Laundering Control Act ("MLCA") because the bank's conduct did not occur "in whole or in part in the United States," as required for jurisdiction. However, Bank of Cyprus neglects to mention that the Government is not attempting to apply its laws to conduct that occurred solely outside the United States. Rather, the Government's Complaint clearly alleges that the actions of Bank of Cyprus' co-conspirators (Kyprianou and Poyiadjis) occurred in the United States and that Kyprianou transferred the proceeds of their illegal activities to the Bank of Cyprus. For instance, the money that Kyprianou stole from AremisSoft through the Bank of Cyprus came from AremisSoft's

1

accounts in the United States in connection with a massive securities fraud committed on a U.S. public company, AremisSoft, and its investors. Yet nowhere in Bank of Cyprus' memorandum of law does Bank of Cyprus recognize the connection between its conduct and the conduct of its co-conspirators that bring its conduct within the MLCA. In essence, Bank of Cyprus simply ignores the allegations of the Government that it is a co-conspirator with the principals of AremisSoft, and asserts that only conduct by Bank of Cyprus itself should be considered in the jurisdictional analysis.

Second, Bank of Cyprus suggests that even if the Government could proceed against Bank of Cyprus, this Court should abstain from exercising jurisdiction because the extraterritorial application of U.S. laws is simply "unreasonable" and is inconsistent with international comity – yet cites to no case law supporting abstention when the Government – as opposed to a private party – is the plaintiff in the action. Beyond simply ignoring the core facts of the Complaint and the applicable law, Bank of Cyprus treats the Government's action as if it was a mere offshoot of the Trustees' action, and ultimately asks this Court to engage in the identical *forum non conveniens* analysis that resulted in the dismissal of the Trustees' action.

But, the argument by Bank of Cyprus – namely, that another forum could have a greater interest than the United States in the enforcement of its own criminal and civil laws – is patently absurd. As this Court well knows, *forum non conveniens* analysis is wholly inapplicable when the United States brings an action for penalties under its criminal laws, since no other forum could <u>ever</u> have a superior interest to this country in enforcing its own laws. As Justice Sutherland stated in 1935, "the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty[.]" <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935). Accordingly, and with all due respect to the Trust which brought the previous action against

2

Bank of Cyprus, the Government does not represent individual investors, but the United States itself. While the American investors' interest in the AremisSoft fraud, standing alone, may be "modest" compared to the interest of Cypriot and English regulators, the Government brings this action on behalf of the citizenry as a whole – not just to recover monies for a limited class of investors, but on behalf of the sovereign state.

In bringing this action, the Government is not seeking to engraft its laws on those of other sovereign nations like Cyprus. Rather, the Government is appropriately enforcing the MLCA and attempting to hold international banks accountable for laundering American currency that was obtained by illegal means. To permit banks like Bank of Cyprus or Lloyds to avoid federal prosecution for money laundering, where they actively conspired with their customers in the United States, is simply to ignore the technological realities of modern banking, and to ignore the clear directive of Congress in amending the MLCA to permit civil actions for money laundering.

Third, Bank of Cyprus goes to great lengths to argue that it is not subject to personal jurisdiction. Bank of Cyprus fails to advise this Court that, in applying to open a representative office in the United States, the bank expressly consented to jurisdiction in the United States for claims asserted by the United States. See Exhibit A to the Declaration of Rua M. Kelly ("Kelly Decl.")("Consent to Jurisdiction"). Moreover, Bank of Cyprus curiously omits any reference to the plain language of Title 18, United States Code, Section 1956(b), which unequivocally confers jurisdiction over foreign persons who maintain accounts in this country for violations of the MLCA. Finally, even if Bank of Cyprus had not waived its personal jurisdiction defense and personal jurisdiction was not conferred by federal law, personal jurisdiction over Bank of Cyprus is clearly present under the New York law.

3

Finally, in arguing that the Government fails to state a claim against Bank of Cyprus,

Bank of Cyprus parses the factual assertions set forth in the Complaint to a degree wholly

inconsistent with the mandate of Federal Rule of Civil Procedure 12(b)(6). Further, the Court

cannot determine on the face of the Complaint that the action is time-barred, therefore dismissal

under Fed. R. Civ. P. 12(b)(6) would be inappropriate. Where all reasonable inferences are to be

drawn in favor of the plaintiff, the Government has amply met its burden.

## STATEMENT OF FACTS

From 1999 through at least July 2005, the Bank of Cyprus aided and facilitated the

scheme of its co-conspirators, Lycourgos Kyprianou and Roys Poyiadjis, to launder vast amounts

of U.S. currency obtained from their illegal activity. Kyprianou controlled approximately 40

accounts at Bank of Cyprus in Cyprus ("Bank of Cyprus (Cyprus)") and Bank of Cyprus in

England ("Bank of Cyprus (UK)"), and the Bank knowingly allowed Kyprianou to launder funds

by means of inter-account transactions having an aggregate value of at least approximately

$162,000,000. Complaint ¶ 1.

Beginning in or about 1998 through July of 2001, Kyprianou and Poyiadjis conspired to

artificially inflate the value of AremisSoft stock through false and misleading statements

concerning the Company's growth and earnings. Complaint ¶¶ 6-8. AremisSoft, a publicly held

computer software technology company, was incorporated in the State of Delaware, and had its

principal place of business in the State of New Jersey. Complaint ¶ 21. The Company's

common stock was publicly traded on the NASDAQ stock exchange from April 1999 until

trading was suspended in July 2001, and the stock was ultimately delisted in August 2001.

Complaint ¶¶ 13, 21. Kyprianou was the founder of AremisSoft and served from its inception as

the Chairman of the Board of Directors and Chief Executive Officer until May 2000 and,

together with Poyiadjis, as Co-CEO from February 2001 to July 31, 2001, when Kyprianou resigned.  Complaint ¶ 21.

Kyprianou and Poyiadjis profited from their fraudulent scheme by secretly and illegally selling their AremisSoft shares at inflated prices.  Complaint ¶ 8.  In addition, Kyprianou siphoned millions more from AremisSoft into accounts he controlled at the Bank of Cyprus. Complaint ¶ 9.  When news reports surfaced in May 2001 that Kyprianou and Poyiadjis had fraudulently misrepresented the value and profitability of AremisSoft, the price of AremisSoft shares plummeted, with investor losses totaling approximately $500,000,000, plus interest. Complaint ¶¶ 11-12.

In order to conceal his illegal conduct, Kyprianou utilized branches at Bank of Cyprus (Cyprus) and Bank of Cyprus (UK).  From 1999 through 2002, Kyprianou opened numerous accounts at Bank of Cyprus (Cyprus) in the names of AremisSoft and several subsidiaries, including at least three accounts held by AremisSoft (Cyprus) Ltd. and at least four accounts held by AremisSoft EE.ME.A.  Complaint ¶ 45.  AremisSoft accounts at Bank of Cyprus (Cyprus) were funded with money transferred from AremisSoft accounts at U.S. Banks including Commerce Bank in New Jersey (Complaint ¶ 44), and were routed through New York based correspondent banks.  (Complaint ¶ 20).  In processing the large dollar denominated inter-account transactions, Bank of Cyprus (Cyprus) routinely disregarded AremisSoft's Board resolution requiring Kyprianou to obtain an additional authorized signature on transactions exceeding $200,000, and instead allowed Kyprianou to engage in multi-million dollar transactions in and out of AremisSoft's accounts on his sole authorization.  Complaint ¶¶ 33, 43.

