HUGHES HUBBARD & REED LLP
John Fellas
Marc A. Weinstein
Sarah L. Cave
Hagit Elul
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)

*Attorneys for Defendant Bank of Cyprus Public Company Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| -against- | Index No.:  07 CIV 9234 (CSH) |
| BANK OF CYPRUS PUBLIC COMPANY LIMITED, | |
| Defendant. | |

**DEFENDANT BANK OF CYPRUS PUBLIC COMPANY LIMITED'S**
**REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................................ 1

Argument ..................................................................................................................................... 2

I.     THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT
       MATTER JURISDICTION ................................................................................................ 2

       A.     The MLCA Cannot Be Applied Extraterritorially To The Bank's Wholly
              Foreign Conduct Based On The Government's Unpled Conspiracy Theory ......... 2

       B.     Applying the MLCA Extraterritorially To The Foreign Activities Of The
              Bank Would Be Unreasonable .............................................................................. 5

II.    THE GOVERNMENT'S CLAIMS FOR THE 99 PRE-2003 TRANSACTIONS
       ARE TIME-BARRED ......................................................................................................... 7

       A.     The Limitations Period Under Section 2462 Governs This Action ........................ 8

       B.     There Is No Basis To Toll The Limitations Period .............................................. 11

III.   THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE
       2003 TRANSACTIONS ................................................................................................... 13

Conclusion ................................................................................................................................ 18

## TABLE OF AUTHORITIES

Page(s)

## CASES

*3M Company v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994)......................................................7, 8, 11

*American Medical Ass'n v. United Healthcare Corp.*, 2006 WL 3833440 (S.D.N.Y. Dec. 29, 2006)......................................................................................................................13

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...............................................................2, 7

*Blusal Meats, Inc. v. United States*, 638 F. Supp. 824 (S.D.N.Y. 1986) ................................8, 9, 10

*Butala v. Aghasiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996) .............................................................12

*Conley v. Gibson*, 355 U.S. 41 (1957) ...............................................................................................7

*Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998).............................................................................................................................7

*Fed. Election Comm'n v. Williams*, 104 F.3d 237 (9th Cir. 1996) ................................................11

*Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S. A.*, 606 F.2d 5 (2d Cir. 1979)...........................................................................................................7

*Ford v. United States*, 273 U.S. 593 (1927)......................................................................................4

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) .................................................................12

*Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999)................................................................7

*Jones v. Coughlin*, 665 F. Supp. 1040 (S.D.N.Y. 1987)............................................................9, 10

*LaSala v. Bank of Cyprus*, 510 F. Supp. 2d 246 (S.D.N.Y. 2007)...................................................6

*In re Maxwell Communication Corp. Plc.*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2nd Cir. 1996).............................................................................................................5, 7

*Nat'l Group for Communications and Computers Ltd. v. Lucent Technologies Inc.*, 420 F. Supp. 2d 253 (S.D.N.Y. 2006)......................................................................................13

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988)............................................11

*S.E.C. v. Alexander*, 248 F.R.D. 108 (E.D.N.Y. 2007).................................................................11

*S.E.C. v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) .................................................................12

## TABLE OF AUTHORITIES
(Continued)

Page(s)

*Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980) ......................................................9, 10

*State of New York v. Cedar Park Concrete Corp.*, 684 F. Supp. 1229 (S.D.N.Y. 1988) ..............13

*Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236 (S.D.N.Y. 2003) .............................9

*In re Towers Financial Corp. Noteholders Litigation*, 1996 WL 393579 (S.D.N.Y. July 15, 1996)........................................................................................................................16

*Trawinski v. United Technologies*, 313 F.3d 1295 (11th Cir. 2002) ...........................................11

*United States v. Bodmer*, 342 F. Supp. 2d 176 (S.D.N.Y. 2004)...................................................4

*United States v. Cabrales*, 524 U.S. 1 (1998)................................................................................3

*United States v. Columba-Colella*, 604 F.2d 356 (5th Cir. 1979) ................................................3

*United States v. Dinero Express, Inc.*, 313 F.3d 803 (2d Cir. 2002) ...........................................16

*United States v. Inco Bank & Trust*, 845 F.2d 919 (11th Cir. 1988) .............................................4

*United States v. Kramer*, 73 F.3d 1067 (11th Cir. 1996)...............................................................4

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002)...............................................................17

*United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002) ..............................................................10

*United States v. Ohio*, 614 F.2d 101 (6th Cir. 1979) ....................................................................5

*United States v. Sadighi*, 199 F.3d 1334 (9th Cir. 1999) ..............................................................4

*United States v. Santos*, 128 S. Ct. 2020 (2008) .........................................................................18

*United States v. Stein*, 1994 WL 285020 (E.D. La. June 23, 1994)...............................................4

*United States v. Tarkoff*, 242 F.3d 991 (11th Cir. 2001) ..............................................................4

*Valdez ex rel. Donely v. United States*, 518 F.3d 173 (2d Cir. 2008)..........................................12

*Wood v. Carpenter*, 101 U.S. (11 Otto) 135 (1879) ...................................................................12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)..........................................9

## STATUTES AND RULES

18 U.S.C. § 1956(a)(1)(A)(i) ........................................................................................................17

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

18 U.S.C. § 1956(b) ............................................................................................4, 9, 17

18 U.S.C. § 3282.............................................................................................................8

28 U.S.C. § 2462.............................................................................................7, 8, 11, 12

Fed. R. Civ. P. 9(b) .....................................................................................................12

Fed. R. Civ. P. 12(b)(6)...........................................................................................7, 9, 14

**MISCELLANEOUS**

Restatement of (Third) of Foreign Relations § 403 (1987) .........................................5, 6

Defendant Bank of Cyprus Public Company Limited (the "Bank") respectfully submits this Reply Memorandum of Law in support of its Motion to Dismiss the complaint.