Kyprianou also held numerous other personal accounts and accounts of his family members at Bank of Cyprus (Cyprus).  Complaint ¶ 46.  In addition, Bank of Cyprus was aware

that Kyprianou controlled other accounts at Bank of Cyprus (Cyprus) in the names of Southwood
Management Limited ("Southwood") and Semark Consultancy Services, Limited ("Semark").
Complaint ¶¶ 46, 47. Bank of Cyprus (Cyprus) was also aware that the record owner of
Southwood was a Kyprianou associate who simultaneously served as AremisSoft's Secretary and
as a Director, and further was signatory on the AremisSoft accounts at Bank of Cyprus (Cyprus).
Complaint ¶ 46. Kyprianou held over one million shares of AremisSoft stock through
Southwood, much of which was sold at artificially inflated prices and millions in proceeds
transferred to Kyprianou through the Southwood account at Bank of Cyprus (Cyprus).
Complaint ¶ 63. Between December 1999 and March 2001, Bank of Cyprus (Cyprus) allowed
more than $30,000,000 to pass between an AremisSoft Bank of Cyprus (Cyprus) account and
Southwood's Bank of Cyprus (Cyprus) account without raising any red flags or questioning the
legitimacy of these related-party transactions. Complaint ¶ 72.

Kyprianou and his wife also served as the sole directors and shareholders of Semark,
which held several accounts at Bank of Cyprus (Cyprus). Complaint ¶ 75. Resembling the
AremisSoft-Southwood transfers, for no bona fide business purpose, apparently $20,000,000
passed between AremisSoft's Bank of Cyprus (Cyprus) account and Semark's Bank of Cyprus
(Cyprus) accounts from May 1999 through March 2001. Complaint ¶ 76. Bank of Cyprus
(Cyprus) then allowed Kyprianou to transfer funds from the Southwood and Semark accounts
into Kyprianou's joint account with his wife at HSBC in London. Id.

Bank of Cyprus also knew that certain other entities maintained accounts at the Bank that
received large transfers from AremisSoft from in or about 2000 through in or about 2001. These
account holders included Still & Life GmBH ("Still & Life"), and Denon International Limited
("Denon"). Neither of these entities maintained an office or conducted any business in Cyprus,

6

yet they maintained accounts at Bank of Cyprus (Cyprus) into which AremisSoft transferred millions of dollars. Complaint ¶ 49. Bank of Cyprus (Cyprus) knew that the accounts held by these entities were controlled by Kyprianou. Complaint ¶ 48. The transfers were all made in connection with the massive securities fraud perpetrated by Poyiadjis and Kyprianou.

The Still & Life account at Bank of Cyprus (Cyprus) was used by Kyprianou to siphon millions from AremisSoft disguised as the acquisition of a software company called E-ChaRM from Still & Life. Almost immediately after AremisSoft transferred $10,900,000 to the Still & Life account at Bank of Cyprus (Cyprus) for the purported acquisition, approximately $9,900,000 was transferred to Kyprianou's Semark account at Bank of Cyprus (Cyprus). Complaint ¶¶ 52-53. Immediately thereafter, Kyprianou directed the transfer of approximately $6,400,000 from Semark back to the originating AremisSoft account at Bank of Cyprus (Cyprus). Complaint ¶ 54. Bank of Cyprus (Cyprus) allowed Kyprianou to churn the accounts while siphoning $3,500,000 from AremisSoft into one of his accounts at Bank of Cyprus (Cyprus). Complaint ¶ 56.

Bank of Cyprus (Cyprus) also allowed Kyprianou to use the Denon account at Bank of Cyprus (Cyprus) to further his fraudulent scheme and to disguise the purported acquisition of a Dubai technology company.    Complaint ¶ 59.    On December 28, 2000, approximately $7,340,000 was transferred from an AremisSoft account at Bank of Cyprus (Cyprus) to a Denon account at the same branch of Bank of Cyprus (Cyprus). Complaint ¶ 57. On that very day, Bank of Cyprus (Cyprus) allowed Kyprianou to transfer almost all those funds – approximately $7,240,000 – from the Denon Bank of Cyprus (Cyprus) account to Kyprianou's Southwood account in the same branch of Bank of Cyprus (Cyprus). Complaint ¶ 58. There is no question that Bank of Cyprus (Cyprus) was aware that Kyprianou controlled the Southwood account at the

7

same branch of Bank of Cyprus (Cyprus). Yet, despite this knowledge, Bank of Cyprus (Cyprus) allowed Kyprianou to siphon $7,240,000 into his Southwood account without questioning the transaction or raising any red flags.

The transfers to Still & Life and to Denon were pursuant to resolutions of the AremisSoft Board of Directors after meetings attended by United States board members of this Delaware corporation. These board members were deceived by the fraudulent representations made by Kyprianou and Poyiadjis to approve the purchases of E-ChaRM from Still & Life and of Denon. In fact those entire sham transactions were part of the fraudulent securities fraud scheme, as were the attendant bank transfers at Bank of Cyprus. Complaint ¶¶ 48-49. The fraud by Kyprianou and Poyiadjis on the AremisSoft Board of Directors to approve the acquisitions and thereby authorize the transfer of money to Bank of Cyprus occurred in the United States and provided the means by which millions of U.S. dollars were laundered by Kyprianou through Bank of Cyprus.

In connection with the purported Denon acquisition, in January 2001 Kyprianou and Poyiadjis transferred $7,100,000 to replenish the AremisSoft Bank of Cyprus (Cyprus) account, with these funds being transferred from an AremisSoft account at Commerce Bank in New Jersey. Complaint ¶ 59. The wire transfer of U.S. dollars from Commerce Bank was facilitated through correspondent bank accounts in New York. Id. The funds themselves originated from the covert payment on behalf of Poyiadjis and Kyprianou of stock option exercise prices from Swiss accounts managed by Roger Meyer. Id. After exercising the options, Kyprianou and Poyiadjis then sold the stock at artificially inflated prices on the open market.

In March 2001, over $1,500,000 which had been transferred from Denon to the Southwood account, was transferred to the Kyprianous' joint bank account at HSBC in London. Complaint ¶ 60. In this way, and for no bona fide business purpose, Bank of Cyprus (Cyprus)

8

allowed numerous large deposits from AremisSoft into accounts at Bank of Cyprus (Cyprus) that were controlled by Kyprianou. Complaint ¶ 49. Bank of Cyprus (Cyprus) allowed Kyprianou to conduct approximately 100 large transactions in rapid succession, transferring millions of dollars from AremisSoft accounts to the above accounts, and then back to Kyprianou's personal accounts, all of which were maintained at the same branch of the Bank of Cyprus (Cyprus). Complaint ¶¶ 33, 41. All of these transactions from one Bank of Cyprus (Cyprus) account to another were made in U.S. dollars and facilitated through correspondent banks located in New York, including Bankers Trust (n/k/a Deutsche Bank AG), The Bank of New York, and J.P. Morgan Chase & Co. Complaint ¶¶ 20, 49.

Bank of Cyprus (Cyprus) allowed Kyprianou to use the numerous accounts as part of his laundering scheme to convert AremisSoft assets and launder the fraud proceeds of his illegal insider trading. Complaint ¶ 50. The unlawful activities of Kyprianou and Poyiadjis which created the millions of dollars laundered through the Bank of Cyprus (Cyprus) occurred in the United States, and the proceeds of their illegal activities were transferred from the United States to the Bank of Cyprus. Complaint ¶¶ 4, 65, 68, 69, 71. Indeed, at least $38,000,000 of the funds laundered through Bank of Cyprus (Cyprus) were derived from sources in the United States. Complaint ¶ 33.

Even after the fraud on AremisSoft was publicly disclosed in May 2001, and after Poyiadjis' and Kyprianou's indictment in the United States in 2001 and 2002, respectively, for their role in the AremisSoft fraud, the Bank of Cyprus (UK) permitted Kyprianou to use his accounts to launder an aggregate of at least $1,400,000 in furtherance of his fraudulent scheme. Complaint ¶¶ 14, 78. As noted above, a portion of the money used to open the accounts at Bank of Cyprus (UK) was transferred from the Kyprianous' personal accounts in HSBC in London

which themselves were funded, in part, with illicit proceeds of Kyprianou's criminal activity transferred from the Southwood and Denon accounts at Bank of Cyprus (Cyprus) controlled by Kyprianou. Complaint ¶¶ 60, 81. Whereas HSBC ceased doing business with Kyprianou when news of his fraud became known, Bank of Cyprus (UK) welcomed his business in the UK as they did in Cyprus. Bank of Cyprus (UK), in conjunction with the home office in Cyprus, allowed Kyprianou's continued money laundering, despite warnings made by a small group of its operational employees that these transactions were suspicious. Complaint ¶¶ 84, 85, 86, 88, 91, 94, 95. Bank of Cyprus management, however, consistently ignored these warnings. Complaint ¶¶ 90, 92, 93. Kyprianou's banking activities through Bank of Cyprus (UK) continued well into 2005 and included transactions that can be traced to the insider trading and other frauds by Kyprianou. Complaint ¶ 99.