## Preliminary Statement

There are two decisive obstacles to the government's case: the government is trying to apply U.S. money laundering law well beyond its extraterritorial reach and to transactions that took place well before the expiration of the statute of limitations.

The first obstacle involves the government's unprecedented use of the civil money laundering statute to seek damages for transactions that took place outside of the U.S. Indeed, in a recent press release, the government acknowledged the unprecedented nature of this action, highlighting its "novel" use of the civil money laundering statute in bringing this suit against the Bank and the related one against Lloyds.[1]  And in its opposition papers, the government does not deny that each of the 107 transactions on which it bases its claim for $162 million in damages involved transfers to and from bank accounts outside of the United States. As a result, the government does not, because it cannot, argue that the MLCA should apply to those foreign transactions on the ground that the Bank engaged in any conduct in the United States with respect to a single one of them.  Rather, it asserts that the MLCA should apply to those 107 transactions because of conduct by the Bank's purported co-conspirators in connection with two entirely separate acts that took place in furtherance of the underlying AremisSoft fraud, a fraud in which the Bank is not alleged to have been involved.  The government cites no authority that such a sweeping application of U.S. money laundering law to these 107 wholly foreign transactions may hinge on so slender a basis, and offers no plausible argument to rebut the assertion that, in any case, it would not be reasonable to do so.

---

[1]     Exhibit 1 to the Reply Declaration of John Fellas dated June 20, 2008 ("Fellas Reply Decl.").

The second fundamental problem with the government's case is that the application of the five-year statute of limitations for civil penalty actions to this case renders 99 of the 107 transactions for which the government claims damages time-barred. And although the government goes through convoluted efforts to avoid the preclusive effects of the statute of limitations — by arguing, for example, that the statute of limitations for criminal actions should apply to this undeniably civil action — its arguments are all without merit.

Moreover, the government's attempts to save its claims with respect to the remaining eight of the 107 claims that took place after September 7, 2002 are likewise futile. While the government accuses the Bank of putting its claims under a "microscope" or a "spotlight," one needs neither device to tell that, under the applicable standards set forth in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the government's allegations with respect to those eight transactions cannot survive a motion to dismiss.

## Argument

## I.  THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

### A.  The MLCA Cannot Be Applied Extraterritorially To The Bank's Wholly Foreign Conduct Based On The Government's Unpled Conspiracy Theory.

The slender peg on which the government hopes to hang its claim of extraterritorial jurisdiction rests not on any act of the Bank in the United States in connection with the 107 transactions for which the government seeks $162 million in damages. Rather, notwithstanding that the Bank is not alleged to have played any role in the underlying AremisSoft securities fraud, the government rests its jurisdictional claims on two acts by supposed co-conspirators alleged to be part of that underlying fraud.

2

The first alleged act was carried out by Roys Poyjiadis (Opp. at 13), who is nowhere alleged in the complaint to be a co-conspirator of the Bank.[2] This particular act is not alleged to be part of any money laundering conspiracy, but only that it was "in furtherance of the conspiracy to defraud AremisSoft." (Compl. ¶ 59.) The same goes for the second of the two acts relied upon by the government: like the first, it is not one of the 107 on which the government bases its claim for damages; like the first, it involved no conduct by the Bank in the United States; and, like the first, it is not alleged to be part of any money laundering conspiracy. Rather, the complaint alleges that on March 16, 2001, "in furtherance of his [sic] fraud and illegal insider trading," proceeds of insider trading by Poyjiadis and Kyprianou were transferred from Brown Brothers Harriman & Co. (*Id.* ¶ 67.)

These two acts, which are alleged to have been carried out in furtherance of the AremisSoft fraud, cannot, as a matter of law, establish extraterritorial jurisdiction under the MLCA over separate alleged money laundering transactions that took place outside of the U.S. In *United States v. Cabrales*, 524 U.S. 1 (1998) (*cited in* Bank Mem. at 11), for reasons equally applicable here, the Supreme Court held that the location of the underlying unlawful activity is irrelevant in determining where the money laundering offense took place for the purpose of establishing venue under the MLCA. *Cabrales*, 524 U.S. at 7 (recognizing that sections 1956 and 1957 "interdict only the financial transactions ... not the anterior criminal conduct that yielded the funds allegedly laundered.") *Cf. United States v. Columba-Colella*, 604 F.2d 356, 359 (5th Cir. 1979) (reversing for lack of subject matter jurisdiction British defendant's conviction for receiving stolen vehicle in Mexico, where all defendant's conduct occurred in Mexico and defendant was not alleged to have participated in the underlying U.S. theft).