### The Bank of Cyprus' Consent to Jurisdiction

The Bank of Cyprus maintains branches and offices throughout the world, including when this action was filed in New York. On August 26, 1992, prior to commencing operations in the United States, Bank of Cyprus Ltd and Bank of Cyprus (Holdings) Ltd. filed an application with the Board of Governors of the Federal Reserve System (the "Federal Reserve") to establish a representative office in the United States. Exhibit B to the Kelly Decl. As part of that application, Bank of Cyprus Ltd. and Bank of Cyprus (Holdings) Ltd. each signed a Consent to Jurisdiction on March 30, 1993 and March 31, 1993, respectively. The Consent to Jurisdiction explicitly states that both entities "consent[] to the jurisdiction of the United States for purposes of any and all claims made by, proceedings initiated by, or obligations to, the United States…and any United States governmental agency, department or division."

10

The Federal Reserve approved Bank of Cyprus' application on November 24, 1997. Exhibit C to the Kelly Decl. In its Order Approving Establishment of a Representative Office, the Federal Reserve stated that the proposed office "has established controls and procedures for the proposed representative office to ensure compliance with U.S. law." Additionally, the Federal Reserve stated that the application was "specifically conditioned on compliance by [Bank of Cyprus] with the commitments made in connection with this application, and with the conditions in this order."

After the Federal Reserve's approval to open a representative bank, Bank of Cyprus applied for and obtained from the State of New York Banking Department a license to maintain a representative office. Exhibit D to the Kelly Decl. The license, signed on April 24, 1998, allowed Bank of Cyprus to establish, maintain and use a representative office in New York. Since that time, up until January 18, 2008,[1] Bank of Cyprus maintained a representative office at 80 Broad Street, New York City.

## ARGUMENT

### I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION.

#### A.   The Government Has Subject Matter Jurisdiction Under 28 U.S.C. § 1345.

Federal district courts have original subject matter jurisdiction over all civil actions commenced by the United States, "[e]xcept as otherwise provided by Act of Congress," pursuant to Title 28, United States Code, Section 1345. Therefore, the district court's jurisdiction cannot reasonably be questioned because subject matter jurisdiction is vested in district courts over civil actions in which the United States is the plaintiff. 28 U.S.C. § 1345. See, e.g., U.S. v. Collins, 503 F.3d 616, 617 (7th Cir. 2007); OCC v. Spitzer, 396 F. Supp.2d 383, 389 (S.D.N.Y. 2005).

---

[1] On January 18, 2008, Bank of Cyprus formally closed its New York representative office. Exhibits E and F to the Kelly Decl.

11

Accordingly, to decide the Defendant's motion pursuant to Federal Rule of Civil Procedure 12(b)(1), this Court need only consider whether the Money Laundering Control Act of 1986, 18 U.S.C. § 1956 *et seq.*, is an Act of Congress limiting subject matter jurisdiction over Bank of Cyprus' conduct outside of the United States.

B. The Government Has Subject Matter Jurisdiction Under the MLCA,
   Where the Conduct Occurred "In Part" in the United States Analysis.

Title 18, United States Code, Section 1956(f), explicitly provides for jurisdiction over Bank of Cyprus' conduct in this case, because the underlying conduct occurred "in part in the United States." 18 U.S.C. § 1956(f). In fashioning its lengthy argument on the limits of extraterritorial jurisdiction, Defendant simply ignores the most crucial facts set forth in the Complaint – namely, that in furtherance of a massive fraudulent scheme perpetrated on a United States company and involving insider trading on a United States market, Bank of Cyprus participated in laundering millions of proceeds of that fraud. In fact, the AremisSoft co-conspirators Kyprianou and Poyiadjis directed the transfer of millions of dollars from an AremisSoft account in the U.S. to the Bank of Cyprus in furtherance of the software company acquisition fraud, as well as a transfer of millions of dollars of insider trading proceeds from an account in New York to the Bank of Cyprus. Complaint ¶¶ 59, 67. In other words, Bank of Cyprus failed to address in the Motion to Dismiss that in fact the Complaint alleges that Bank of Cyprus conspired with others, not that it acted alone. Accordingly, Bank of Cyprus ignores not only that the fraudulent actions of its co-conspirators took place within U.S. borders, but that transactions in furtherance of these fraudulent actions originated in the United States, which means that the conduct at issue occurred "in whole or in part" within the United States, and that extraterritorial jurisdiction is proper under 18 U.S.C. § 1956(f) of the MLCA.

The MLCA's legislative history makes plain that Congress – far from seeking to proscribe jurisdiction – explicitly sought to hold foreign banks responsible for the kind of conduct in which Bank of Cyprus engaged with AremisSoft's principals. The Senate, in particular, contemplated two examples regarding transactions occurring "in part" in the United States as defined by 1956(f): (1) *"[A] person transfers by wire the proceeds of a drug transaction from a bank in the United States to a bank in a foreign country,"* and, (2) "[A] person telephones instructions from the United States to one foreign bank to transfer such proceeds to another foreign bank." S. Rep. 99-433 at 14. (*emphasis added*). Here, the Complaint clearly sets forth the facts surrounding a wire transfer from a bank in the United States to a foreign bank – Bank of Cyprus. For example, the Complaint notes that "Poyiadjis, in furtherance of the conspiracy to defraud AremisSoft, gave directions from New York, New York, for AremisSoft to transfer $7,100,000 in United States dollars from an AremisSoft account at Commerce Bank in New Jersey to an AremisSoft account at Bank of Cyprus (Cyprus), in connection with the purported Denon purchase." Further, Kyprianou and Poyiadjis' AremisSoft stock holdings were traded through a brokerage account in New York and the proceeds of these trades were transferred to accounts at various banks for the benefit of Kyprianou and Poyiadjis, including a transfer of $6,000,000 from Brown Brothers Harriman in New York to an AremisSoft account controlled by Kyprianou at Bank of Cyprus (Cyprus). Complaint ¶ 67. Plainly, such transactions were overt acts by co-conspirators (Kyprianou and Poyiadjis) that constituted conduct "in part" in the United States, thus creating extraterritorial jurisdiction.

For example, in United States v. Bodmer, a court in this district held that it had extraterritorial jurisdiction over financial transactions involving money laundered in furtherance of a scheme in violation of the Foreign Corrupt Practices Act ("FCPA"), even though each

transaction occurred outside of the United States. 342 F. Supp.2d 176, 190-91 (S.D.N.Y. 2004). The plot alleged in Bodmer involved a complicated consortium of off-shore shell companies and a massive scheme of bribery to illegally effectuate the privatization of the Azerbaijan State Oil Company. Id. at 178-79. The defendant, a Swiss national operating through his Swiss law firm, then opened Swiss bank accounts to launder money in furtherance of the scheme. Id. He proceeded to wire funds through banks in Switzerland, the Netherlands, and the United Arab Emirates, and arranged for U.S. currency to be flown to Azerbaijan via private jets and charters. Id. The sole nexus to the U.S. was a Delaware company with a principal place of business in New York involved in purchasing the privatization vouchers. Id.

The court in Bodmer exercised extraterritorial jurisdiction for violations of 18 U.S.C. § 1956 over financial transactions executed wholly outside the U.S. that were the proceeds of a scheme involving a U.S. company. Id. at 191. In doing so, the court explicitly held that to allow a foreign money launderer to be immune from prosecution for laundering proceeds of the specified unlawful activity outside the United States would be tantamount to stating that such "launderers would be beyond the reach of the Department of Justice even if part of the conduct occurred in the United States. This would contravene Congress's clearly articulated intention to include foreigners within the scope of the MLCA. See 18 U.S.C. § 1956(f)." Id.