---

2    The conspiracy count alleges only that "Bank of Cyprus and Kyprianou unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other. . ." (Compl. ¶ 121; *id.* ¶¶ 122-125.)

3

The money laundering cases relied on by the government are inapposite because they involved either the conduct of U.S. citizens who, unlike the Bank, are undisputedly subject to extraterritorial jurisdiction under the MLCA, or conduct in the U.S. in furtherance of money laundering.[3] (Opp. at 13-16 (citing cases).)  None involved a purported conspiracy between a foreign citizen (Kyprianou) and a foreign entity (the Bank) to launder money via transactions occurring entirely abroad (in London and Cyprus) as alleged here in the complaint.  *Cf. United States v. Kramer*, 73 F.3d 1067 (11th Cir. 1996) (reversing money laundering conviction where the defendant participated only in the transfer of money from Switzerland to Luxembourg).

The two examples cited in the legislative history of the MLCA are likewise of no assistance to the government.  Unlike here, each example involved conduct in furtherance of money laundering by the defendant in the United States:  (1) a defendant in the U.S. transferring money from a U.S. bank to a foreign bank, or (2) a defendant arranging, while in U.S. territory, a transaction between two foreign banks.  *See* S. Rep. No. 99-433, at 14.

Finally, the government's attempt to base its claim of extraterritorial jurisdiction on the personal jurisdiction provisions of the MLCA is misplaced.  (Opp. at 16, 17 n.3 (citing 18 U.S.C. § 1956(b)(2).)  That the MLCA provides for personal jurisdiction over a bank having a correspondent banking relationship in the U.S. is distinct from the issue of whether there is

---

3    *See United States v. Tarkoff*, 242 F.3d 991 (11th Cir. 2001) (involving money laundering by a U.S. citizen); *United States v. Sadighi*, 199 F.3d 1334 (9th Cir. 1999) (unpublished opinion) (jurisdiction over non-citizen involved in conspiracy with U.S. citizen where money laundering transactions took place in Los Angeles and New York); *United States v. Inco Bank & Trust*, 845 F.2d 919 (11th Cir. 1988) (money laundering conspiracy involving transportation of money by plane from Florida to Cayman Islands); *United States v. Bodmer*, 342 F. Supp. 2d 176 (S.D.N.Y. 2004) (indictment alleging wire transfers from a New York bank as overt acts in furtherance of money laundering conspiracy) (*see* Fellas Reply Decl. Ex. 2: indictment in *U.S. v. Bodmer*, 03 cr. 947 (Aug. 5, 2003) at ¶ 27); *United States v. Stein*, 1994 WL 285020 (E.D. La. June 23, 1994) (alleging transfer of funds from New Orleans to London in violation of MLCA). *Ford v. United States*, 273 U.S. 593 (1927) (cited at Opp. 15) is also inapposite.  There the Supreme Court affirmed the conviction of foreign defendants for conspiracy to import alcohol into the U.S. where the co-conspirators committed conduct in the U.S. in furtherance of the conspiracy. *Id.* at 601.

subject matter jurisdiction, under a separate provision of the MLCA, with respect to foreign

banking transactions.

> **B.    Applying the MLCA Extraterritorially To The Foreign Activities Of The Bank Would Be Unreasonable.**

The government fails to show it is reasonable to apply the MLCA here.

First, in relying on the Bank's Consent to Jurisdiction,[4] the government confuses

the concept of personal jurisdiction with that of the reasonableness of applying U.S. laws to

conduct that took place abroad.  Even where a court has personal jurisdiction, it is an

independent question whether it is reasonable to apply U.S. law extraterritorially.  *See, e.g., In re*

*Maxwell Communication Corp. Plc.*, 186 B.R. 807 (S.D.N.Y. 1995) (holding bankruptcy law

should not be applied extraterritorially despite personal jurisdiction over defendants), *aff'd*, 93

F.3d 1036 (2nd Cir. 1996).  And this question is to be assessed by reference to the factors in the

Restatement (Third) of Foreign Relations § 403(1) (1987) which nowhere mention personal

jurisdiction.  (Bank Mem. at 15-17.)

Second, the government argues that it is reasonable for the MLCA to extend to

the foreign transactions here because its status *qua* government means that doing otherwise

would "relegate the United States' interest to that of any civil litigant[.]"  (Opp. at 18.)  But this

argument is flawed for two reasons.  As an initial matter, "[a]bstention from exercise of federal

jurisdiction is not improper simply because the United States is the party seeking the federal

---

4    The government accuses the Bank of disingenuity because it did not mention in its opening papers a Consent to
Jurisdiction that it signed 15 years ago in connection with opening a representative office in New York.  (Opp.
at 20.)  There is no mystery to why the Bank did not mention this Consent: no one at the Bank involved in this
case recalled that document signed 15 years ago.  In light of the Consent, the Bank concedes the point and
withdraws its motion to dismiss to the extent it is based on a lack of personal jurisdiction.

forum." *United States v. Ohio*, 614 F.2d 101, 104 (6th Cir. 1979).[5] Moreover, the government's attempt to differentiate itself from just "any civil litigant" is undercut by the undisputed fact that, under its Coordination Agreement with the Trustees, any recovery would go directly to the Trustees. (Bank Mem. at 3.) Nor does the government dispute the fact that its stated interest in securing a recovery for the Trustees can be pursued by the Trustees themselves in the Cyprus courts, which, as this Court found, is an adequate forum for their claims. *LaSala v. Bank of Cyprus*, 510 F. Supp. 2d 246, 255 (S.D.N.Y. 2007).