Like the defendant in Bodmer, Bank of Cyprus should not be immune from prosecution or for civil penalties for laundering money in furtherance of a conspiracy involving fraud that occurred in the U.S. because its involvement occurred after the money was stolen from the U.S. and purposefully concealed at Bank of Cyprus, especially since funds in furtherance of the fraud originated in the United States. See also United States v. Tarkoff, 242 F.3d 991, 995 (11th Cir. 2001) (holding that a defendant may be convicted for conspiracy to violate and violating the

money laundering statute where the two monetary transactions at issue occurred wholly outside the United States).

Bank of Cyprus does not argue that an overt act of a co-conspirator could not create jurisdiction in this case, nor could it. Indeed, jurisdiction over all of a predominantly foreign scheme can be established on the basis of overt acts in the United States. Ford v. United States, 273 U.S. 593, 624 (1927) ("The overt acts charged in the conspiracy . . . were acts within the jurisdiction of the United States, and the conspiracy charged . . . had for its object crime in the United States, and was carried on partly in and partly out of this country, and so was within its jurisdiction under the principles above settled."); United States v. Inco Bank & Trust Corp., 845 F.2d 919, 920 & n. 4 (11th Cir. 1988) ("[A] conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction.").

Moreover, while Congress "did not intend to impose a duty on foreign citizens operating wholly outside the United States to become aware of U.S. laws," it absolutely intended "extraterritorial jurisdiction over the offense to situations in which the interests of the United States are involved." S. Rep. 99-433 at 14. Bank of Cyprus spends pages of its Memorandum claiming the conduct occurred wholly outside the US by focusing on each financial transaction with a microscope, conveniently ignoring the entirety of the conduct alleged in the Complaint which states unequivocally that Bank of Cyprus knowingly laundered the proceeds of a securities fraud committed in the United States involving a United States market through its accounts.

> Section 1956 was enacted to combat 'one of the greatest challenges facing law enforcement today.' S. Rep. 99-433, at 3-4. In light of the modern methods of transporting funds between countries, Congress authorized extraterritorial jurisdiction for violations of the nation's money laundering statute. It is clear that in so doing Congress intended section 1956 to apply to money laundering activities in which the United States has a substantial interest.

15

United States v. Stein, No. 93-375, 1994 WL 285020, at \*5 (E.D. La. June 23, 1994). Indeed, Bank of Cyprus participated in the conspiracy by engaging in continuous transactions with full knowledge that they were designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of the fraud. Complaint ¶¶ 43-51; United States v. Sadighi, 199 F.3d 1334, at \*3 (9th Cir. 1999) ("The government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States."). The MLCA was specifically enacted to deter such activities. S. Rep. 99-433. Therefore, to state that Bank of Cyprus' conduct falls outside the extraterritorial jurisdiction of the United States is patently illogical.

The broad scope of the MLCA is demonstrated by section 18 USC § 1956(b)(2), which provides that United States district courts have jurisdiction[2] over any foreign person including any financial institution authorized under the laws of a foreign country if the foreign financial institution maintains a bank account at a financial institution in the United States. Not only does Bank of Cyprus fall within this provision, but the accounts it maintained at financial institutions in the United States were the very accounts used to launder United States currency for the benefit of Kyprianou.

Although the Defendant argues that this Court lacks jurisdiction over the Government's Complaint, the argument regarding extraterritorial jurisdiction is more accurately read as a 12(b)(6) argument that the Government has failed to state a claim. In other words, Defendant argues that where Bank of Cyprus never engaged in money laundering transactions within United States' borders, the United States does not have a colorable claim of any kind. However,

---

[2] Similarly, Section 1957 of the MLCA clearly permits jurisdiction– notwithstanding the defendant's contention that Bank of Cyprus' actions took place in Cyprus -- because the acts of the co-conspirators were committed in the United States. See 18 U.S.C. § 1957 (authorizing jurisdiction where "the offense . . .takes place in the United States.")

16

Defendant has fundamentally misread the Complaint, for the United States clearly alleged that the Bank of Cyprus' actions did not occur in a vacuum – the transactions in which it engaged redounded to the benefit of the co-conspirators, and to the bank (in added profits). This is an action alleging an international conspiracy to launder the proceeds of securities fraud – and where the United States has sufficiently alleged that co-conspirators' actions took place within its borders, the jurisdictional inquiry is at an end. While it may be unpleasant for the Bank of Cyprus to be named as a co-conspirator in the context of a securities fraud, albeit in a civil case, it cannot simply choose to read out the facts relative to the co-conspirators and insist that the Court look only at its own conduct, because those actions serve to create jurisdiction here.[3]

In sum, where the United States itself has brought this action, alleging that substantial conduct occurred in the United States, and involved United States-based perpetrators and U.S. victims, the District Court plainly has subject matter jurisdiction.

## C. Where the United States is the Plaintiff, Exercising Jurisdiction is Neither Unreasonable Nor Inconsistent with Principles of International Comity.

Nonetheless, Bank of Cyprus argues that the Court should decline to exercise jurisdiction under the "reasonableness analysis" of the Restatement (Third) Foreign Relations Law of the United States (1987), for reasons of international comity. In making this argument, Bank of Cyprus once more ignores its Consent to Jurisdiction through which it agreed to have claims by the United States adjudicated in this forum. Bank of Cyprus consented to the "jurisdiction of the United States for purposes of any and all claims made by, proceedings initiated by, or obligations to, the United States." This language implies that claims asserted by the U.S. pursuant to the

---

[3] Bank of Cyprus contends that jurisdiction cannot be based solely on maintaining correspondent bank accounts in the United States. However, the MLCA plainly provides for jurisdiction over foreign banks that maintain a correspondent account in the United States. See 18 U.S.C. §1956(b)(2)(A), (C), as amended by USA PATRIOT Act of 2001, P.L. 107-56 (Oct. 26, 2001).

17

"jurisdiction of the United States" would be heard before the U.S. federal courts. See 28 U.S.C. § 1345. Having agreed to the selection of this forum, Bank of Cyprus cannot be heard to complain that it finds itself before this forum for its money laundering activities in violation of United States law. M/S Bremen v. Zapata Off-shore Co., 407 U.S. 1, 15 (1972) (forum selection clauses are enforceable); Phillips v. Audio Active Ltd., 494 F.3d 378 (2d Cir. 2007) (same).

Even if Bank of Cyprus did not consent to this forum, its argument for this Court to decline jurisdiction fails. Bank of Cyprus attempts to minimize the United States' interest in this case. D. Br. at 15-17. Such an argument essentially relegates the United States' interest to that of any civil litigant. In fact, as Congress made explicit in enacting the MLCA, the United States has a powerful interest in combating money laundering schemes to ensure the integrity of its financial markets. The United States has an extremely strong interest in protecting its citizens from being defrauded by companies like AremisSoft, and having their monies transferred off-shore and laundered by international banks. The investing public lost hundreds of millions of dollars when Kyprianou and others secretly sold millions of AremisSoft shares and laundered the proceeds through international financial institutions, including Bank of Cyprus. It is the Government's duty to protect shareholders from having their money stolen – and it is also our obligation to recover those monies, whether they be located in the United States or overseas. The MLCA empowers the Government to take precisely this type of action. There is no principled basis on which to abstain from exercising such jurisdiction for reasons of international comity, where Congress placed its imprimatur on precisely this type of civil action, charging foreign banks with laundering the proceeds of a crime.

II.    THIS COURT HAS PERSONAL JURISDICTION OVER BANK OF CYPRUS.

A.    Standard of Review.

When a district court chooses to rely on the pleadings and affidavits and chooses not to conduct a full-blown evidentiary hearing on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing that the court has personal jurisdiction over the defendant. Porina v. Marward Shipping Co., No. 06-5397, 2008 WL 850301, at *2 (2d Cir. April 1, 2008). As with any motion to dismiss, the court is to "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in his favor." DiStefano v. Carozzi N.Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001) (internal citations omitted). Moreover, courts may consider matters outside the pleadings without converting the motion to one for summary judgment. See Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d Cir. 1997).