Third, the government argues that it is reasonable to apply the MLCA to foreign conduct on the theory that it has a strong interest in applying its own money laundering laws. (Opp. at 3, 18.) But this assumes precisely what is in issue, namely that it is reasonable to apply the MLCA extraterrorially in the first place. One of the Restatement factors is "the extent to which another state may have an interest in regulating the activity." Restatement (Third) of Foreign Relations § 403(2)(g) (1987). Here the government itself has acknowledged in its complaint that the Bank was subject to a rigorous scheme of money laundering laws in both Cyprus and England, where the alleged money laundering transactions took place, some as many as eight years ago. (Compl. ¶¶ 35-36.) There can be little doubt that those countries had a greater interest in transactions that took place within their borders than does the U.S. over long-ago concluded transactions that took place thousands of miles away. *See LaSala,* 510 F. Supp. 2d at 263 (finding that the U.S. interest "pales in comparison" to that of Cyprus). Moreover, the purported strength of the government's interest is belied by its inordinate delay in bringing these claims. In these circumstances it is not reasonable to extend the MLCA to transactions that took place in, and were regulated by the laws and institutions of, other countries that have a greater

---

5    Indeed, the commentary to section 403 of the Restatement on Foreign Relations explicitly contemplates its application to situations where the United States is bringing a criminal or civil action. *See* Restatement (Third) of Foreign Relations § 403 Comment (f) (1987).

interest than the U.S. in the conduct of banks operating within their borders. *Cf. Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London* 147 F.3d 118 (2d Cir. 1998) (finding it unreasonable to exercise jurisdiction under securities law over foreign defendant where activity took place principally abroad "particularly [] when the transaction is clearly subject to the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong."); *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S. A.*, 606 F.2d 5 (2d Cir. 1979) (declining jurisdiction over securities fraud because conduct in the United States was secondary or ancillary to the alleged fraud).

Finally, while the government seeks to hold the Bank liable for undertaking transactions after it reported its suspicions regarding Kyprianou to the English money laundering authorities, it does not dispute the fact that, under English law, the blocking of a transaction after the report of a suspicion can give rise to criminal liability under English law for the offence of tipping off. (Bank Mem. at 34.) It is not reasonable for the government to seek to apply the MLCA to transactions that took place in England, which, if not undertaken, could have attracted criminal liability under English law on the part of the Bank. *Cf. In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1050 (2d Cir. 1996) (holding it to be unreasonable to apply U.S. bankruptcy law to events in England where U.S. law would conflict with English bankruptcy law).

## II.    THE GOVERNMENT'S CLAIMS FOR THE 99 PRE-2003 TRANSACTIONS ARE TIME-BARRED.[6]

It is settled that the statute of limitations for civil penalty actions is five years, 28 U.S.C. § 2462, and that a cause of action for a civil penalty accrues at the date of the violation.

---

6    The government quotes from *Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999), for the standard to be applied to a 12(b)(6) motion in the context of the statute of limitations. (Opp. at 26.) But in the quoted language, the Second Circuit was discussing the now-repudiated standard for evaluating such a motion under *Conley v. Gibson*, 355 U.S. 41 (1957), a standard rejected by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). *Harris* can no more be relied upon than *Conley* itself.

As the court in *3M Company v. Browner*, 17 F.3d 1453, 1460 (D.C. Cir. 1994) explained:

> In an action for a civil penalty, the government's burden is to prove the violation; injuries or damages resulting from the violation are not part of the cause of action; the suit may be maintained regardless of damage. . . *Because liability for the penalty attaches at the moment of the violation, one would expect this to be the time when the claim for the penalty 'first accrued.'*

*Id.* at 1460 (emphasis added). Thus, a cause of action for each of the 107 transactions accrued on the date of the violation — that is, the date each transaction took place. As a result, the government's claims are time-barred with respect to the 99 of the 107 transactions that took place prior to September 7, 2002 — five years before the statute of limitations was tolled, and thus the relevant date for limitations purposes. (Bank Mem. at 22.)

In an attempt to get around the fatal effects of the statute of limitations, the government advances two arguments that not only are unsupported by any precedent, but also are inconsistent with settled law:  (i) the statute of limitations for criminal actions (18 U.S.C. § 3282) rather than for civil penalty actions (28 U.S.C. § 2462) should apply to this civil penalty action; and (ii) that even if the statute of limitations for civil actions did apply, the statute of limitations should be tolled.  These arguments are without merit.