Bank of Cyprus' defense of lack of personal jurisdiction is meritless for three independent and definitive reasons: first, because Bank of Cyprus consented to the jurisdiction of the courts of the United States when the bank applied to the Board of Governors of the Federal Reserve for a license to open a representative office in the United States, and that contractual consent is binding; second, because the MLCA explicitly provides for jurisdiction over foreign persons in Section 1956(b) of Title 18, United States Code; and third, because its contacts with New York are sufficient to give this Court personal jurisdiction over it.[4]

---

[4] See Koninklijke Philips Electronics v. Digital Works, Inc., 358 F. Supp.2d 328, 333 n.5 (S.D.N.Y. 2005) (where court has jurisdiction over defendant on the basis of defendant's consent, no need to analyze whether court has jurisdiction under long-arm statute (citing cases)). See also Burger King v. Rudzewicz, 471 U.S. 462, 473 n. 14 (1985) (holding that the "personal jurisdiction requirement is a waivable right" and where "forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process"); Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 465 U.S. 694, 703-05 (1982) (personal jurisdiction is an individual right, it can be waived, and parties can consent to personal jurisdiction.

B.    Bank of Cyprus Consented to the Jurisdiction of this Court.

Although Bank of Cyprus moves for dismissal based on lack of personal jurisdiction,

Bank of Cyprus fails to disclose to the Court that it unconditionally consented to the jurisdiction

of this Court. See Exhibit A to the Kelly Decl. The defendant consented to "the jurisdiction of

the United States for purposes of any and all claims made by, proceedings initiated by, or

obligations to, the United States." The Bank of Cyprus Consent to Jurisdiction confers personal

jurisdiction over the defendant for the purposes of this Complaint.

Bank of Cyprus' express consent to the jurisdiction of this Court is valid and binding. As

the Supreme Court has explained,

> [B]ecause the personal jurisdiction requirement is a waivable right, there are a 'variety of
> legal arrangements' by which a litigant may give 'express or implied consent to the
> personal jurisdiction of the court.' For example, particularly in the commercial context,
> parties frequently stipulate in advance to submit their controversies for resolution within
> a particular jurisdiction. Where such forum-selection provisions have been obtained
> through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their
> enforcement does not offend due process.

Burger King, 471 U.S. at 473 n. 14 (citations omitted). Following this reasoning, courts in this

district have consistently enforced contractual clauses consenting to jurisdiction, particularly if

signed by sophisticated commercial parties such as Bank of Cyprus. See Koninklijke, 358 F.

Supp.2d at 332-33 (upholding consent to jurisdiction); Webpro Inc. v. Petrou, 02 Civ. 3465,

2002 WL 31132889, at *3 (S.D.N.Y. Sept. 25, 2002) ("Challenges to personal jurisdiction may

be waived by either express or implied consent" and such consent controls absent a "strong

showing that it should be set aside"); cf. Hoffman v. Blaski, 363 U.S. 335, 343 (1960)

(acknowledging that venue, like personal jurisdiction, may be waived).

In Koninklijke, 358 F. Supp.2d at 330, the defendant had agreed to "irrevocably waive[]

any objection to the jurisdiction, process and venue." The court declared that in the face of such

20

submission to jurisdiction, there was a "strong presumption favoring enforcement" of such a clause, and defendant had to make a "strong showing" to overcome that presumption. Id. at 332. This presumption is especially powerful in the commercial context, in which a commercial party can contractually consent to a forum for dispute resolution and thereby waive its personal jurisdiction defense. Mastec Latin America v. Inepar S/A Industrias E Construcoes, No. 03 Civ. 9892, 2004 WL 1574732, at *3 (S.D.N.Y. July 13, 2004). Such consent should be enforced unless it would be "unreasonable and unjust." Burger King, 471 U.S. at 473 n.14.

Bank of Cyprus cannot meet the Burger King test to show that enforcement of its Consent to Jurisdiction would be unreasonable and unjust. Bank of Cyprus is a highly sophisticated commercial party, with approximately $750 million in after-tax profits in 2007, which engaged in sophisticated financial transactions in this case alone totaling at least $162,000,000. Having waived its personal jurisdiction defense and agreed to selection of this forum, Bank of Cyprus must now refrain from arguing that this Court lacks jurisdiction over its person and that this Court may not entertain this case based on international comity. Regardless, this Court need go no further to analyze Bank of Cyprus' contacts under federal law or under New York law including the long-arm statute because this Court has personal jurisdiction over Bank of Cyprus and is the selected forum for these money laundering claims by the United States based on Bank of Cyprus' binding consent.

C.     Section 1956(b) Confers Jurisdiction Over Foreign Persons.

Even without Bank of Cyprus' Consent to Jurisdiction, this Court has personal jurisdiction over Bank of Cyprus pursuant to 18 U.S.C. § 1956(b). Defendant simply fails to address the applicability of section 1956(b) to the question of personal jurisdiction. Under the

21

plain language of the MLCA, the district courts have jurisdiction over any foreign person

("including any financial institutional authorized under the laws of a foreign country") if:

> (A) the foreign person commits an offense under subsection (a) involving a
> financial transaction that occurs in whole or in part in the United States;
> (B) the foreign person converts, to his or her own use, property in which the
> United States has an ownership interest by virtue of the entry of an order of
> forfeiture by a court of the United States; *or*
> (C) the foreign person is a financial institution that maintains a bank account at a
> financial institution in the United States.

Title 18, United States Code, Section 1956(b) (*emphasis added*). Accordingly, Bank of Cyprus

is subject to personal jurisdiction under the MLCA under 1956(b)(2)(A), where the financial

transaction occurred "in whole or in part" in the United States. As discussed in detail above,

Bank of Cyprus committed an offense where financial transactions occurred at least in part in the

United States.    Moreover, Bank of Cyprus is subject to personal jurisdiction pursuant to

1956(b)(2)(C) simply by virtue of maintaining a bank account at a financial institution in the

United States.    Bank of Cyprus engaged in U.S. dollar transactions facilitated through

correspondent banks located in New York, including Bankers Trust (n/k/a Deutsche Bank AG),

The Bank of New York, and J.P. Morgan Chase & Co. Complaint ¶¶ 4, 20, 49. Thus, Bank of

Cyprus is properly the subject of this action.

     D.     Bank of Cyprus Had a Presence in this Forum, Transacted Business in New York, and Purposefully Availed Itself of this Forum.

Two independent bases for personal jurisdiction over Bank of Cyprus also exist under

New York law. Bank of Cyprus' representative office in New York created a presence in the

state such that personal jurisdiction exists regardless of whether the claim arises out of the

transaction of business in New York. Personal jurisdiction is also present under New York's

long-arm statute, based on Bank of Cyprus' contacts with New York. Regardless of whether

subject matter jurisdiction is based on diversity of citizenship or federal question jurisdiction, the

Court may look to the New York law to determine whether personal jurisdiction exists. See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105 (2d Cir. 1997) (federal question); Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986) (diversity).

        1.      Personal Jurisdiction Under N.Y. C.P.L.R. § 301.

"A foreign corporation is amenable to suit in New York courts under [N.Y. C.P.L.R. § 301] if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." Landoil ResourcesCorp. v. Alexander & Alexander Services, Inc., 77 N.Y.2d 28, 33, 563 N.Y.S.2d 739 (1990) (citations omitted). The Court "must be able to say from the facts that the corporation is 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity.'" Id. at 33-34 (citations omitted). In applying this test, the presence of an office of the defendant in New York has been an important factor in determining that the foreign corporation is present in the state for purposes of personal jurisdiction. Bryant v. Finnish National Airline, 15 N.Y.2d 426, 432 (1965) (office and bank account maintained in NY); Tauza v Susquehanna Coal Co., 220 N.Y. 259, 256-66 (1917) (branch office maintained in NY). The classic indicia of to show presence in New York for purposes of N.Y. C.P.L.R. § 301 "include: 1) the existence of an office in New York; 2) the solicitation of business in New York; 3) the existence of bank accounts or other property in New York; and 4) the presence of employees in New York." Overseas Media, Inc. v. Skvortsov, 407 F. Supp.2d 563, 567-68 (S.D.N.Y. 2006); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.2000). A defendant who is found to be doing business in New York in a permanent and continuous manner may be sued in New York on causes of action wholly unrelated to acts done in New York." Overseas Media, 407 F. Supp.2d at 567-68.