### A.    The Limitations Period Under Section 2462 Governs This Action.

First, the government urges this Court to apply a criminal statute of limitations provision, 18 U.S.C. § 3282, to this civil penalty case, even though no court has ever done so. But it is settled that 28 U.S.C. § 2462 sets forth the limitations period for a civil penalty action. *See 3M Company,* 17 F.3d at 1461 (section 2462 is applicable to "the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise."). Whatever might be the law in the criminal context regarding "the last overt act" rule, courts have made plain that "the last overt act rule is not applicable to actions for civil conspiracy." *See, e.g., Blusal Meats,*

*Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986). Thus, the government is simply wrong to claim that there is "no precedent" for the proposition that "the last overt act" rule has no application in a civil context. (Opp. at 28.)

While the government relegates to a footnote its discussion of the relevant authorities on this issue cited by the Bank in its opening brief (Bank Mem. at 23-24), presumably in the hope of downplaying their significance — the government is incorrect in claiming that these cases relate only to "issues of damages calculation" or are not "persuasive authority on a motion to dismiss." (Opp. at 28 n. 8.) First, the cases are not, as the government suggests, about the mathematics of damages calculations, but rather make it clear that where the plaintiff is not entitled to recover any damages because a claim is time-barred, such claim cannot proceed as a matter of law. Second, contrary to the government's assertions, four of the five cases cited by the Bank arose in the context of pre-trial dismissal motions, in each case resulting in a dismissal of claims falling outside of the applicable limitations period.[7] *See, e.g., Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980) (affirming Rule 12(b)(6) dismissal of claims); *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236 (S.D.N.Y. 2003) (granting summary judgment on statute of limitations grounds); *Jones v. Coughlin*, 665 F. Supp. 1040 (S.D.N.Y. 1987) (dismissing claims alleged in a conspiracy "arising out of acts outside the [applicable] period"); *Blusal Meats*, 638 F. Supp. at 830 (granting summary judgment dismissing claims based on conspiratorial acts preceding the statute of limitations period and citing cases).[8]

---

[7] Only the Supreme Court's decision in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) addressed a post-judgment ruling (and then only because the defendant raised the statute of limitations defense only after the trial court rendered judgment). Nevertheless, nothing in that case remotely indicates that it does anything other than mandate dismissal of the portion of the government's claims accruing prior to the limitations period.

[8] Operating under the erroneous premise that issues of damages lack relevance on a motion to dismiss, the government proceeds in a futile attempt to distinguish the instant case from the civil penalty claims dismissed as time-barred in *Blusal Meats*. The government suggests that, unlike the claims in *Blusal* under the False

In any case, regardless of their procedural posture, these cases stand for the proposition that "no matter how recent" the last alleged act occurred, "violations committed outside the statute of limitations *cannot be brought* inside by an allegation of the existence of a conspiracy." *Jones,* 665 F.Supp. at 1044 (emphasis added); *see also Blusal Meats*, 638 F. Supp. at 830 ("The principle is well settled in this circuit that the occurrence of an act in furtherance of a civil conspiracy within the limitations period does not render every related but otherwise time barred conspiratorial act actionable.").

The government's reliance on another criminal case, *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002), to save its substantive counts (Counts I to IV) is equally unavailing. In *Moloney*, the Court did not address any statute of limitations issues, but, rather, the narrow issue of whether, in the circumstances of that case, the aggregation of multiple laundering transactions in a single criminal count even constituted a crime under the statute. Ignoring *Moloney*'s context and entirely distinct set of facts, the government claims that it can avoid the statute of limitations on the ground that "a single money laundering count can encompass multiple acts provided each act is part of a unified scheme." (Opp. at 29.) But whatever may be *Moloney*'s impact on a criminal statute of limitations analysis, it would not in any case apply to the civil context. As with civil conspiracy claims, the accrual dates for substantive civil claims based on a series of violations are the dates of each individual violation for which recovery is sought, not the date of the last violation in the series. *See Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir. 1980) ("Characterizing defendants' separate wrongful acts as having been committed in further of a conspiracy *or as 'a single series of interlocking*

---

Claims Act ("FCA") where the government "had to show it suffered damages," no such showing is required under Section 1956(b). (Opp. at 28 n. 8.) The court in *Blusal Meats* made clear, however, that under the FCA the government could recover a $2,000 civil penalty for each violation "in the absence of proof of damage to the United States." *See* 638 F. Supp. at 827. Section 1956(b) has a similar penalty provision permitting the U.S. to recover for the amount of each alleged laundering transaction or $10,000 per violation.

*events*' does not postpone the accrual of claims based on individual wrongful acts.") (emphasis added).

### B.    There Is No Basis To Toll The Limitations Period.

The government argues in the alternative that even if the statute of limitations for civil penalty actions (28 U.S.C. § 2462) does apply here, this Court should toll that statute by applying the discovery rule. (Opp. at 30.) The government cites no cases so holding,[9] and the only three Courts of Appeals to have addressed this issue have rejected the position the government urges this Court to adopt. *See Trawinski v. United Technologies*, 313 F.3d 1295, 1298 (11th Cir. 2002) (holding that discovery rule "has no place in a proceeding to enforce a civil penalty under a federal statute"); *3M Co.*, 17 F.3d at 1460-63 (same); *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996) (same).