It is undisputed that Bank of Cyprus operated and maintained a representative office in the State of New York, solicited business in New York, had bank accounts or other property in New York, and had employees present in New York through the closing of its representative office in New York in January 2008.[5] It therefore had such a presence in the state under N.Y. C.P.L.R. § 301 that the courts of New York may exercise personal jurisdiction over Bank of Cyprus. It matters not whether the cause of action before the court arose from the transaction of business in the state of New York by Bank of Cyprus' representative office. The Court has personal jurisdiction under N.Y. C.P.L.R. § 301 over Bank of Cyprus on the Government's money laundering claims.

2.    Personal Jurisdiction Under the N.Y. Long-Arm Statute.

New York courts have jurisdiction over an out-of-state defendant if it "transacts business" in New York and the relevant cause of action "arises from" that business activity. See N.Y. C.P.L.R. § 302(a)(1); Cutco, 806 F.2d at 365. In order to meet the "transacting business" prong of Section 302(a)(1), the party "need not be physically present in the state at the time of service." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999). Rather, jurisdiction under Section 302(a)(1) extends "to any non-resident who has purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." Id. (internal marks omitted). The exercise of personal jurisdiction in a New York court is also proper over a non-domiciliary defendant who "in person or through an agent... commits a tortious act within the state." See N.Y. C.P.L.R. § 302(a)(2); Simon v. Philip Morris, Inc., 86 F. Supp.2d 95, 119 (E.D.N.Y. 2000). It is well established that acts committed in New York by the co-conspirator of an out-of-state

---

[5] Reasonably enough, Bank of Cyprus does not contend in its Motion to Dismiss that the closure of its representative office divests this court of jurisdiction, since the instant complaint was brought by the Government months earlier.

24

defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under N.Y. C.P.L.R. §§ 302(a)(1) and (2).  Id.; see also Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp.2d 736, 759 (S.D.N.Y. 2004). The court may exercise personal jurisdiction over the a foreign defendant based on the acts of its co-conspirators if plaintiffs have alleged facts sufficient (1) to establish a prima facie case of conspiracy, (2) to warrant the inference that the foreign defendant was a member of that conspiracy, (3) to demonstrate that a co-conspirator committed a tort or transacted business within New York within the meaning of CPLR § 302(a)(1) or (a)(2), and (4) to justify the finding of an agency relationship between the co-conspirator acting in New York and the foreign defendant.  Id.

Here, as a threshold matter, it is undisputed that Bank of Cyprus established and maintained a representative office at 80 Broad Street, New York City, New York. up until January 18, 2008.  Further, the funds laundered were the proceeds of specified unlawful activity that occurred in the United States.  Indeed, the fraud was committed on a United States company using a United States exchange and affecting over 6,000 United States citizens.  Complaint ¶¶ 6-12.  Bank of Cyprus then laundered U.S. dollars through a U.S. correspondent bank in New York.  ¶¶ 18, 43.  The money laundered included specifically two financial transactions involving millions of dollars that originated in the United States.  Complaint ¶¶ 59, 67.

Moreover, the Complaint clearly (1) states a claim for conspiracy under 18 U.S.C. § 1956(h) (Complaint ¶¶ 120-126); (2) alleges Bank of Cyprus' involvement in that conspiracy (Complaint ¶¶ 40, 42, 77, etc.); (3) alleges contacts with the State of New York by the co-conspirators Kyprianou and Poyiadjis – such as the $6,000,000 in insider trading proceeds transferred from the BBH account in New York to the AremisSoft Bank of Cyprus (Cyprus) account in Cyprus at the direction of Kyprianou and Poyiadjis (Complaint ¶¶ 6-14, 40-42, 67,

etc.); and (4) alleges that Bank of Cyprus and its co-conspirators, Kyprianou and Poyiadjis, maintained an agency relationship by pleading that Bank of Cyprus laundered the proceeds of it co-conspirators' fraud, some of which was received from New York (Complaint ¶¶ 40-42, 59, 67, 77, 82, etc.). Daventree, 349 F. Supp.2d at 759. Accordingly, the exercise of personal jurisdiction over Bank of Cyprus is proper based on the acts of its co-conspirators in New York because the causes of action for violations of the money laundering statutes unquestionably arose from Kyprianou's and Poyiadjis' activity in New York.

These contacts also more than satisfy constitutional Due Process requirements because Bank of Cyprus "purposefully availed itself of the privilege of conducting activities" in New York and thus "should reasonably anticipate being haled into Court there." Burger King Corp., 471 U.S. at 474-75; Simon, 86 F. Supp.2d at 126 (finding the exercise of personal jurisdiction based on co-conspirator's contacts with New York also sufficient to satisfy Due Process).

III.    THE GOVERNMENT'S CLAIMS ARE NOT TIME-BARRED.

A.    Standard of Review.

Under Rule 12(b)(6), a plaintiff must provide the grounds on which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). In ruling on a motion to dismiss under Rule 12(b)(6), the court is required to accept all the alleged facts as true and to draw all reasonable inferences in favor of the plaintiff. See LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991). A Rule 12(b)(6) motion based on the affirmative defense of the statute of limitations cannot be granted unless the action is clearly time-barred on the face of the Complaint. Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)

B.    Section 3282 Provides the Applicable Statute of Limitations.

Criminal money laundering and conspiracy to commit money laundering are subject to the five year statute of limitations set out in 18 U.S.C. § 3282. United States v. LaSpina, 299 F.3d 165, 173 (2d Cir. 2002).[6] With regard to Count V of the Complaint (alleging conspiracy), it is black letter law that the Government may bring an action alleging a money laundering conspiracy so long as at least one overt act in furtherance of the conspiracy occurred within the applicable five-year statute of limitation period.[7] See, e.g., United States v. Brasco, 516 F.2d 816 (2d Cir. 1976); see also 18 U.S.C. § 3282. Here, there are numerous overt acts that occurred within the applicable five-year period. While the Complaint does not and need not articulate the Government's theory as to how each and every transaction constituted money laundering, the post-September 7, 2002 transactions bear clear indicia of money laundering wherein the Government explicitly described the nexus between the specific transactions and Kyprianou's scheme to hide the proceeds of the AremisSoft fraud. Complaint ¶¶ 93-97.

As described in the Government's Complaint, the Bank of Cyprus (UK) allowed multiple transfers of unlawfully obtained funds in 2003. Complaint ¶¶ 94-97. Throughout this period, bank personnel had serious concerns about the transfers of the Kyprianous, but management at Bank of Cyprus (UK) continued to allow transfers out of the Kyprianou accounts. Id. Moreover, the Bank of Cyprus may not absolve itself of responsibility for laundering money on behalf of its

---

[6] Section 3282 provides: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." Although there are no reported cases addressing the statute of limitations governing civil money laundering actions, the United States respectfully submits that Section 3282 is the applicable statute for criminal and civil actions brought under the MLCA, to ensure consistency in the application and enforcement of the money laundering laws.

[7] Defendant contends that the applicable statute of limitations is Title 28, United States Code, Section 2462, the "catch-all" provision for civil actions. Under 28 U.S.C. § 2462, a claim may be brought no later than five years from the date when the claim first accrued. While the Government disagrees that 28 U.S.C. § 2462 is the applicable statute, the parties' disagreement is of no moment,. As discussed below, this action was brought within the five-year limitation period of section 2462.