As a last-ditch effort to avoid the statute of limitations, the government urges this Court to adopt the doctrine of fraudulent concealment, even though it failed to plead any elements of that doctrine in its complaint. This argument is equally unavailing. The doctrine tolls the statute of limitations only if the government sufficiently alleges that: (i) the Bank concealed the existence of the cause of action; (ii) the government did not discover the cause of action as a result of the concealment until a time within the five-year period; and (iii) the government's continuing ignorance was not attributable to lack of diligence on its part. *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Such allegations must be pled in the complaint, and must satisfy the standards of particularity for fraud claims under Fed. R. Civ. P. 9(b). *See, e.g.*, *Butala v. Aghasiwala*, 916 F. Supp. 314, 319-20 (S.D.N.Y. 1996). The

---

9    The government cites *S.E.C. v. Alexander*, 248 F.R.D. 108 (E.D.N.Y. 2007) (Opp at 30), to support application of a discovery rule here. In *Alexander*, however, not only did the court decline to decide the question of when the claim accrued, but also the court's focus was on whether the discovery rule should apply to *fraud* claims, which the instant case is not.

government, having failed to plead any of these prongs, argues that it satisfies the first prong of the three-part test on the ground that the offense of money laundering is "inherently self-concealing," even though it cites no case that has ever held that. This is both legally unprecedented, and, as demonstrated below, factually inapplicable.

First, even assuming that, in theory, a money laundering offense could be inherently self-concealing, it certainly was not here vis-à-vis the Bank. In allegedly participating in this offense, the Bank took no action to conceal its identity or role in the transactions at issue. For a crime to be self-concealing the defendant must have engaged in "some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that [was] designed to mask the cause of action." *S.E.C. v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007) (quotation omitted). *See also Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143 (1879) ("Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.")[10] In executing the funds transfers, the Bank made no effort to avoid detection of its identity, role or conduct. The complaint does not suggest otherwise.

Second, by the government's own allegations, on October 11, 2001 and again July 2, 2002 — both prior to the September 7, 2002 limitations date — the Bank notified the money laundering authorities in England of its suspicions about its supposed co-conspirator. (Compl. ¶¶ 85, 90, 92; Bank Mem. at 7.) Even if the doctrine of inherent self-concealment could even apply here, it certainly cannot apply to a case where the alleged money laundering conspirator has itself

---

10    The government's assertion raised for the first time in its opposition brief about its MLAT request (Opp. at 32) — which appears nowhere in the complaint — cannot be relied upon to save its claim. *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000). Moreover, the MLAT request does not support any inference that the Bank's conduct was self-concealing. The MLAT request was entirely independent of the Bank's alleged money laundering and thus not "inherent" to it, and, in any case, the government does not claim that the Bank engaged in any "trick" or "contrivance" in connection with that request.

openly reported suspicions about its purported co-conspirator to the appropriate money laundering authorities in the country in which it is operating.

Third, the complaint affirmatively alleges numerous other facts undercutting the government's ability to rely on the notion that any alleged money laundering was inherently self-concealing. The government alleges that "worldwide attention began to focus on AremisSoft for reporting fraudulently inflated income" in May 2001 as a result of an article in *The New York Times*, that the government began to investigate the AremisSoft fraud later that same year, that the SEC filed a civil action in October 2001, that the government indicted Poyiadijs in December 2001, that the government started a civil forfeiture action in March 2002, and that in June 2002, the government indicted Kyprianou, including specifically for allegedly money laundering through the Bank. (Compl. ¶¶ 11, 23, 24, 79; Fellas Decl. Ex. 3: Indictment in *United States v. Lycourgos Kyprianou et al.*, 01 cr. 1177 (S.D.N.Y.).) In light of the government's various actions before September 7, 2002, even if the alleged money laundering here was inherently self-concealing, it was certainly exposed *at the latest* by June 2002 when the government indicted the Bank's purported co-conspirator for allegedly laundering money through the Bank.[11]

## III.    THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE 2003 TRANSACTIONS.

The government cannot point to any facts in the complaint sufficient to state a claim as to any of the eight 2003 transactions. Instead, the government (i) ignores the

---

11    Nor has the government pled a single fact to satisfy the second and third prongs of the fraudulent concealment doctrine — that the Bank's concealment prevented discovery of the nature of the claim and the government's due diligence. *See American Medical Ass'n v. United Healthcare Corp.*, 2006 WL 3833440, at *11 (S.D.N.Y. Dec. 29, 2006) (rejecting tolling of limitations period for purportedly self-concealing offense based on failure to allege sufficient facts to establish second and third prongs); *Nat'l Group for Communications and Computers Ltd. v. Lucent Technologies Inc.*, 420 F. Supp. 2d 253 267 (S.D.N.Y. 2006) (granting motion to dismiss on statute of limitations grounds where second and third elements of fraudulent concealment were not pled); *State of New York v. Cedar Park Concrete Corp.*, 684 F. Supp. 1229, 1233 (S.D.N.Y. 1988) (granting motion to dismiss and rejecting claim of fraudulent concealment for failure to adequately allege ignorance and due diligence where state delayed bringing claim until three years after opening investigation).

appropriate legal standards and resorts to metaphors about "spotlights" and "microscopes," or (ii) reverts to relying on facts pre-dating the applicable limitations period or otherwise wholly conclusory allegations to support its claims. The Bank's focus on these eight transactions is entirely proper, as these transactions form the only possible basis for recovery in light of the staleness of all the alleged pre-2003 transactions. When considering the 2003 transactions, as the Court must, neither a spotlight nor a microscope is necessary to recognize the glaring deficiencies in the complaint.