27

co-conspirators because the Bank of Cyprus (UK) made two NCIS reports to authorities in the UK about transactions it questioned. As alleged by the Government, rank-and-file employees of Bank of Cyprus (UK) raised concerns about suspicious monetary activities that were ultimately given short shrift by management as the Bank proceeded to facilitate further Kyprianou transactions involving fraudulently derived proceeds, notwithstanding the lower-level employees' concerns. Complaint ¶ 93. On this Rule 12(b)(6) motion, it is the Government's allegations that must be accepted as true, and the Bank of Cyprus cannot prevail by arguing its own interpretation of the facts. LaBounty, 933 F.2d at 123. Moreover, Bank of Cyprus assumes, contrary to any allegation in the Government's Complaint, that UK authorities advised U.S. authorities about these NCIS reports. Rank speculation by the defendant provides no basis on which to dismiss the Government's Complaint.

Nonetheless, Defendant contends that Count V is time-barred as to pre-September 7, 2002 transactions. Bank of Cyprus essentially argues that this Court should ignore the conspiracy count and consider only the individual transactions as isolated and unrelated events. There is no precedent for doing so and moreover, the cases cited for this proposition are wholly inapposite.[8] Here, had the Government proceeded criminally, which option remains available, the "last overt act" rule would apply in determining when the statute of limitations started to run. It is inconceivable that a more stringent rule should apply simply because the Government, in the exercise of prosecutorial discretion, determined instead to bring a civil enforcement action.

_____

[8] The cases cited by Bank of Cyprus - which primarily involve issues of damages calculation - are not persuasive authority on a motion to dismiss the Government's enforcement action for monetary penalties for failure to state a claim. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) (private antitrust action focusing on damages analysis); Singleton v. City of New York, 632 F.2d 185 (2d. Cir. 1980) (private civil rights case involving damages for civil conspiracy); Jones v. Coughlin, 665 F. Supp. 1040 (S.D.N.Y. 1987) (same); Blusal Meats, Inc. v. United States, 638 F. Supp. 824, 828 (S.D.N.Y. 1986) (civil conspiracy under False Claims Act where Government had to show it suffered damages), aff'd on other grounds, 817 F.2d 1007 (2d. Cir. 1987); Stolow v. Greg Manning Auctions, Inc., 258 F. Supp.2d 236, 251 (S.D.N.Y. 2003) (private antitrust damages for conspiracy).

As to Counts I through IV of the Government's Complaint, the substantive money laundering counts are not time-barred. The Second Circuit's rule is clear: "[A] single money laundering count can encompass multiple acts provided that each act is part of a unified scheme." United States v. Moloney, 287 F.3d 236, 241 (2d Cir. 2002) (permitting Government to aggregate series of financial transactions over several years into single count indictment charging money laundering). Accordingly, the Government's decision to aggregate all of the financial transactions by Bank of Cyprus relative to AremisSoft was proper under the MLCA. The Defendant cannot prevail by simply asserting that many of those transactions took place more than five years before the date of the Tolling Agreement. The Government submits that because money laundering is a continuing offense, any pre-September 7, 2002 conduct is properly encompassed in the substantive counts, as well as the conspiracy count.

C.    Application of Section 2462 as Statute of Limitations.

Even if the Court were to decline to apply Section 3282 to these civil money laundering claims, and instead apply the civil penalty and fine limitations period under 28 U.S.C. § 2462, the result would be the same – all of the Government's claims would survive this challenge under Rule 12(b)(6).[9]

In making its argument that the Government's claims are barred by Section 2462, Bank of Cyprus makes a fundamental error of law. Bank of Cyprus simply goes back in time five years from the date that the parties entered into the Tolling Agreement and states that pre-September 7, 2002 money laundering transactions are barred by the applicable statute of limitations. Bank of Cyprus thereby ignores a crucial part of the analysis under Section 2462.

---

[9] Section 2462 provides: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

29

Under that statute of limitations, the period does not start to run until "the date when the claim first accrued." Without any analysis of when the money laundering claim first accrued, Bank of Cyprus' commencement of the limitations period on the dates of the money laundering violations cannot be sustained.

Numerous authorities in this District have concluded that when the cause of action accrues for a civil fine or penalty under Section 2462 is subject to doctrines that allow the date of accrual of the cause of action to be later than when the underlying conduct occurred. For example, in Securities and Exchange Commission v. Jones, No. 05 Civ. 7044(RCC), 2006 WL 1084276 (S.D.N.Y. April 25, 2006), the court noted that the fraudulent concealment doctrine applies to section 2462. To establish the concealment element, a plaintiff can allege either that the defendant took affirmative steps to prevent discovery of the fraud or that the wrong itself was self-concealing. Id. citing State of New York v. Henrickson Bros., Inc., 840 F.2d 1065 (2d Cir. 1988) (bid-rigging conspiracy was found to be a self-concealing wrong). So, too, in Securities and Exchange Commission v. Alexander, 2007 WL 28161195 (E.D.N.Y. Sept. 26, 2007), Judge Garaufis surveyed early Supreme Court precedent on the discovery rule and fraudulent concealment doctrines, concluding there are significant reasons for finding that a discovery rule governs the accrual of the limitations period in section 2462. Id. at *15; see also Securities and Exchange Commission v. Power, 525 F.Supp.2d 415, 424-25 (S.D.N.Y. 2007) (fraudulent concealment doctrine operates to toll the statute if the plaintiff alleges: (1) that the defendants concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some

point within five years of commencing the action; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part).[10]

Here, on the Rule 12(b)(6) motion, the Court need only look to the money laundering allegations in the Government's Complaint to see that Bank of Cyprus' offenses were inherently self-concealing. Indeed, the very purpose of the money laundering engaged in by Bank of Cyprus was to secrete funds unlawfully obtained and to confound anyone seeking to discover and unravel the trail of the fraud's proceeds by all of the methods detailed in the Government's Complaint. Consequently, the money laundering allegations here are within the protection of the discovery rule and equitable tolling doctrine that the statute of limitations would not commence to run until such time as the plaintiff knew, or should have known in the exercise of reasonable diligence, that he had a claim.[11] Reviewing the allegations of the Government's Complaint under that established test under Section 2462, no part of the Government's claims are subject to dismissal as time-barred. Nothing in the Government's Complaint indicates that, by September 7, 2002, the Government knew or should have known that any of the self-concealing money laundering transactions alleged in the Complaint had occurred. Hence, there is no basis on which the Court can conclusively determine that the Government's claim for civil penalties first accrued before September 7, 2002.

---

[10] The Second Circuit recently made it clear that, although the doctrines of equitable tolling and fraudulent concealment are often used interchangeably, there is no requirement that the defendant have actively engaged in misconduct for equitable tolling to apply to a limitations period. Valdez ex rel. Donely v. United States, 518 F.3d 173, 182-83 (2d Cir. 2008). The wrong itself, such as fraud committed by a defendant, can be self-concealing, not requiring any further misconduct by a defendant to confound the plaintiff in his effort to discover his or her claim.
[11] The Government made a request to the Cyprus Central Authority pursuant to the relevant Mutual Legal Assistance Treaty ("MLAT") in force between Cyprus and the United States on September 27, 2002, which included a request for documents from Bank of Cyprus relevant to the AremisSoft fraud. The Cyprus Central Authority replied to the MLAT by producing documents in December 2003, which included the account documents for some of Kyprianou's accounts at Bank of Cyprus. At no time earlier than December 2003 could the Government reasonably have comprehended Bank of Cyprus' complicity in the AremisSoft fraud. Therefore, at no time earlier than December 2003 could the Government's money laundering claims have first accrued under 28 U.S.C. § 2462.

On this Rule 12(b)(6) motion, the Complaint is clearly not barred on its face. Once it is time for the facts of the case to be explored, there will undoubtedly be fact issues on purposeful fraudulent concealment by Bank of Cyprus. When the Cyprus Central Authority replied to the Mutual Legal Assistance Treaty request in December 2003, not all of Kyprianou's accounts at Bank of Cyprus were disclosed. Such failure to candidly disclose all Kyprianou accounts at Bank of Cyprus obstructed the Government from discovering the money laundering activities at an earlier point in time. Having obstructed the Government from discovering its money laundering activities at an earlier point in time, Bank of Cyprus stands in no position before this Court to ask that a time bar be applied to the Government's claims.