      The Court need look no further than the first element required for the government to state a claim for Counts I to V — that the funds transferred were the proceeds of specified unlawful activity — to conclude that dismissal of all five counts is warranted. The 2003 transactions consist of eight transfers, all withdrawals from a specific UK account (ending in 0706), aggregating approximately $1 million. As noted in the Bank's opening papers, the complaint not only lacks any factual allegation regarding the criminal origin of these funds, but, also pleads facts that undermine the government's conclusory allegations of criminal origin. (Bank Mem. at 27.)[12]

      In response, the government contends that paragraphs 79 to 81 of the complaint contain allegations that the Bank UK account (0706) used for the 2003 transactions was "funded

---

12   Thus, as noted in the Bank's opening memorandum — the government acknowledges that before undertaking any of these transactions, the Bank reported its purported co-conspirator to the English money laundering authorities (NCIS). (Bank Mem. at 32-34.) The government's response that there is no evidence that the U.S. authorities were informed of these reports misses the point entirely. (Opp. at 28.) The Bank highlights these reports not to suggest knowledge on the part of the government, but to demonstrate the implausibility of the government's allegations for the purpose of assessing whether it has stated a claim. The eight 2003 transactions all involved accounts at the Bank UK in London, as did the two earlier transactions it reported to the NCIS. The fact that, before undertaking any of the eight transactions, the Bank UK reported its purported co-conspirator to the English authorities, which report could have triggered intrusive investigative and enforcement measures, undercuts the plausibility of the government's core allegation that the Bank was engaged in money laundering with respect to the eight transactions that took place after its reports. Indeed, NCIS had an arrangement in place to cooperate with the U.S. Financial Crimes Enforcement Network. (Bank Mem. at 33 and n. 23.)

from the proceeds of Kyrpianou's frauds." (Opp. at 33.) But those paragraphs support no such allegation. Paragraphs 79 to 81 merely allege that in August 2001, more than 16 months prior to the 2003 transactions in dispute, Kyprianou moved approximately $400,000 from accounts at HSBC to two *entirely separate* Bank UK accounts, identified elsewhere in the complaint as accounts ending in the numbers 2-750 and 4-750. (Compl. ¶ 41, Ex. 94 & 95.) As an initial matter, it is striking to note that, in its brief, the government points to HSBC as the beacon of responsible corporate citizenship for having allowed Kyprianou to transfer funds from HSBC to the Bank when HSBC ceased dealing with him. (Opp. at 10.) Yet, in the very next breath, it charges the Bank with money laundering for having received those *very same* funds from HSBC in the *very same* transactions. (Compl. ¶ 49, Ex. 94 & 95.)

But, more to the point, the allegations pointed to by the government to support its claim of money laundering with respect to the eight transfers in 2003 from account number 0706 at the Bank UK — that in August 2001 there were transfers from HSBC to account numbers 2-750 and 4-750 at the Bank UK — leave gaping holes in the government's allegations:

- There is not a single factual allegation of any deposit, much less deposits of criminal origin, into the property account (0706) from which the eight alleged money laundering withdrawals were made in 2003;

- There is not a single factual allegation that the funds deposited from HSBC into the other, different accounts (2-750 and 4-750) were subsequently transferred, in whole or in part, to the property account (0706) from which the eight withdrawals were made;

- Even assuming the government had pled facts to support an allegation that the HSBC funds were transferred into the property account, and that those were the funds subsequently withdrawn in 2003, that would account for only $400,000 of the approximately $1,000,000 alleged to have been laundered in 2003, leaving a shortfall of approximately $600,000.

Equally lacking (and thus equally and independently fatal to the government's claims) are factual allegations that the 2003 Transactions were designed either to conceal or

15

disguise (Counts I, III, and V), or to further promote Kyprianou's fraud (Counts II, III and V).[13]

With respect to the element of concealment for transactions in 2003, the government alleges a

single act — the Bank's purported compliance with Kyprianou's request to wire transfer £25,000

without showing the remitter's name *in October 2001*. (Opp. at 34; Compl. ¶¶ 83, 84.) But this

allegation is contradicted by the document the government quotes from in its complaint.

(Compl. ¶ 84.) Thus, the government neglects to point out that this very document states on its

face that the Bank informed Kyprianou's representative that it would *not* honor that request: "I

have informed Mr. Kyprianou's executive in UK that we can not effect above payment without

showing the remitter's name…" (Fellas Reply Decl. Ex. 4.)[14]  In any case, it defies logic that a

supposed act of concealment for a transfer *in 2001* could state a claim for concealment as to

eight separate funds transfers in 2003.