## IV. THE GOVERNMENT DOES NOT FAIL TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6) AS TO THE 2003 TRANSACTIONS

### A. The Government Sufficiently States a Claim With Respect to the 2003 Transactions.

Defendant argues that the Government failed to allege (1) that the 2003 transactions involved proceeds derived from specified unlawful activity; (2) that by executing the transactions, the Bank intended to disguise the source of the funds and had knowledge that the funds derived from specified unlawful activity; (3) that by executing the transactions, the Bank intended further to promote the AremisSoft fraud; (4) that there were any transfers to or from the United States as required under 18 U.S.C. § 1956(a)(2); and (5) that a conspiracy took place after the limitations date. As an initial matter, Bank of Cyprus is once again attempting to deflect the focus from the overall conspiracy to commit money laundering in furtherance of the AremisSoft fraud by shining a spotlight on each separate transaction. Notwithstanding this narrow perspective of the facts as pled, the Government has more than adequately stated a claim with respect to the 2003 transactions.

1.  The 2003 Transactions Involved Proceeds
    Derived From Specified Unlawful Activity.

The 2003 transactions involved proceeds derived from specified unlawful activity because they were set forth as part of an overall chart listing one hundred seven (107) transactions, all of which were alleged as $162,000,000 of the proceeds of the fraud. Complaint ¶ 41. It is improper to parse the money laundering claim for purposes of Rule 12(b)(6) by focusing on each transaction on a stand-alone basis. Defendant improperly isolates the eight 2003 transactions, and argues that all of the other transactions are time-barred. This is incorrect. The 2003 transactions are pled as part of the unified scheme to launder the proceeds of the fraud. All transactions in the scheme are actionable. Further, as plainly alleged in the Complaint ¶¶ 79-81, Kyprianou's Bank of Cyprus (UK) accounts were funded from the proceeds of Kyprianou's frauds. In fact, as alleged in the Complaint, the Bank of Cyprus (UK) accounts were funded by transfers from Kyprianou's HSBC accounts. Id. These Kyprianou HSBC accounts were funded by proceeds of the fraud, such as the approximately $2,000,000 funneled from the AremisSoft account through the Semark account at Bank of Cyprus (Cyprus) and the approximately $9,000,000 funneled from the AremisSoft account through the Southwood account at Bank of Cyprus (Cyprus). Complaint ¶¶ 76, 65.

2.  The Bank of Cyprus Intended to Disguise the Source of the Funds and
    had Knowledge that the Funds Derived from Specified Unlawful Activity.

Ironically, it seems to be the churning of the funds through the various accounts at Bank of Cyprus and other banks that has stumped Bank of Cyprus as to the connection of the 2003 transactions to the underlying fraud because Bank of Cyprus and Kyprianou were so successful at designing transactions to "conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity." 18 U.S.C. § 1956. Throughout the

33

Complaint, the Government alleges Bank of Cyprus' knowledge and participation in laundering the proceeds of this fraud applies as much to the 2003 transactions as to any of the other 100 transactions because its managers had full knowledge that the funds being transferred to Kyprianou's Bank of Cyprus accounts were proceeds of the AremisSoft fraud. Complaint ¶¶ 82-95. For example, also in October 2001, Bank of Cyprus (UK) was directed to process a transfer of funds from one of Kyprianou's accounts to one of his accounts at Lloyds without showing the remitter's name. Complaint ¶ 83. Bank of Cyprus complied with this instruction, thus acting to conceal Kyprianou's fraud. Id. Despite its documented internal concerns and the NCIS reporting, Bank of Cyprus chose to continue to assist Kyprianou to conceal the origins of the transfers rather than stop the unlawful activity through and including the transactions in 2003. Complaint ¶¶ 77, 82.

### 3.     The Bank of Cyprus Further Intended to Promote the AremisSoft Fraud.

Defendant makes a another attempt at misdirection by arguing the *non sequitur* that, because the AremisSoft fraud was exposed in 2001, the transactions in 2003 could not plausibly have been conducted to promote the carrying on of that fraud as required by Sections 1956(a)(1)(A) and (a)(2)(A). It is Bank of Cyprus' willingness to continue permitting and assisting with transactions after the fraud went public that further supports the Government's allegations that Bank of Cyprus was fully aware of its participation in laundering Kyprianou's fraudulent proceeds in furtherance of the AremisSoft fraud. It was after the fraud was publicized that Bank of Cyprus (UK) knowingly complied with Kyprianou's request to omit the remitter's name from a transfer of funds from a Kyprianou Bank of Cyprus (UK) account to a Kyprianou Lloyds account. Complaint ¶ 83. What was disclosed in 2001 was the illegality. But the Bank of Cyprus continued to launder the proceeds of that illegal activity through 2003. Indeed, after

34

its own documented concerns about the publicized fraud and Kyprianou's suspicious bank activity, Bank of Cyprus nevertheless continued to allow transfers out of the Kyprianou's accounts. Complaint ¶ 96. It is specious to claim, and Defendant cites no law to support such a claim, that once a specified unlawful activity is exposed to the public that such activity cannot continue to be promoted. The purpose of laundering the money through Bank of Cyprus was to promote the unlawful activity as much as to conceal or disguise the nature of its origin. 18 U.S.C. §§ 1956 (a)(1)(A)-(B) and (a)(2)(A)-(B).

4.    The Complaint Adequately Alleges Transfers in 2003 to or from the United States as Required Under 18 U.S.C. § 1956(a)(2).

Defendant further argues that the Government's Complaint does not allege any facts that the 2003 transactions involved the transfer of funds "from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States," as required for a violation of 18, U.S.C. § 1965(a)(1)(2). D.Br. at 30. Again, the 2003 transactions were set forth as part of an overall chart listing one hundred seven (107) transactions, all of which were alleged to involve the laundering of millions of dollars of the proceeds of the specified unlawful activities Kyprianou engaged in. Complaint ¶ 41. To shine the spotlight on individual transactions is to conveniently ignore the overall scheme, which includes transfers to and from the United States. In fact, the Government plainly alleges the transfer of $7,100,000 from the AremisSoft Commerce Bank account in New Jersey to the AremisSoft Bank of Cyprus account, the purpose of which was to create the necessary illusion of cash flow in furtherance of the Denon fraud. Complaint ¶ 59. Another $6,000,000, this time proceeds of the insider trading fraud, originating in an account in New York was transferred to the AremisSoft Bank of Cyprus account at the direction of Poyiadjis. Complaint ¶ 67. Both of these transactions contributed to the overall continuing scheme perpetrated by Bank

35

of Cyprus, Kyprianou and Poyiadjis, which included the churning of funds via over 100 transactions, including the 2003 transaction, in and among the multitude of Kyprianou beneficially owned accounts at Bank of Cyprus.  By definition, the monies stolen from U.S. investors could not have been laundered in foreign banks without having been transferred overseas, thus placing the conduct, including the 2003 transactions, squarely within Section 1956(a)(1)(2); see also United States v. Dinero Express, Inc., 313 F.3d 803, 807 (2d Cir. 2002) (holding that "a course of conduct that begins with a sum of money located in one country and ends with a related sum of money located in another may constitute a 'transfer' for purposes of Section 1956(a)(2)"); United States v. Piervinanzi, 23 F.3d 670, 678 & n.6 (2d Cir. 1994) (holding that "'transportation' includes wire transfers of funds).

> 5.    The Complaint Sufficiently Alleges that a
>       Conspiracy Continued to Take Place in 2003.

The 2003 transactions are part of the overall scheme, which the Bank participated in, even after the disclosure of the illegal activity in 2001.  Accordingly, the claims for conspiracy under section 1956(h) are sufficiently pled.

In sum, the Government's Complaint amply provides what is required of the plaintiff under the Federal Rules of Civil Procedure: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

## CONCLUSION

For these reasons, the Government respectfully requests that this Court DENY the

Defendant's Motion to Dismiss.

Dated:        New York, New York
              April 23, 2008

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America


By: _____
                              RUA M. KELLY (MA-643351)
                              Assistant United States Attorney
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Telephone:  (212) 637-2471
                              Facsimile:  (212) 637-0421