        But the problems with the government's claim of concealment do not end there.

The October 2001 transfer request was, as the complaint makes plain, one of the two transactions

that the Bank contemporaneously reported to the UK law enforcement authorities. (Compl. ¶¶

83-85.) Thus, even assuming this transfer bore any temporal relevance to the 2003 transactions

(which it does not), the Bank's report to English money laundering authorities of this very

transaction is inconsistent with an inference of intent to conceal.

---

13  As noted in the Bank's opening memorandum, Count III should be dismissed on the independent ground that
the government does not allege that the 2003 transactions involved a transfer of funds to or from the United
States. (Bank Mem. at 30-31). While the government yet again cites to the 2001 transactions (Opp. at 35-36),
it fails to identify *any single* allegation establishing *any* nexus between the 2003 transactions — which
involved the transfer of funds from Kyprianou's property account at the Bank UK to other bank accounts in
England — to any earlier transfer of funds to or from the United States. *United States v. Dinero Express, Inc.*,
313 F.3d 803 (2d Cir. 2002) (*cited in* Opp. at 36) is inapposite. There the Second Circuit held that a four-step
"course of conduct that begins with a sum of money located in one country and ends *with a related sum of
money* located in another" could constitute a single transaction in violation of the MLCA. *Id.* at 807 (emphasis
added); *see id.* at 804-05 (describing series of transfers as close in time and involving "same sum of money").

14  "[A] Court cannot accept as true an allegation in the complaint that is contradicted by the very document
referred to in the complaint." *In re Towers Financial Corp. Noteholders Litigation*, 1996 WL 393579, at *10
(S.D.N.Y. July 15, 1996) (citing cases).

In short, the government is urging this Court to credit conclusory allegations that are undermined by specific facts alleged in the complaint suggesting a far more plausible and obvious inference — that transactions in Kyprianou's own name in 2003 had no such design. (Bank Mem. at 29 (citing cases that open and routine transactions cannot be considered to be money laundering).) Moreover, the government's repeated assertion that the Bank knew in 2003 that it was doing business with a criminal does not equate to an intent to conceal the nature, source, or ownership of the funds transferred in 2003. *See United States v. LaSpina*, 299 F.3d 165, 174-75 (2d Cir. 2002) (rejecting government's view that scope of a conspiracy includes "any monetary transaction made by the conspirators" with the fraudulently obtained money, but rather includes only those transactions designed to further the original aims of concealing or disguising nature, source or ownership of proceeds).

The government's opposition also makes plain that its claims of promotional money laundering in 2003 (Counts II, III, and V) are not supported by any factual allegations. Other than the citing to the October 2001 transfer request, which for the reasons discussed above cannot assist it, the government simply resorts to conclusory allegations that the Bank "continued to launder the proceeds of that illegal activity through 2003" and that after the fraud was exposed and terminated,[15] the Bank "nevertheless continued to allow out transfers out of the Kyprianou's [sic] accounts." (Opp. at 34-35.) The government fails to plead how this alleged activity *promoted* the underlying terminated fraud.

---

15    The government alleges that Kyprianou carried on the AremisSoft fraud through two different schemes: insider trading and embezzlement of AremisSoft funds. (Compl. ¶¶ 8-9.) It is clear from the complaint that the AremisSoft fraud was terminated by governmental authorities well before the 2003 transactions. There was no insider trading because Nasdaq halted trading of AremisSoft stock some two years earlier on July 30, 2001. (Compl. ¶ 13.) And Kyprianou was no longer embezzling AremisSoft funds because he had resigned from the Company as of July 2001 (*id.* ¶ 13), AremisSoft had declared bankruptcy as of March 2002 (*id.* ¶ 15) and had been indicted for the fraud in July 2002 (*id.* ¶ 14).

Section 1956(a)(1)(A)(i) prohibits transactions conducted "with the intent to promote *the carrying on* of specified unlawful activity." (Emphasis added). Recently, a plurality of the Supreme Court construed this provision to mean "'[t]o contribute to the … prosperity' of something, or to 'further' something." *United States v. Santos*, 1228 S.Ct. 2020, 2027 (2008) (*citing* Webster's 2d, p. 1981: "[O]ne promotes 'the carrying on of' a gambling enterprise by merely assuring that it *continues in business.*" (emphasis added).) The government's attempt to allege promotional money laundering based on the 2003 transactions after the underlying AremisSoft fraud was discovered *and terminated* defies both logic and the plain terms of the MLCA.

## Conclusion

For the foregoing reasons and those set forth in the moving papers of the Bank, the complaint should be dismissed in its entirety and with prejudice.

Dated:    New York, New York
          June 20, 2008

HUGHES HUBBARD & REED LLP

By:_____
    John Fellas
    Marc Weinstein
    Sarah L. Cave
    Hagit Elul
    One Battery Park Plaza
    New York, New York 10004
    (212) 837-6000


*Attorneys for Defendant Bank of Cyprus
Public Company Limited*

60315187_1.DOC